RECEIPT # 4979 0
AMOUNT S
SUMMONS ISSUED
LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
BY DPTY. CLK. _mcr_
DATE _1-24-06_

Case 1:06-cv-10149-RGS   Document 1   Filed 01/24/06   Page 1 of 23

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| UNITED STATES OF AMERICA ) | |
| [UNDER SEAL], ) | CIVIL ACTION NO. |
| ) | |
| PLAINTIFF, ) | |
| ) | |
| v. ) | |
| ) | **FILED UNDER SEAL** |
| [UNDER SEAL], ) | **PURSUANT TO** |
| ) | **31 U.S.C. § 3730(b)(2)** |
| DEFENDANT. ) | |
| ) | |

# 06 - 10149 PBS

MAGISTRATE JUDGE _MBB_

**COMPLAINT**



**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

)                    CIVIL ACTION NO.
)
UNITED STATES OF AMERICA, *ex rel.*      )
ADAM B. RESNICK AND MAUREEN NEHLS,)
)
)                    **FILED UNDER SEAL**
PLAINTIFFS,          )                    **PURSUANT TO**
)                    **31 U.S.C. § 3730(b)(2)**
)
*v.*                 )
)
OMNICARE, INC., MORRIS ESFORMES,         )    JURY TRIAL DEMANDED
PHILLIP ESFORMES, and SAVASENIOR         )
HEALTHCARE, INC.,    )
)
DEFENDANTS.          )

# 06 - 10149 PBS

## COMPLAINT

Qui tam plaintiffs Adam B. Resnick and Maureen Nehls ("Relators") allege as

follows:

I.    INTRODUCTION

1.    This is an action to recover damages and civil penalties on behalf of the United

States of America arising from false statements and claims made or caused to be made by the

defendants to the United States and its agents and intermediaries in violation of the False Claims

Act, 31 U.S.C. §§ 3729 *et seq.* (the "FCA"). The false claims and statements at issue were made

or caused to be made by the defendants in connection with kickbacks and claims for payments

made for pharmaceutical products.

2.    Originally enacted in 1863, the FCA was substantially amended in 1986 by the

False Claims Amendments Act. The 1986 amendments enhanced the government's ability to

recover losses sustained as a result of fraud against the United States.

3.      The FCA provides that any person who knowingly submits or causes to be sub-
mitted to the government or recipients of federal funds a false or fraudulent claim for payment or
approval is liable for a civil penalty of between $5,000 and $11,000 for each such claim, and
three times the amount of the damages sustained by the government. The Act empowers persons
having information regarding a false or fraudulent claim against the government to bring an
action on behalf of the government and to share in any recovery. The original complaint must be
filed under seal, without service on the defendants. That complaint remains under seal while the
government investigates the allegations and determines whether to join the action.

4.      Pursuant to the FCA, relators seek to recover on behalf of the United States
damages and civil penalties arising from false and improper charges contained in claims for
payment that defendants submitted or caused to be submitted to the Medicare and Medicaid
programs.

5.      Defendant Omnicare, Inc. ("Omnicare") is a large institutional pharmacy that has
grown dramatically over the last several years by purchasing other smaller institutional pharm-
acies. One such purchase occurred in June 2004, when Omnicare, in conspiracy with Phillip and
Morris Esformes, violated the anti-kickback law in connection with Omnicare's purchase of
Total Pharmacy Services, LLC. As alleged below, the price paid to Total Pharmacy Services,
LLC grossly exceeded its fair market value. The inflated purchase price was in fact paid to
defendants Morris and Phillp Esformes, and others, to buy long term pharmacy contracts with a
number of nursing homes in violation of federal anti-kickback laws. Omincare also purchased at
least two other institutional pharmacies – Pharmco and Medistat – at inflated purchase prices to

$-2-$

"buy" contracts between the pharmacies and captive nursing homes. In addition, in 2005,

Omnicare made a substantial "loan" to Rubin Schron to enable Schron to purchase the nursing

home chain Mariner (now SavaSenior Healthcare, Inc). In return, Omnicare obtained contracts

for the Mariner homes. In each of these cases, the nursing home contracts obtained as a result of

Omnicare's improper payments allowed Omnicare to submit thousands of claims for reimburse-

ment to government-funded health care programs. As a result, the federal government paid

defendants and their co-conspirators substantial amounts that would not have paid had the truth

been known about defendants' and their co-conspirators' misconduct.

