# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA and THE STATE OF FLORIDA [UNDER SEAL], | ) ) ) ) CIVIL ACTION NO. |
| PLAINTIFF, | ) )  _____ OLaviol47 |
| v. | ) ) FILED UNDER SEAL PURSUANT TO |
| [UNDER SEAL], | ) 31 U.S.C. § 3730(b)(2) |
| DEFENDANT. | ) ) |

## FIRST AMENDED COMPLAINT

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| | CIVIL ACTION NO. |
| UNITED STATES OF AMERICA and THE ) | |
| STATE OF FLORIDA, *ex rel*. ) | _____ |
| ADAM B. RESNICK AND MAUREEN NEHLS,) | |
| ) | **FILED UNDER SEAL** |
| PLAINTIFFS, ) | **PURSUANT TO** |
| ) | **31 U.S.C. § 3730(b)(2)** |
| *v.* ) | |
| ) | |
| OMNICARE, INC., MORRIS ESFORMES, ) | JURY TRIAL DEMANDED |
| PHILLIP ESFORMES, NATIONAL SENIOR ) | |
| CARE, INC., and SAVASENIOR ) | |
| HEALTHCARE, INC., ) | |
| ) | |
| DEFENDANTS. ) | |
| ) | |

### FIRST AMENDED COMPLAINT

Qui tam plaintiffs Adam B. Resnick and Maureen Nehls ("Relators") allege as

follows:

### I.    INTRODUCTION

1.    This is an action to recover damages and civil penalties on behalf of the United

States of America and the State of Florida arising from false statements and claims made or

caused to be made by the Defendants to the United States and its agents and intermediaries in

violation of the Federal False Claims Act, 31 U.S.C. §§ 3729 *et seq*. (the "Federal FCA") and to

the State of Florida and its agents and intermediaries ("Florida" or the "State") in violation of the

Florida False Claims Act, sections 68.081 *et seq*., Florida Statutes (the "Florida FCA").  The

false claims and statements at issue were made or caused to be made by the Defendants in

connection with kickbacks and claims for payments made for pharmaceutical products.

2. Originally enacted in 1863, the Federal FCA was substantially amended in 1986 by the False Claims Amendments Act. The 1986 amendments enhanced the government's ability to recover losses sustained as a result of fraud against the United States.

3. The Federal FCA provides that any person who knowingly submits or causes to be submitted to the United States or recipients of Federal funds a false or fraudulent claim for payment or approval is liable for a civil penalty of between $5,000 and $11,000 for each such claim, and three times the amount of the damages sustained by the United States. The Act empowers persons having information regarding a false or fraudulent claim against the United States to bring an action on behalf of the United States and to share in any recovery. The original complaint must be filed under seal, without service on the defendants. That complaint remains under seal while the United States investigates the allegations and determines whether to join the action.

4. The Florida FCA also imposes liability on anyone who, *inter alia*: (a) knowingly presents or causes to be presented to the State a false claim for payment or approval; (b) knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the State; or (c) conspires to submit a false claim to the State or to deceive the State for the purpose of getting a false or fraudulent claim allowed or paid.

5. Anyone who violates the Florida FCA is liable for a civil penalty of between $5,000 and $10,000 for each such claim, and three times the amount of the damages sustained by the State. As with the Federal FCA, the Florida Act empowers persons having information regarding a false or fraudulent claim against the State to bring an action on behalf of the State and to share in any recovery.

$- 2 -$

6.     Pursuant to the Federal and Florida False Claims Acts, Relators seek to recover on behalf of the United States and the State of Florida damages and civil penalties arising from false and improper charges contained in claims for payment that Defendants submitted or caused to be submitted to the Medicare program, the Medicaid program and other Federal or State-funded health care programs.

7.     Defendant Omnicare, Inc. ("Omnicare") is a large institutional pharmacy that has grown dramatically over the last several years by purchasing other smaller institutional pharmacies. One such purchase occurred in June 2004, when Omnicare, in conspiracy with Phillip and Morris Esformes, violated Federal and Florida anti-kickback laws in connection with Omnicare's purchase of Total Pharmacy Services, LLC. As alleged below, the price paid to Total Pharmacy Services, LLC grossly exceeded its fair market value. The inflated purchase price was in fact paid to Defendants Morris and Phillip Esformes, and others, to buy long term pharmacy contracts with a number of nursing homes in violation of Federal and Florida anti-kickback laws.

8.     Omnicare also purchased at least two other institutional pharmacies – Pharmco and Medistat – at inflated purchase prices to "buy" contracts between the pharmacies and captive nursing homes.

9.     In addition, in 2005, Omnicare made a substantial "loan" to Rubin Schron to enable Schron to purchase Mariner Health Care, a nursing home chain. In return, Omnicare obtained or extended contracts to supply medication to the Mariner nursing homes. The former Mariner nursing homes are now run by National Senior Care, Inc., SavaSenior Healthcare, Inc. and other affiliates and subsidiaries of National Senior Care, Inc.