## JURISDICTION AND VENUE

6.     The Court has jurisdiction over the subject matter of this action pursuant to both

28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on

this Court for actions brought pursuant to 31 U.S.C. § 3730. Under 31 U.S.C. §3730(e), there

has been no statutorily relevant public disclosure of the "allegations or transactions" in this Com-

plaint. Each relator, moreover, would qualify under that section of the FCA as an "original

source" of the allegations in this Complaint even had such a public disclosure occurred.

7.     The Court has personal jurisdiction over the defendants pursuant to 31 U.S.C.

§ 3732(a), which authorizes nationwide service of process, and because the defendant Omnicare,

which conspired with each of the other defendants to violate the anti-kickback law and the FCA,

can be found in and transacts the business that is the subject matter of this lawsuit in the District

of Massachusetts.

8.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because defendant

Omnicare, which conspired with each of the other defendants to violate the Anti-Kickback law

$-3-$

and the False Claims Act, can be found and transacts the business that is the subject matter of this lawsuit in the District of Massachusetts.

## PARTIES

9.     Relator Adam Resnick brings this action against all defendants on behalf of himself and the United States Government pursuant to 31 U.S.C. § 3730(b)(1). Relator Maureen Nehls brings this action against defendants Omnicare, Morris Esformes and Phillip Esformes, for the allegations set forth in paragraphs 1-73 and 80-98 below, on her own behalf and on behalf of the United States.

10.    Relators are residents of Illinois.

11.    Defendant Omnicare, Inc., headquartered in Covington, Kentucky, is a provider of pharmaceutical care for the elderly. Omnicare serves approximately 1.4 million residents in long-term care facilities and other chronic care settings across the United States (including Massachusetts) and in Canada. It is the largest U.S. provider of pharmacy services to nursing home residents. As a result of the fraudulent transactions alleged herein and similar transactions into which it likely also has entered (based upon its pattern of behavior of which relators are personally aware), Omnicare has gained market share that has allowed it to increase volume discounts that it receives from pharmaceutical manufacturers and wholesale distributors and thus reap additional profits for its sales of pharmaceutical services to nursing homes throughout the country.

12.    Defendant Morris Esformes resides in Illinois and Florida. Morris Esformes owns and manages nursing homes in Florida and Illinois.

13.    Defendant Phillip Esformes is the son of Morris Esformes. Phillip Esformes is a

– 4 –

resident of Florida. Phillip Esformes owns minority portions of nursing homes, and is actively involved in the operations and financial management of nursing homes owned or controlled by his father.

14.     Defendant SavaSenior Health Care, Inc. ("Sava"), headquartered in Marietta, Georgia, was formerly Mariner Health Care. Sava operates more than 250 nursing homes, including homes in Amesbury, New Bedford, and Menthuen, Massachusetts.

## **BACKGROUND**

15.     Medicare is a federally-funded health insurance program primarily benefitting the elderly. Medicare Part A, the Basic Plan of Hospital Insurance, covers the cost of inpatient hospital services and post-hospital nursing facility care.

16.     Nursing facilities typically contract with an institutional pharmacy to provide the drugs and other pharmaceutical products needed by their patients -- whether Medicare, Medicaid, or private pay.

17.     Since 1998, Medicare has paid skilled nursing facilities ("SNF's") under a prospective payment system ("PPS"). Under PPS, Medicare pays a fixed fee per patient per day based upon the acuity of each patient's condition. That fixed fee covers the pharmaceutical products provided to the patients. For Medicare patients, a contract between an institutional pharmacy and a nursing home would typically provide that the pharmacy would supply all necessary drugs for a set rate. Thus, the pharmacy bears the risk of excessive drug costs.

18.     In contrast, prescription drugs for Medicaid patients (who make up a majority of the patients at most nursing homes) are typically billed to the Medicaid program by the pharm-

acy. The reimbursement levels are set for each drug by the relevant state Medicaid program.