10.     In each of these cases, the nursing home contracts obtained as a result of

– 3 –

Omnicare's improper payments allowed Omnicare to submit thousands of claims for reimbursement to health care programs funded by the United States and/or Florida. As a result, the United States and Florida paid Defendants and their co-conspirators substantial amounts that would not have paid had the truth been known about Defendants' and their co-conspirators' misconduct.

## JURISDICTION AND VENUE

11.     The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. §1367, and 31 U.S.C. § 3732, the last of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§3729 and 3730.

12.     Further, 31 U.S.C. §3732(b) specifically confers jurisdiction on this Court over the state law claims asserted in this Complaint.

13.     Under 31 U.S.C. §3730(e), there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint. Each Relator, moreover, would qualify under that section of the Federal FCA as an "original source" of the allegations in this Complaint even had such a public disclosure occurred.

14.     Under section 68.087(3), Florida Statutes, there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint. Each Relator, moreover, would qualify under that section of the Florida FCA as an "original source" of the allegations in this Complaint even had such a public disclosure occurred.

15.     The Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process, and because Defendant Omnicare, which conspired with each of the other Defendants to violate the anti-kickback law and the Federal FCA, can be found in and transacts the business that is the subject matter of this lawsuit

$- 4 -$

in the District of Massachusetts.

16.    Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because

Defendant Omnicare, which conspired with each of the other Defendants to violate the Federal and Florida Anti-Kickback laws and the Federal and Florida False Claims Acts, can be found and transacts the business that is the subject matter of this lawsuit in the District of Massachusetts.

## PARTIES

17.    Relator Adam Resnick brings this action against all Defendants on behalf of himself and the United States pursuant to 31 U.S.C. § 3730(b)(1) and on behalf of himself and the State of Florida pursuant to section 68.083(2), Florida Statutes.

18.    Relator Maureen Nehls brings this action against Defendants Omnicare, Morris Esformes and Phillip Esformes, for the allegations set forth in paragraphs 1-85 and 94-125 below, on her own behalf and on behalf of the United States and the State of Florida.

19.    Relators are residents of Illinois.

20.    Defendant Omnicare, Inc., headquartered in Covington, Kentucky, is a provider of pharmaceutical care for the elderly. Omnicare serves approximately 1.4 million residents in long-term care facilities and other chronic care settings across the United States (including Massachusetts and Florida) and in Canada. It is the largest U.S. provider of pharmacy services to nursing home residents. As a result of the fraudulent transactions alleged herein and similar transactions into which it likely also has entered (based upon its pattern of behavior of which Relators are personally aware), Omnicare has gained market share that has allowed it to increase volume discounts that it receives from pharmaceutical manufacturers and wholesale distributors and thus reap additional profits for its sales of pharmaceutical services to nursing homes

$- 5 -$

throughout the country.

21.     Defendant Morris Esformes resides in Illinois and Florida.  Morris Esformes owns and manages nursing homes in Florida and Illinois.

22.     Defendant Phillip Esformes is the son of Morris Esformes.  Phillip Esformes is a resident of Florida.  Phillip Esformes owns minority portions of nursing homes, and is actively involved in the operations and financial management of nursing homes owned or controlled by his father.

23.     Defendant National Senior Care, Inc. ("NSC") is a Delaware corporation.  On or about December 10, 2004, National Senior Care purchased and merged with Mariner Health Care, a Delaware corporation that owned or operated (either directly or through affiliates and subsidiaries) more than 250 nursing homes, including homes in Massachusetts and Florida. After the merger, NSC operated the former Mariner nursing homes through various affiliates and subsidiaries.

24.     Defendant SavaSenior Health Care, Inc. ("Sava"), headquartered in Marietta, Georgia, owns and/or operates a number of the nursing homes formerly owned by Mariner Health Care.  Sava operates more than 250 nursing homes, including homes in Amesbury, New Bedford, and Methuen, Massachusetts.

## BACKGROUND

25.     Medicare is a Federally-funded health insurance program primarily benefitting the elderly.  Medicare Part A, the Basic Plan of Hospital Insurance, covers the cost of inpatient hospital services and post-hospital nursing facility care.

$-6-$

26.    Medicaid is a program funded jointly by the Federal and state governments to provide health care benefits for certain people, primarily the poor and disabled. The Florida Medicaid program is administered by the Agency for Health Care Administration ("AHCA").

27.    Nursing facilities typically contract with an institutional pharmacy to provide the drugs and other pharmaceutical products needed by their patients – whether payment is to be made by Medicare, Medicaid, another State-funded health care program, private insurance or the patient.

28.    Since 1998, Medicare has paid skilled nursing facilities ("SNF's") under a prospective payment system ("PPS"). Under PPS, Medicare pays a fixed fee per patient per day based upon the acuity of each patient's condition. That fixed fee covers the pharmaceutical products provided to the patients. Thus, the SNF bears the risk of excessive drug costs.