19.     The federal health care Anti-Kickback statute, 42 U.S.C. §1320a-7b(b), arose out of Congressional concern that payoffs to those who can influence health care decisions will result in goods and services being provided that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population. To protect the integrity of federal health care programs from these difficult-to-detect harms, Congress enacted a prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback actually gives rise to overutilization or poor quality of care.

20.     The Anti-Kickback statute prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending or arranging for the purchase of any item for which payment may be made under a federally-funded health care program. 42 U.S.C. §1320a-7b(b). Under this statute, health care companies may not offer or pay – and sources of patient referrals may not solicit or receive – any remuneration, directly or indirectly, overtly or covertly, that is intended to induce the purchase, order or recommendation of any good, facility, service, or item that may be paid for, in whole or part, by a federal health care program. The law thus prohibits any kind of payment by a pharmacy company to a nursing home or its principals or agents, in cash or kind, that has as one of its purposes inducement of the nursing home to purchase prescriptions of the company's pharmaceutical products.

21.     Pursuant to its authority under that Act, the Department of Health and Human Services ("HHS") has delineated exceptions to application of the Anti-Kickback statute for, among other things, certain kinds of investment interests that HHS has concluded do not signifi-

– 6 –

cantly implicate the policy concerns underlying the Act. See 42 C.F.R. § 1001.952. Those

exceptions, however, are narrowly tailored so as not to permit improper economic inducements

to be disguised as unproblematic investment mechanisms. An entity whose activity otherwise

would be covered by the broad, remedial language of the proscriptions under the Act is exempted

from liability for such conduct only if investment interests and conduct meet all of the applicable

standards set forth in the regulations for one of the three categories of investment exceptions that

HHS has approved. Id., at § 1001.952(a). Thus, in the category most relevant to this matter, an

entity that possesses investment interests held by active or passive investors who stand to gain

from health care sales of the entity can find safe harbor from the proscriptions of the Anti-

Kickback statute only to the extent that it meets all eight applicable standards set forth in 42

C.F.R. § 1001.952(a)(2). Most notably, these include the requirement that no more than 40% of

the value of each class of the investment interests may be held in the year prior to the transaction

at issue "by investors who are in a position to make or influence referrals to . . . or otherwise

generate business for the entity," and that no more than 40% of the entity's gross revenue relating

to furnishing of health care items or services in the prior year my come "from referrals or

business otherwise generated from investors." Id., at §§1001.952(a)(2)(i) & (vi).

22.     Violation of the Anti-Kickback statute subjects the violator to exclusion from

participation in federal health care programs, civil monetary penalties, and imprisonment of up to

five years per violation.  42 U.S.C. §§1320a-7(b)(7), 1320a-7a(a)(7).  These civil monetary

penalties may be up to $50,000 for each act in violation of the Anti-Kickback statute and dam-

ages of up to three times the amount of the remuneration offered or paid. 42 U.S.C. §1320a-7(b).

23.     Compliance with the Anti-Kickback law is a precondition to participation as a

– 7 –

health care provider under the Medicaid, CHAMPUS/TRICARE, CHAMPVA, Federal
Employee Health Benefit Program, and other federal health care programs.

24.    The enactment of these provisions demonstrates Congress's commitment to the
fundamental principle that federal health care programs will not tolerate the payment of kick-
backs. Thus, compliance with the Anti-Kickback statute is a prerequisite to a provider's right to
receive or retain reimbursement payments from Medicaid and other federal health care programs.
Reimbursement is also prohibited by the general legal principle that providers who are corrupt or
unethical or violate the integrity of a government program involving government funds are not
entitled to payment from the public fisc for the resulting claims.

## ALLEGATIONS
### Total Pharmacy Transaction

25.    In mid-2002, Tim Dacy, Bruce Paler, and Phillip Esformes organized a limited
liability company named Total Ancillary Services, LLC ("TAS"). Dacy owned 51%, defendant
Phillip Esformes owned 40%, and Bruce Paler owned 9%. At that time, defendants also created
Total Pharmacy (later known as Total Pharmacy, Illinois) as a wholly-owned subsidiary of TAS
to provide pharmaceutical products to nursing homes. Later, TAS created Total Pharmacy of
Florida and Total Pharmacy of Illinois (collectively "Total Pharmacy").