29.    In contrast, prescription drugs for Medicaid patients (who make up a majority of the patients at most nursing homes) are typically billed to the Medicaid program by the pharmacy. The reimbursement levels are set for each drug by the relevant state Medicaid program.

30.    The Federal health care Anti-Kickback statute, 42 U.S.C. §1320a-7b(b), arose out of Congressional concern that payoffs to those who can influence health care decisions will result in goods and services being provided that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population. To protect the integrity of Federal health care programs from these difficult-to-detect harms, Congress enacted a prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback actually gives rise to overutilization or poor quality of care.

– 7 –

31. The Federal Anti-Kickback statute prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending or arranging for the purchase of any item for which payment may be made under a Federally-funded health care program. 42 U.S.C. §1320a-7b(b). Under this statute, health care companies may not offer or pay – and sources of patient referrals may not solicit or receive – any remuneration, directly or indirectly, overtly or covertly, that is intended to induce the purchase, order or recommendation of any good, facility, service or item that may be paid for, in whole or part, by a Federal health care program. The law thus prohibits any kind of payment by a pharmacy company to a nursing home or its principals or agents, in cash or kind, that has as one of its purposes inducement of the nursing home to purchase prescriptions of the company's pharmaceutical products.

32. Pursuant to its authority under that Act, the Department of Health and Human Services ("HHS") has delineated exceptions to application of the Federal Anti-Kickback statute for, among other things, certain kinds of investment interests that HHS has concluded do not significantly implicate the policy concerns underlying the Act. See 42 C.F.R. § 1001.952. Those exceptions, however, are narrowly tailored so as not to permit improper economic inducements to be disguised as unproblematic investment mechanisms. An entity whose activity otherwise would be covered by the broad, remedial language of the proscriptions under the Act is exempted from liability for such conduct only if that entity's investment interests and conduct meet all of the applicable standards set forth in the regulations for one of the three categories of investment exceptions that HHS has approved. Id. § 1001.952(a). Thus, in the category most relevant to this matter, an entity that possesses investment interests held by active or passive investors who stand to gain from health care sales of the entity can find safe harbor from the proscriptions of the

– 8 –

Federal Anti-Kickback statute only to the extent that it meets all eight applicable standards set forth in 42 C.F.R. § 1001.952(a)(2). Most notably, these include the requirement that no more than 40% of the value of each class of the investment interests may be held in the year prior to the transaction at issue "by investors who are in a position to make or influence referrals to . . . or otherwise generate business for the entity," and that no more than 40% of the entity's gross revenue relating to furnishing of health care items or services in the prior year my come "from referrals or business otherwise generated from investors." Id. §§1001.952(a)(2)(i) & (vi).

33.     Violation of the Federal Anti-Kickback statute subjects the violator to exclusion from participation in Federal health care programs, civil monetary penalties, and imprisonment of up to five years per violation. 42 U.S.C. §§1320a-7(b)(7), 1320a-7a(a)(7). These civil monetary penalties may be up to $50,000 for each act in violation of the Anti-Kickback statute and damages of up to three times the amount of the remuneration offered or paid. 42 U.S.C. §1320a-7(b).

34.     Compliance with the Anti-Kickback law is a precondition to participation as a health care provider under the Medicaid, CHAMPUS/TRICARE, CHAMPVA, Federal Employee Health Benefit Program, and other Federal health care programs.

35.     Florida law similarly prohibits the offer, payment, solicitation or receipt of remuneration or kickbacks in exchange for referrals. See, e.g., sections 409.920, 456.054 817.505, Florida Statutes; but see State v. Harden, *No. SC04-613, 2006 Fla. LEXIS 889 (Fla. May 18, 2006)* (ruling that earlier version of section 409.920(2)(e) was preempted by Federal law). Compliance with the Federal and State Anti-Kickback laws is a precondition to participation as a health care provider under the Medicaid program and other State-funded health

– 9 –

care programs.

36.     The enactment of these statutes demonstrates the commitment of both the United

States and Florida to the fundamental principle that government health care programs will not

tolerate the payment of kickbacks. Thus, compliance with the Federal and State Anti-Kickback

statutes is a prerequisite to a provider's right to receive or retain reimbursement payments from

the Medicaid program or other State-funded health care programs. Reimbursement is also

prohibited by the general legal principle that providers who are corrupt or unethical or violate the

integrity of a government program involving government funds are not entitled to payment from

the public fisc for the resulting claims.

## ALLEGATIONS
### Total Pharmacy Transaction

37.     In mid-2002, Tim Dacy, Bruce Paler, and Phillip Esformes organized a limited

liability company named Total Ancillary Services, LLC ("TAS"). Dacy owned 51%, Defendant

Phillip Esformes owned 40%, and Bruce Paler owned 9%. At that time, Dacy, Phillip Esformes

and Paler also created Total Pharmacy (later known as Total Pharmacy, Illinois) as a wholly-

owned subsidiary of TAS to provide pharmaceutical products to nursing homes. Later, TAS

created Total Pharmacy of Florida and Total Pharmacy of Illinois (collectively "Total

Pharmacy").