26.    Phillip Esformes's stake in TAS was offered as a way to generate business with
nursing homes owned by Phillip's father Morris Esformes. Phillip Esformes also had a minority
ownership share in some of those homes.

27.    Relator Nehls was hired by Paler in 2002 to serve as the Vice President of

− 8 −

Pharmacy Operations. When recruited for the job, Nehls was told by Paler that Morris Esformes wanted his own pharmacy for his nursing homes so that he could control costs. Nehls ,who was reluctant to leave her current employer, was assured that Total Pharmacy was a long term venture.

28.     Tim Dacy told relator Resnick that Phillip Esformes was paid $100,000 a month by TAS. Nehls was aware that substantial payments were made each month from TAS to Phillip Esformes. In return, all of the Esformes homes began purchasing drugs from Total Pharmacy for their patients, many of whom were Medicare and/or Medicaid beneficiaries. These Esformes-owned facilities were: Bourbonnais Terrace; Kankakee Terrace; Joilet Terrace; Lake Park Center; Terrace Nursing Home, LLC; West Chicago Terrace; Woodside Extended Care; Brunham Healthcare Properties; LLC, Community Care Center; Crestwood Terrace; Emerald Park; Frankfort Terrace; and Presidential Pavilion LLC. Morris Esformes insisted that each contract be signed by the manager of the nursing facility since he did not want his name appearing on contracts with Total Pharmacy.

29.     In addition, Morris Esformes obtained one-year contracts for Total Pharmacy with several nursing homes where he had some substantial financial relationships. These included Victorian Manor; Hillside Healthcare; and Terrace North.

30.     Morris Esformes also had sufficient influence over several other nursing homes to force those homes to switch from their current pharmacy and, instead, give one year contracts to Total Pharmacy. These homes were Doctors Nursing & Rehabilitation Center, LLC; Kankakee Nursing & Rehabilitation Center; Douglas Rehabilitation & Care Center; and Palos Hills

– 9 –

Extended Care LLC.

31.     Total Pharmacy never did any marketing, nor did it seek out customers. Instead, 100% of its business came through Morris Esformes.

32.     It was apparent to relator Nehls that the professional staff at the homes identified in the preceding paragraphs were unhappy with being forced to switch pharmacy providers.

33.     In 2003, Total Pharmacy opened operations in Florida where Morris Esformes also owned a number of homes. Again, all of the business Total Pharmacy did in that state was with homes owned or controlled by Morris Esformes. Total Pharmacy had one-year contracts with the Morris Esformes' homes. (One-year contracts are the norm in the industry.) Again, Morris Esformes insisted that these contracts be between Total Pharmacy and the individual homes and that they be signed by an official at each home.

34.     The Total Pharmacy customers in Florida included Bradford Terrace; Fairhaven; Harmony Center at Greenbriar; Nursing Center at Mercy; Oceanside; Wooland-Alachua; Woodland-Citrus; Woodland-Deland; and Southpoint Terrace.

35.     Morris Esformes was in continual contact with Paler and provided Paler with substantial direction concerning the pharmacy's operations. Paler (and occasionally Phillip Esformes) relayed these directions (which included such matters as formulary decisions and financial arrangements) to Nehls as she ran the pharmacy. Morris Esformes constantly demanded substantial payments from TAS. Sometimes these payments came in the form of charitable contributions made at his directions. Other times, he demanded that Total Pharmacy write off amounts owed by his nursing homes. He also required that Total Pharmacy make

$-10-$

payments to Dr. Luis Veras of $3,300 a month.

36.     Nehls was constantly struggling to keep a range of drugs on the formulary for Medicare patients. Because the nursing homes were at risk for the cost of drugs provided to Medicare recipients, Morris and Phillip Esformes refused to put some expensive drugs on the pharmacy's formulary. On the other hand, these restrictions did not apply to the patients with Medicaid coverage because these were a source of profit to the pharmacy and did not impose additional expense on the nursing homes. As a result, a patient could receive one set of drugs while on the Medicare skilled nursing ward and then be switched to a different and more costly drug regimen when he or she was moved to the unskilled Medicaid ward.