38.     Phillip Esformes's stake in TAS was offered as a way to generate business with

nursing homes owned by Phillip's father Morris Esformes. Phillip Esformes also had a minority

ownership share in some of those homes.

$-10-$

39.     Relator Nehls was hired by Paler in 2002 to serve as the Vice President of

Pharmacy Operations. When recru ted for the job, Nehls was told by Paler that Morris Esformes

wanted his own pharmacy for his nursing homes so that he could control costs. Nehls, who was

reluctant to leave her then-current employer, was assured that Total Pharmacy was a long term

venture.

40.     Tim Dacy told Relator Resnick that Phillip Esformes was paid $100,000 a month

by TAS. Nehls was aware that substantial payments were made each month from TAS to Phillip

Esformes. In return, all of the Esformes homes in Illinois began purchasing drugs from Total

Pharmacy for their patients, many of whom were Medicare and/or Medicaid beneficiaries. These

Esformes-owned facilities were: Bourbonnais Terrace; Kankakee Terrace; Joilet Terrace; Lake

Park Center; Terrace Nursing Home, LLC; West Chicago Terrace; Woodside Extended Care;

Brunham Healthcare Properties LLC; Community Care Center; Crestwood Terrace; Emerald

Park; Frankfort Terrace; and Presidential Pavilion LLC.

41.     Morris Esformes insisted that each contract be signed by the manager of the

nursing facility because he did not want his name appearing on contracts with Total Pharmacy.

42.     In addition, Morris Esformes obtained one-year contracts for Total Pharmacy with

several nursing homes in Illinois where he had some substantial financial relationships. These

homes included Victorian Manor; Hillside Healthcare; and Terrace North.

43.     Morris Esformes also had sufficient influence over several other nursing homes in

Illinois, and used that influence to force those homes to switch from their then-current pharmacy

and, instead, give one-year contracts to Total Pharmacy. These homes were Doctors Nursing &

– 11 –

Rehabilitation Center, LLC; Kankakee Nursing & Rehabilitation Center; Douglas Rehabilitation & Care Center; and Palos Hills Extended Care LLC.

44.     During this period, Total Pharmacy did not do any marketing, nor did it seek out customers. Instead, 100% of its business came through Morris Esformes.

45.     It was apparent to Relator Nehls that the professional staff at the homes identified in the preceding paragraphs were unhappy with being forced to switch pharmacy providers.

46.     In 2003, Total Pharmacy opened operations in Florida where Morris Esformes also owned a number of homes. Again, all of the business Total Pharmacy did in that state was with homes owned or controlled by Morris Esformes. Total Pharmacy had one-year contracts with the Morris Esformes' homes. (One-year contracts are the norm in the industry.) Again, Morris Esformes insisted that these contracts be between Total Pharmacy and the individual homes and that they be signed by an official at each home.

47.     The Total Pharmacy customers in Florida included Bradford Terrace; Fairhaven; Harmony Center at Greenbriar; Nursing Center at Mercy; Oceanside; Woodland-Alachua; Woodland-Citrus; Woodland-Deland; and Southpoint Terrace.

48.     Morris Esformes was in continual contact with Paler and provided Paler with substantial direction concerning the pharmacy's operations. Paler (and occasionally Phillip Esformes) relayed these directions (which included such matters as formulary decisions and financial arrangements) to Nehls as she ran the pharmacy. Morris Esformes constantly demanded substantial payments from TAS. Sometimes these payments came in the form of charitable contributions made at his directions. Other times, he demanded that Total Pharmacy

write off amounts owed by his nursing homes.  He also required that Total Pharmacy make payments to Dr. Luis Veras of $3,300 a month.

49.     Nehls was constantly struggling to keep a range of drugs on the formulary for Medicare patients.  Because the nursing homes were at risk for the cost of drugs provided to Medicare recipients, Morris and Phillip Esformes refused to put some expensive drugs on the pharmacy's formulary.  On the other hand, these restrictions did not apply to the patients with Medicaid coverage because these were a source of profit to the pharmacy and did not impose additional expense on the nursing homes.  As a result, a patient could receive one set of drugs while on the Medicare skilled nursing ward and then be switched to a different and more costly drug regimen when he or she was moved to the unskilled Medicaid ward.

50.     In late 2003, Tim Dacy asked Relator Resnick to serve as a consultant to Total Pharmacy.  Resnick's assignment was to pitch limited partnership shares in Total Pharmacy "franchises" in California and Florida under the name "US Pharmacy."  As a result, Resnick has first-hand knowledge of the operations of TAS, Total Pharmacy, and the circumstances surrounding the sale of Total Pharmacy to Omnicare in 2004.