37.     In late 2003, Tim Dacy asked relator Resnick to serve as a consultant to Total Pharmacy. Resnick's assignment was to pitch limited partnership shares in Total Pharmacy "franchises" in California and Florida under the name "US Pharmacy." As a result, Resnick has first-hand knowledge of the operations of TAS, Total Pharmacy, and the circumstances surrounding the sale of Total Pharmacy to Omnicare in 2004.

38.     Largely as a result of the burdens Morris Esformes placed on it, Total Pharmacy was not profitable.

39.     The original capital contributions to TAS totaled $10,000, and the operations – including Total Pharmacy – were financed with a line of credit from Central Illinois Bank, which is the bank used by Morris Esformes.

40.     From the beginning, the owners of Total Pharmacy used the bank loans to make substantial payments to themselves, but as time went on, payments stopped to Dacy and Paler.

– 11 –

Phillip Esformes, however, continued to draw his monthly payment.

41.     By early 2004, Total Pharmacy owed the bank more than $7 million, and the bank told the pharmacy that it needed to pay down at least $1 million on its loan. Morris Esformes intervened, and convinced the bank to give the Pharmacy a 90-day extension on the repayment demand, and Morris Esformes began to try to find a buyer.

42.     Institutional pharmacies are valued according to the number of beds they serve, the average revenue per bed they generate, and the length of their contracts to supply those beds. The profit an institutional pharmacy can make depends on the difference between the price it pays to purchase drugs and the reimbursement it obtains for those drugs. Because larger volumes of business bring greater discounts, the key to building the most profitable institutional pharmacy is in locking in the greatest discount from pharmaceutical suppliers.

43.     In early 2004, Omnicare reviewed Total Pharmacy's business (which included one-year contracts). Omnicare offered to purchase Total Pharmacy of Illinois for $14 million, but insisted that Total Pharmacy's $7 million in accounts receivable would be retained by Omnicare, thus making the net value of the offer $7 million.

44.     Morris Esformes thought this number was too low, and he instructed Dacy to see what price Neighborcare, a competitor of Omnicare would be willing to pay. Dacy delegated this task to Resnick.

45.     On March 9, 2004, Jack Kordash, Executive Vice President of NeighborCare sent a confidentiality agreement to Resnick. Subsequently, Mark Renfree, CFO of Total Pharmacy provided information about Total Pharmacy's operations to Kordash.

46. On March 22, Kodash asked Resnick for more details on the information provided by Renfree. Kordash also said that Renfree had told him that "you are currently negotiating contracts that can be extended for 5-10 years."

47. Resnick passed on these questions to Renfree who, on March 22, told Kordash that "[a]s of January 31, 2004, we have 3, 289 licensed beds under contract. Of these, 2,711 are under 10-year contracts which can only be cancelled for cause following a cure period and 578 are under 1-year contracts which can be cancelled with 30 days notice."

48. This statement was false. There were no 10-year contracts in place.

49. Jack Kordash confirmed that "10-year contracts are worth a premium," and he put his estimated value of Total Pharmacy of Illinois between $10 and $13 million.

50. In April 2004, Morris Esformes and Joel Germunder, CEO of Omnicare, met at Morris Esformes' headquarters to discuss the sale of both Total Pharmacy of Illinois and Total Pharmacy of Florida . Tim Dacy also attended the meeting, along with Tracy Finn of Omnicare. When staff at Total Pharmacy heard that a sale might be coming and expressed dismay, Dacy told the staff that Morris Esformes was directing the sale and that the matter was out of his hands.

51. Dacy described the meeting between Germunder and Morris Esformes to Resnick immediately after it occurred. Dacy told Resnick that Ominicare offered to pay $15 million for Total Pharmacy if there were 3-year contracts in place with the homes owned by Esformes, $20 million for 5-year contracts with the Esformes owned homes, and $25 million if there were 10-year contracts with the Esformes owned homes. Omnicare understood in making these

$-13-$

representations that no such contracts currently existed and that any extensions of existing contracts that would be made would be done for the specific purpose of obtaining a higher price for sale of Total Pharmacy to Omnicare.