51.     Largely as a result of the burdens Morris Esformes placed on it, Total Pharmacy was not profitable.

52.     The original capital contributions to TAS totaled $30,000 ($10,000 from each Dacy, Phillip Esformes and Paler), and the operations – including Total Pharmacy – were financed with a line of credit from Central Illinois Bank, which is the bank used by Morris Esformes.

– 13 –

53.    From the beginning, the owners of Total Pharmacy used the bank loans to make substantial payments to themselves, but as time went on, payments to Dacy and Paler stopped. Phillip Esformes, however, continued to draw his monthly payment..

54.    By early 2004, Total Pharmacy owed the bank more than $7 million, and the bank told the pharmacy that it needed to pay down at least $1 million on its loan. Morris Esformes intervened, and convinced the bank to give Total Pharmacy a 90-day extension on the repayment demand, and Morris Esformes began to try to find a buyer.

55.    Institutional pharmacies are valued according to the number of beds they serve, the average revenue they generate per bed, and the length of their contracts to supply those beds. The profit an institutional pharmacy can make depends on the difference between the price it pays to purchase drugs and the reimbursement it obtains for those drugs. Because larger volumes of business bring greater discounts, the key to building the most profitable institutional pharmacy is to generate the highest possible volume of business in order to lock in the greatest discount from pharmaceutical suppliers.

56.    In early 2004, Omnicare reviewed Total Pharmacy's business (which included one-year contracts with its client nursing homes). Omnicare offered to purchase Total Pharmacy of Illinois for $14 million, but insisted that Total Pharmacy's $7 million in accounts receivable would be retained by Omnicare, thus making the net value of the offer $7 million.

57.    Morris Esformes thought this number was too low, and he instructed Dacy to see what price Neighborcare, a competitor of Omnicare would be willing to pay. Dacy delegated this task to Resnick.

– 14 –

58.     On March 9, 2004, Jack Kordash, Executive Vice President of NeighborCare sent a confidentiality agreement to Resnick. Subsequently, Mark Renfree, CFO of Total Pharmacy provided information about Total Pharmacy's operations to Kordash.

59.     On March 22, Kordash asked Resnick for more details on the information provided by Renfree. Kordash also said that Renfree had told him that "you are currently negotiating contracts that can be extended for 5-10 years."

60.     Resnick passed on these questions to Renfree who, on March 22, told Kordash that "[a]s of January 31, 2004, we have 3, 289 licensed beds under contract. Of these, 2,711 are under 10-year contracts which can only be cancelled for cause following a cure period and 578 are under 1-year contracts which can be cancelled with 30 days notice."

61.     This statement was false. There were no 10-year contracts in place at that time.

62.     Jack Kordash confirmed that "10-year contracts are worth a premium," and he put his estimated value of Total Pharmacy of Illinois between $10 and $13 million.

63.     In April 2004, Morris Esformes and Joel Germunder, CEO of Omnicare, met at Morris Esformes' headquarters to discuss the sale of both Total Pharmacy of Illinois and Total Pharmacy of Florida . Tim Dacy also attended the meeting, along with Tracy Finn of Omnicare. When staff at Total Pharmacy heard that a sale might be coming and expressed dismay, Dacy told the staff that Morris Esformes was directing the sale and that the matter was out of his hands.

64.     Dacy described the meeting between Germunder and Morris Esformes to Resnick immediately after it occurred. Dacy told Resnick that Omnicare offered to pay $15 million for

– 15 –

Total Pharmacy if there were 3-year contracts in place with the Illinois and Florida homes owned by Esformes, $20 million for 5-year contracts with the Esformes-owned homes, and $25 million if there were 10-year contracts with the Esformes-owned homes. Omnicare understood in making these representations that no such contracts currently existed and that any extensions of existing contracts that would be made would be done for the specific purpose of obtaining a higher price for sale of Total Pharmacy to Omnicare.

65.     While these negotiations were pending, Total Pharmacy secured 5-year contracts with an automatic 5-year renewal provision with the homes owned by Morris Esformes. However, rather than having each contract signed individually by the administrator of each nursing home, in June 2004 Morris Esformes signed one contract, as President of EMI Enterprises, Inc., which covered all of the Florida homes owned by Morris Esformes (and one that was scheduled to open in January 2005). This contract was back-dated to March 1, 2004. The homes covered by this contract included: Bradford Terrace; Fair Havens Center; Fleming Island Facility (opening in January 2005); Harmony Healthcare Center; The Nursing Center at Mercy; Oceanside Extended Care; Southpoint Terrace; The Terrace of Daytona Beach; Woodland Terrace; Woodland Terrace of Citrus County; and Woodlands Care Center of Alachua County.

66.     Similar group contracts were signed by Morris Esformes for his Illinois homes.

67.     Esformes still wanted a bigger price, and he offered to secure contracts for Omnicare with a number of homes in Missouri owned by Dr. Sharo Shirshekan if Omnicare would increase the price. At this time, Total Pharmacy was not authorized to do business in Missouri.