52. While these negotiations were pending, Total Pharmacy secured 5-year contracts with an automatic 5-year renewal provision with the homes owned by Morris Esformes. This contract was back-dated to March 1, 2004. Rather than having each contract signed individually by the administrator of each nursing home, in June 2004 Morris Esformes signed as President of EMI and covered all of the Florida homes owned by Morris Esformes (and one that was scheduled to open in January 2005). The homes covered by this contract included: Bradford Terrace; Fair Havens Center; Fleming Island Facility (opening in January 2005); Harmony Healtchare Center; The Nursing Center at Mercy; Oceanside Extended Care,; Southpoint Terrace; The Terrace of Daytona Beach; Woodland Terrace; Woodland Terrace of Citrus County; and Woodlands Care Center of Alachua County.

53. Esformes still wanted a bigger price, and he offered to secure contracts for Omnicare with a number of homes in Missouri owned by Dr. Sharo Shirshekan if Omnicare would increase the price. At this time, Total Pharmacy was not authorized to do business in Missouri.

54. Morris Esformes contended that Dr. Shirshekan owed him $6 million, although Dr. Shirshekan contested the legitimacy of the debt. Esformes offered to forgive the debt if Shirshekan would give him multi-year contracts with Shirshekan's nursing homes.

55. Shirshekan reluctantly agreed to give 5-year contracts to Omnicare, and the

– 14 –

purchase price to Total Pharmacy was increased so that – in addition to the $25 million purchase price – Total Pharmacy retained the right to keep the $7 million it held in accounts receivable. The final Omnicare offer, once the contracts with the Shirshekan homes were delivered, was thus a net $32 million.

56.     The sale was closed on June 30, 2004. According to the paperwork accompanying the sale, Phillip Esformes received $10 million for his share of Total Pharmacy. However, Resnick was present during a call conducted over a speaker phone between Phillip Esformes and Tim Dacy, in which Phillip complained that his father was insisting that Phillip pay the entire $10 million to him. Phillip Esformes asked Dacy to lie and tell Morris Esformes that the tax rate on the $10 million was 40% (rather than the actual 15% rate) so that Phillip could retain some of the $10 million.

## Pharmco Transaction

57.     Pharmco was an institutional pharmacy founded by Rocky Whitehead and Mike Bolin.

58.     Pharmco was based in Cincinnati, Ohio, and had pharmacies in Ohio, Missouri, Florida and California. By 2004, Pharmo's annual revenue was $95 million.

59.     Al Schwartzberg and his son Harris Schwartzberg own a nursing home chain called Cypress Healthcare ("Cypress"). In 2004, Cypress owned 14 nursing home throughout Florida.

60.     In 2003, Pharmco of Florida began doing business. Al and Harris Schwartzberg were given a 50% ownership interest in Pharmco of Florida, and Pharmco began to provide

$-15-$

service to the Cypress homes in Florida.

61.    Management at Cypress quickly became dissatisfied with Pharmco's service.
Because there were no contracts in place, in early 2004, Cypress executive Richard Kase and
Resnick began discussions about switching Cypress' business from Pharmco to Total Pharmacy.

62.    According to Kase and the other management at Cypress, the Parmco service was
replete with medical errors and often drugs were not available, even for refilling standing orders.

63.    Throughout the first quarter of 2004, Kase and Harris Schwartzberg, CEO of
Cypress, worked with Nehls and Resnick to determine whether Total Pharmacy could provide
them better service. After several months of meetings and due diligence, Kase decided that Total
Pharmacy could provide the level of service they required. Kase formally recommended that
Cypress switch its business to Total Pharmacy, and provided a detailed list of service require-
ments that Total Pharmacy would have to meet.

64.    On April 2, 2004, Resnick was abruptly told by Schwartzberg that Cypress would
stay with Pharmco, since "they were unwilling to put our Administrators and Don's through
another difficult transition...."