− 16 −

68.     Morris Esformes contended that Dr. Shirshekan owed him $6 million, although
Dr. Shirshekan contested the legitimacy of the debt. Esformes offered to forgive the debt if
Shirshekan would give him multi-year contracts with Shirshekan's nursing homes.

69.     Shirshekan reluctantly agreed to give 5-year contracts to Omnicare, and the
purchase price to Total Pharmacy was increased so that – in addition to the $25 million purchase
price – Total Pharmacy retained the right to keep the $7 million it held in accounts receivable.
The final Omnicare offer, once the contracts with the Shirshekan homes were delivered, was thus
a net $32 million.

70.     The sale was closed on June 30, 2004. According to the paperwork
accompanying the sale, Phillip Esformes received $10 million for his share of Total Pharmacy.
However, Resnick was present during a call conducted over a speaker phone between Phillip
Esformes and Tim Dacy, in which Phillip complained that his father was insisting that Phillip
pay the entire $10 million to him. Phillip Esformes asked Dacy to lie and tell Morris Esformes
that the tax rate on the $10 million was 40% (rather than the actual 15% rate) so that Phillip
could retain some of the $10 million.

## Pharmco Transaction

71.     Pharmco was an institutional pharmacy founded by Rocky Whitehead and Mike
Bolin.

72.     Pharmco was based in Cincinnati, Ohio, and had pharmacies in Ohio, Missouri,
Florida and California. By 2004, Pharmco's annual revenue was $95 million.

73.     Al Schwartzberg and his son Harris Schwartzberg own a nursing home chain
called Cypress Healthcare ("Cypress"). In 2004, Cypress owned 14 nursing home throughout

Florida.

74.    In 2003, Pharmco of Florida began doing business. Al and Harris Schwartzberg were given a 50% ownership interest in Pharmco of Florida, and Pharmco began to provide service to the Cypress homes in Florida.

75.    Management at Cypress quickly became dissatisfied with Pharmco's service. Because there were no contracts in place, in early 2004, Cypress executive Richard Kase and Resnick began discussions about switching Cypress' business from Pharmco to Total Pharmacy.

76.    According to Kase and the other management at Cypress, the Pharmco service was replete with medical errors and often drugs were not available, even for refilling standing orders.

77.    Throughout the first quarter of 2004, Kase and Harris Schwartzberg, CEO of Cypress, worked with Nehls and Resnick to determine whether Total Pharmacy could provide them better service. After several months of meetings and due diligence, Kase decided that Total Pharmacy could provide the level of service they required. Kase formally recommended that Cypress switch its business to Total Pharmacy, and provided a detailed list of service requirements that Total Pharmacy would have to meet.

78.    On April 2, 2004, Resnick was abruptly told by Harris Schwartzberg that Cypress would stay with Pharmco, since "they were unwilling to put our Administrators and DON's through another difficult transition . . . ."

79.    Shortly thereafter, Resnick learned that, at the end of March, 2004, Omnicare had purchased Pharmco for $50 million. To achieve that purchase price for Pharmco, the Cypress homes were required to sign pharmacy service contracts with Omnicare. The Schwartzbergs

– 18 –

were paid $1 million in exchange for signing those contracts.

## Medistat Transaction

80.     In late 2003, Omnicare was engaged in negotiations to purchase Medistat, an institutional pharmacy based in Boca Raton, Florida.

81.     A number of Medistat nursing home customers began contacting Nehls to see if they could obtain service from Total Pharmacy, because they did not have contracts in place with Medistat and they did not want to become Omnicare customers after the purchase.

82.     During this same time period, Relator Resnick was also trying to generate business for his new US Pharmacy venture with the Avante Group, which owned nursing homes in Florida and Georgia.

83.     However, once the Medistat purchase was completed, Michael Boker – the CFO of Avante – told Resnick that he was interested in US Pharmacy but that he has just signed one-year contracts with Medistat.

84.     According to Boker, Avante signed one-year contracts with Medistat when the Omnicare purchase occurred. Boker said that Avante got paid immediately for signing the contracts. Boker told Resnick that when the one-year contracts were up, he would revisit doing business with Resnick.

85.     The fact that payments were made for the Avante contracts through the Medistat purchase was confirmed in conversations that Resnick had with Alan Lichtman, a lawyer representing a number of nursing home interests.

86.     Resnick had approached Lichtman, who represented a number of nursing home interests, to see if he could interest Lichtman in US Pharmacy. Lichtman told Resnick that he

could bring him 5,200 beds – 3,600 now and 1,600 when the contracts between Avante and Omnicare expired. Lichtman asked Resnick what he would get for delivering the contracts.

87.     Resnick was subsequently told that Teddy Lichstein, who owned Avante, was paid $6 million from Medistat for delivering Avante contracts as part of the Omnicare purchase.