65.    Shortly thereafter, Resnick learned that, at the end of March, Omnicare had
purchased Pharmco for $50 million. To achieve that purchase price for Pharmco, the Cypress
homes were required to sign pharmacy service contracts with Omnicare. The Schwartzbergs
were paid $1 million in exchange for signing those contracts.

## Medistat Transaction

66.    In late 2003, Omnicare was engaged in negotiations to purchase Medistat, an
institutional pharmacy based in Boca Raton, Florida.

– 16 –

67. A number of Medistat nursing home customers began contacting Nehls to see if they could obtain service from Total Pharmacy, because they did not have contracts in place with Medistat and they did not want to become Omnicare customers after the purchase.

68. During this same time period, relator Resnick was also trying to generate business for his new US Pharmacy venture with the Avante Group, which owned nursing homes in Florida and Georgia.

69. However, once the Medistat purchase was completed, Michael Bokor – the CFO of Avante – told Resnick that he was interested in US Pharmacy but that he has just signed one-year contracts with Medistat.

70. According to Boker, Avante signed one-year contracts with Medistat when the Omnicare purchase occurred. Boker said that Avante got paid immediately for signing the contracts. Boker told Resnick that when the one-year contracts were up, he would revisit doing business with Resnick.

71. The fact that payments were made for the Avante contracts through the Medistat purchase was confirmed in conversations that Resnick had with Alan Lichtman, a lawyer representing a number of nursing home interests.

72. Resnick had approached Lichtman, who represented a number of nursing home interests, to see if he could interest Lichtman in US Pharmacy. Lichtman told Resnick that he could bring him 5,200 beds – 3,600 now and 1,600 when the contracts between Avante and Omnicare expired. Lichtman asked Resnick what he would get for delivering the contracts.

73. Resnick was subsequently told that Teddy Lichstein, who owned Avante, was paid $6 million from Medistat for delivering Avante contracts as part of the Omnicare purchase.

**Mariner Transaction**

74.     In addition to his consulting work with TAS, Resnick also served as a consultant to Medliance.  Medliance was a company that did consulting work with nursing homes, including reviewing bills between pharmacies and nursing homes to determine overpayments made by the nursing homes.

75.     Medliance wanted to obtain contracts with both IHS and Mariner Health Care. Mariner Health Care  was a large nursing home chain that had recently emerged from bank- ruptcy.  Rubin Schron, who had purchased IHS, another large nursing home chain, out of bankruptcy also wanted to purchase Mariner and had made an offer to do so by October 2004.

76.     In October 2004, Resnick – acting on behalf or Medliance – attended a meeting in New York City to discuss a contract between Medliance and IHS and Medliance and Mariner with representatives of Mr. Schron.  At that meeting, Schron's lawyer declined to proceed with a discussion of a contract between Mariner and Medliance because Mariner was in extensive conversations with Omnicare, and Omnicare would not want Mariner to sign an agreement that would permit review of its pharmacy bills.

77.     In addition, Resnick was told that Schron was a little short of cash for the Mariner closing so that Omnicare was going to put up the cash as a "loan" to Schron and, in return, Mariner would sign contracts with Omnicare.

78.     Resnick was also told that Medline, a large medical supply company, was also providing $10 million to Schron and that, in return, Medline would get a big supply contract with an "up front" rebate.

79.     In June 2005, Medline announced a $30 million sole-source contract to supply

Mariner's 81 nursing homes.

## SUMMARY

80.     As described above, Omnicare has engaged in a pattern and practice of buying contracts to supply medications to nursing facilities.

81.     These inducements, whether (1) in the form of an high package sales price for a pharmacy plus last minute long term contracts with captive nursing home customers or (2) cash inducements to nursing home owners under the guise of a "loan," violate the federal healthcare Anti-Kickback law and the False Claims Act.

82.     Claims submitted by Omnicare to the federal government for medications supplied to federally-insured patients who reside in homes where Omnicare obtained contracts through the payment of such unlawful inducements are fraudulent claims and are not properly subject to reimbursement under the Medicare or Medicaid programs.