## Mariner Transaction

88.     In addition to his consulting work with TAS, Resnick also served as a consultant to Medliance. Medliance was a company that did consulting work with nursing homes, including reviewing bills between pharmacies and nursing homes to determine overpayments made by the nursing homes.

89.     Medliance wanted to obtain contracts with both IHS and Mariner Health Care. Mariner Health Care was a large nursing home chain that had recently emerged from bankruptcy. Rubin Schron, who had purchased IHS, another large nursing home chain, out of bankruptcy also wanted to purchase Mariner and had made an offer to do so by October 2004.

90.     In October 2004, Resnick – acting on behalf of Medliance – attended a meeting in New York City to discuss a contract between Medliance and IHS and Medliance and Mariner with representatives of Mr. Schron. At that meeting, Schron's lawyer declined to proceed with a discussion of a contract between Mariner and Medliance because Mariner was in extensive conversations with Omnicare, and Omnicare would not want Mariner to sign an agreement that would permit review of its pharmacy bills.

91.     In addition, Resnick was told that Schron was a little short of cash for the Mariner closing so that Omnicare was going to put up the cash as a "loan" to Schron and, in return, the Mariner nursing homes would sign contracts with Omnicare.

$-20-$

92. On December 10, 2004, NSC (an entity controlled and funded in part by Schron) purchased and merged with Mariner. After the merger between NSC and Mariner, NSC operated the former Mariner homes, including homes in Massachusetts and Florida, through various affiliates and subsidiaries (including Sava).

93. After Omnicare made the "loan" to Schron, the former Mariner homes either extended old or signed new contracts with Omnicare.

94. Resnick was also told that Medline, a large medical supply company, was also providing $10 million to Schron and that, in return, Medline would get a big supply contract with an "up front" rebate.

95. In June 2005, Medline announced a $30 million sole-source contract to supply Mariner's 81 nursing homes.

## SUMMARY

96. As described above, Omnicare has engaged in a pattern and practice of buying contracts to supply medications to nursing facilities.

97. The inducements offered by Omnicare, whether in the form of (1) a high package sales price for a pharmacy plus last minute (or back dated) long-term contracts with captive nursing home customers; or (2) cash inducements to nursing home owners under the guise of a "loan," violate Federal and State Anti-Kickback laws and the Federal and State False Claims Acts.

98. Claims submitted by Omnicare to the State for medications supplied to patients who reside in homes where Omnicare obtained contracts through the payment of such unlawful inducements are fraudulent claims and are not properly subject to reimbursement under the

$-21-$

Medicare program, the Medicaid program or other Federal or State-funded health care programs.

99.     As also described above, Morris and Phillip Esformes have engaged in a pattern and practice of using their control over nursing home facilities to cause those facilities to refer patients to pharmacies owned or controlled by them.

100.     Morris and Phillip Esformes have also sold to Omnicare long-term contracts to supply medications to the nursing facilities controlled by them.

101.     These practices by Morris and Phillip Esformes violate Federal and State Anti-Kickback laws and the Federal and State False Claims Acts.

102.     Claims submitted by Total Pharmacy to the United States or Florida for medications supplied to patients who reside in homes owned or controlled by Morris or Phillip Esformes are fraudulent claims and are not properly subject to reimbursement under the Medicare program, the Medicaid program or other Federal or State-funded health care programs.

103.     Prescription forms or any other documents generated by the Esformes-controlled nursing homes pursuant to contracts with Omnicare and used or relied upon by Omnicare to support claims submitted to the United States or Florida are false statements and records used to get the United States and Florida to pay or approve false or fraudulent claims.

## COUNT ONE

31 U.S.C. §§ 3729(a)(1)

104.     Relators reallege and incorporate by reference the allegations made in Paragraphs 1 through 101 of this Complaint.

105.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 *et seq*., as amended.

106. Through the acts described above, Defendants knowingly presented and caused to be presented to the United States fraudulent claims, records, and statements in order to obtain reimbursement for pharmacy services provided under the Medicare program, the Medicaid program or other Federally-funded health care programs.

107. The United States, unaware of the falsity of the claims made by the Defendants, approved, paid, and participated in payments made by the United States' fiscal intermediaries for claims that otherwise would not have been allowed.

108. By reason of these payments and approvals, the United States has been damaged, and continues to be damaged, in an amount yet to be determined.

## COUNT TWO

31 U.S.C. §3729(a)(2)

109. Relators reallege and incorporate by reference the allegations made in Paragraphs 1 through 101 of this Complaint.

110. This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as amended.

111. Through the acts described above, Defendant knowingly made, used, and caused to be made and used false records and statements to get false or fraudulent claims paid or approved by the United States.

112. The United States unaware of the falsity of the records, statements, and claims made or submitted by Defendants and their agents and employees paid Defendants for claims that would not be paid if the truth were known.

113. By reason of the Defendants' false records, statements, and claims the United

– 23 –

States has been damaged, and continues to be damaged, in an amount yet to be determined.