## COUNT ONE

31 U.S.C. §§ 3729(a)(1)

83.     Relators reallege and incorporate by reference the allegations made in Paragraphs 1 through 82 of this Complaint.

84.     This is a claim for treble damages and forfeitures under the False Claims Act, 31 U.S.C. §§ 3729-32, as amended.

85.     Through the acts described above, defendants and their agents and employees knowingly presented and caused to be presented to the United States Government fraudulent claims, records, and statements in order to obtain reimbursement for pharmacy services provided under the Medicare and Medicaid programs.

$-19-$

86.     The United States, unaware of the falsity of the claims made by the defendants, approved, paid, and participated in payments made by the United States' fiscal intermediaries for claims that otherwise would not have been allowed.

87.     By reason of these payments and approvals, the United States has been damaged, and continues to be damaged, in an amount yet to be determined.

### COUNT TWO
31 U.S.C. §3729(a)(2)

88.     Relators reallege and incorporate by reference the allegations made in Paragraphs 1 through 82 of this Complaint.

89.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 *et seq*., as amended.

90.     Through the acts described above, defendant knowingly made, used, and caused to be made and used false records and statements to get false or fraudulent claims paid or approved by the United States Government.

91.     The United States unaware of the falsity of the records, statements, and claims made or submitted by defendants and their agents and employees paid defendants for claims that would not be paid if the truth were known.

92.     By reason of the defendants' false records, statements, and claims the United States has been damaged, and continues to be damaged, in an amount yet to be determined.

### COUNT THREE
31 U.S.C. §3729(a)(3)

93.     Relators reallege and incorporate by reference the allegations made in Paragraphs

1 through 82 of this Complaint.

94.    In the manner described above, defendants have conspired among themselves with the other persons and entities identified in this Complaint whereby defendants have agreed unlawfully to pay and receive unlawful kickbacks and to procure, sign, and accept the benefit of fraudulent pharmacy service contracts for care provided nursing home residents insured by the Medicare and Medicaid programs.

95.    Defendants and their co-conspirators knew, both in fact and within the meaning of the False Claims Act, that through these inflated long-term pharmacy arrangements that defendants and their co-conspirators would be violating the federal health care Anti-Kickback statute and the False Claims Act, by getting false or fraudulent Medicare and Medicaid claims submitted by defendants and/or their co-conspirators allowed or paid.

96.    The United States, unaware of the falsity of the claims made by the defendants and their co-conspirators, approved, paid, and participated in payments made by the United States' fiscal intermediaries for claims that otherwise would not have been allowed.

97.    By reason of these payments and approvals, the United States has been damaged, and continues to be damaged, in an amount yet to be determined.

## PRAYER FOR RELIEF

**WHEREFORE**, relators request that judgment be entered against defendants, ordering that:

a.    defendants cease and desist from violating the False Claims Act, 31 U.S.C. § 3729 *et seq.*;

b.    defendants pay an amount equal to three times the amount of damages the United

– 21 –

States have sustained because of defendants' actions, plus a civil penalty against defendants of

not less than \$5,500, and not more than \$11,000 for each violation of 31 U.S.C. § 3729;

  c.  relators be awarded the maximum amount allowed pursuant to 31 U.S.C. §

3730(d);

  d.  relators be awarded all costs of this action, including attorneys' fees, expenses,

and costs pursuant to 31 U.S.C. § 3730(d) and (h);

  e.  the United States and relators be granted all such other relief as the Court deems

just and proper.

## DEMAND FOR JURY TRIAL

  Pursuant to Rule 38 of the Federal Rules of Civil Procedure, relators hereby demand a

trial by jury.

Dated: January 24, 2006

            BARTLETT HACKETT FEINBERG P.C.

            By: _____

            Howard Brown (BBO#547948)
            Bartlett Hackett Feinberg P.C.
            155 Federal Street, Ninth Floor
            Boston, MA 02110
            Telephone: (617) 422-0200

            PHILLIPS & COHEN LLP
            Mary Louise Cohen
            Peter W. Chatfield
            2000 Massachusetts Avenue, NW
            Washington, DC 20036
            Telephone: (202) 833-4567

            COUNSEL FOR *QUI TAM* PLAINTIFFS