## COUNT THREE

31 U.S.C. §3729(a)(3)

114.    Relators reallege and incorporate by reference the allegations made in Paragraphs 1 through 101 of this Complaint.

115.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 *et seq*., as amended.

116.    In the manner described above, Defendants have conspired among themselves with the other persons and entities identified in this Complaint whereby Defendants have agreed unlawfully to pay and receive unlawful kickbacks and to procure, sign, and accept the benefit of fraudulent pharmacy service contracts for care provided nursing home residents insured by the Medicare program, the Medicaid program or other Federally-funded health care programs.

117.    Defendants and their co-conspirators knew, both in fact and within the meaning of the Federal False Claims Act, that through these inflated long-term pharmacy arrangements that Defendants and their co-conspirators would be violating the Federal health care Anti-Kickback statute and the False Claims Act, by getting false or fraudulent claims submitted by Defendants and/or their co-conspirators to the Medicare program, the Medicaid program or other Federally-funded health care programs allowed or paid.

118.    The United States, unaware of the falsity of the claims made by the Defendants and their co-conspirators, approved, paid, and participated in payments made by the United States' fiscal intermediaries for claims that otherwise would not have been allowed.

119.    By reason of these payments and approvals, the United States has been damaged,

and continues to be damaged, in an amount yet to be determined.

## **COUNT FOUR**

Section 68.082(2)(a)-(c), Florida Statutes

120. Relators reallege and incorporate by reference the allegations made in Paragraphs 1 through 101 of this Complaint.

121. This is a claim for treble damages and penalties under the Florida False Claims Act, sections 68.081 *et seq.*, Florida Statutes.

122. Through the acts described above, Defendants and their agents and employees knowingly presented and caused to be presented to the State of Florida false claims in order to obtain reimbursement for pharmacy services provided under the Medicaid program and other State-funded health care programs.

123. Through the acts described above, Defendants and their agents and employees knowingly made, used and caused to be made and used false records or statements to get the State of Florida to pay or approve false or fraudulent claims for pharmacy services provided under the Medicaid program and other State-funded health care programs.

124. Through the acts described above, Defendants, their agents, employees and other co-conspirators identified in this Complaint knowingly conspired to submit false claims to the State of Florida and to deceive the State for the purpose of getting the State to pay or allow false or fraudulent claims for pharmacy services provided under the Medicaid program and other State-funded health care programs.

125. Each prescription that was dispensed as a result of Defendants' illegal inducements represents a false or fraudulent record, and each claim for reimbursement for such

– 25 –

prescriptions submitted to a State-funded health care program represents a false or fraudulent claim for payment.

126.    The State of Florida, unaware of the falsity or fraudulence of the records, statements and claims made or submitted by Defendants, their agents, employees and co-conspirators, approved, paid and continues to approve and pay claims that otherwise would not have been approved or paid.

127.    Defendants and their co-conspirators knew, both in fact and within the meaning of the Florida False Claims Act, that through the acts described above they would be violating the Federal and State Anti-Kickback statutes and the State False Claims Act, by getting false or fraudulent claims submitted by Defendants and/or their co-conspirators allowed or paid.

128.    By reason of these payments and approvals, the State of Florida has been damaged, and continues to be damaged, in an amount yet to be determined.

## PRAYER FOR RELIEF

**WHEREFORE,**  Relators request that judgment be entered against Defendants, ordering that:

a.    Defendants cease and desist from violating the Federal False Claims Act, 31 U.S.C. § 3729 *et seq*. and the Florida False Claims Act, sections 68.081 *et seq*., Florida Statutes;

b.    Defendants pay an amount equal to three times the amount of damages the United States and the State of Florida have sustained because of Defendants' actions, plus a civil penalty against Defendants of not less than $5,500, and not more than $11,000 for each violation of 31 U.S.C. § 3729 and of not less than $5,000, and not more than $10,000 for each violation of section 68.082(2), Florida Statutes;

— 26 —

c.    Relators be awarded the maximum amount allowed pursuant to 31 U.S.C. §

3730(d) and section 68.085, Florida Statutes;

d.    Relators be awarded all costs of this action, including attorneys' fees, expenses,

and costs pursuant to 31 U.S.C. § 3730(d) and (h) and section 68.086(2), Florida Statutes;

e.    The United States, the State of Florida and Relators be granted all such other

relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relators hereby demand a

trial by jury.

Dated: July **24**, 2006

BARTLETT HACKETT FEINBERG PC

By:    Nward 2-

Howard Brown
Bartlett Hackett Feinberg PC
BBO #547948
155 Federal Street, Ninth Floor
Boston, MA 02110
Telephone: (617) 422-0200

PHILLIPS & COHEN LLP
Mary Louise Cohen
Peter W. Chatfield
Timothy P. McCormack
2000 Massachusetts Avenue, NW
Washington, DC 20036
Telephone: (202) 833-4567

COUNSEL FOR *QUI TAM* PLAINTIFFS

– 27 –