FILED
IN CLERKS OFFICE

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

2009 MAR -4 ₽ 4: 51

U.S. DISTRICT COURT
DISTRICT OF MASS.

UNITED STATES OF AMERICA, et al., ex rel. )
ADAM B. RESNICK,                          )
                                          )
            Plaintiffs,                   )
                                          )
    v.                                    )     Civil Action. No. 06-10149-RGS
                                          )
OMNICARE, INC., RUBIN SCHRON,             )
LEONARD GRUNSTEIN, MURRAY FORMAN, )
MARINER HEALTH CARE, INC., and            )     **FILED UNDER SEAL**
SAVASENIORCARE ADMINISTRATIVE             )
SERVICES, LLC,                            )
                                          )
            Defendants.                   )
                                          )

## COMPLAINT OF THE UNITED STATES

This is an action to recover treble damages, restitution, and civil penalties under the False

Claims Act, 31 U.S.C. §§ 3729-33, and the common law for the submission of false claims to

federal health care programs as a result of a kickback that defendant Omnicare, Inc.

("Omnicare"), offered and paid, and that the remaining defendants, Rubin Schron, Leonard

Grunstein, Murray Forman, Mariner Health Care, Inc. ("Mariner"), and SavaSeniorCare

Administrative Services, LLC ("Sava"), solicited and/or received, in violation of the federal anti-

kickback statute, 42 U.S.C. § 1320a-7b(b).

### Introduction

Omnicare is a large nursing home pharmacy, and Mariner and Sava operate nursing

homes. Omnicare paid Mariner and Sava $50 million to induce them to sign long-term

pharmacy contracts pursuant to which they steered their nursing home patients, including

Medicare and Medicaid patients, to Omnicare for pharmacy dispensing services. The

defendants, including individual defendants Schron, Grunstein, and Forman, conspired with Omnicare to disguise the $50 million kickback as payment for a Mariner business unit called Mariner Medical Supply ("MMS"). At the time of Omnicare's agreement to pay the $50 million, MMS had only two employees and no tangible assets apart from accounts receivable valued at less than $3 million.

## Jurisdiction and Venue

1.      This Court has subject matter jurisdiction under 28 U.S.C. § 1345. The Court has supplemental jurisdiction to entertain the common-law causes of action under 28 U.S.C. § 1367(a).

2.      The Court may exercise personal jurisdiction over the defendants, and venue is appropriate in this Court, under 31 U.S.C. § 3732(a), because at least three of the defendants – Omnicare, Mariner, and Sava – transact or transacted business in this District, and because all of the defendants submitted, caused to be submitted, or conspired to submit false claims in this District.

## The Parties

3.      Plaintiff United States, acting through the Department of Health and Human Services ("HHS"), administers the Health Insurance Program for the Aged and Disabled established by Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, et seq. (Medicare), and Grants to States for Medical Assistance Programs pursuant to Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 et seq. (Medicaid).

4.      Relator Adam Resnick is a resident of Illinois.

2

5.     Defendant Omnicare is a Delaware corporation with headquarters in Covington, Kentucky. Omnicare is the nation's largest provider of pharmacy services to nursing homes and other long-term care facilities. Through contracts with these facilities, it dispenses drugs to approximately 1.4 million long-term care residents in 47 states, including Massachusetts.

6.     Defendant Rubin Schron is a resident of New York. At all relevant times, defendant Schron directly or indirectly controlled defendants Sava and Mariner.

7.     Defendant Murray Forman is a resident of New York. He is the sole employee of MetCap Securities, LLC ("MetCap"), an investment bank. At all relevant times, defendant Forman acted as defendant Schron's agent in connection with the conduct alleged herein.

8.     Defendant Leonard Grunstein is a resident of New Jersey. He is the principal owner of MetCap. He is also a lawyer. At all relevant times, defendant Grunstein acted as defendant Schron's agent in connection with the conduct alleged herein.

9.     Defendant Mariner is a Delaware corporation with headquarters in Atlanta, Georgia. Prior to being acquired on December 10, 2004, Mariner was a public company and one of the nation's largest nursing home chains, operating approximately 252 nursing homes representing approximately 32,000 nursing home beds. After being acquired on December 10, 2004, privately-held Mariner continued to operate numerous nursing homes, including at least two nursing homes in Massachusetts.

10.    Defendant Sava is a privately-held Delaware limited liability company with headquarters in Atlanta, Georgia. Sava operates numerous nursing homes, including at least two nursing homes in Massachusetts.

3

## **Legal Background**

### A.   **The Anti-Kickback Statute**

11.   The federal anti-kickback statute, 42 U.S.C. § 1320a-7b(b) ("AKS"), arose out of

congressional concern that remuneration and gifts given to those who can influence healthcare

decisions would result in goods and services being provided that are medically unnecessary, of

poor quality, or even harmful to a vulnerable patient population. To protect the integrity of the

Medicare and Medicaid programs from these harms, Congress enacted a prohibition against the

payment of kickbacks in any form. First enacted in 1972, Congress strengthened the AKS in

1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions did not evade its

reach. See Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42

U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142;

Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

12.   The AKS prohibits any person or entity from offering, making, soliciting, or

accepting remuneration, in cash or in kind, directly or indirectly, to induce or reward any person

for purchasing, ordering, or recommending or arranging for the purchasing or ordering of

federally-funded medical goods or services:

(b) Illegal remunerations
> (1) whoever knowingly and willfully solicits or receives any remuneration (including
> any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in
> kind--
> (A) in return for referring an individual to a person for the furnishing or arranging for
> the furnishing of any item or service for which payment may be made in whole or in
> part under a Federal health care program, or
> (B) in return for purchasing, leasing, ordering, or arranging for or recommending
> purchasing, leasing, or ordering any good, facility, service, or item for which payment
> may be made in whole or in part under a Federal health care program, shall be guilty

4

of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

(2) whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person--

(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b)(1), (2). Violation of the AKS also can subject the perpetrator to

exclusion from participation in federal health care programs and, effective August 6, 1997, civil

monetary penalties of $50,000 per violation and three times the amount of remuneration paid. 42

U.S.C. § 1320a-7(b)(7) and 42 U.S.C. § 1320a-7a(a)(7).

13.    The Office of the Inspector General of HHS ("HHS-OIG") has advised that, if the

purchase price for a business acquisition is in reality a fee to induce the recipient of the payment

to refer business reimbursed by Medicare or other federal programs, the payment of the

remuneration violates the AKS. When determining the true intent of such a payment, one

relevant factor is whether the amount paid reflects the fair market value of the acquired business.

When determining the fair market value of goodwill and other intangible assets of a healthcare

entity that refers business reimbursed by Medicare or other federal programs, traditional methods

of valuation "do not comport with the prescriptions of the anti-kickback statute." For example, a

payment made for a referral stream is not reflective of fair market value if the referrals are for

business reimbursed by federal programs. See Letter from D. McCarthy Thornton, HHS-OIG, to

T.J. Sullivan, IRS, Dec. 22, 1992, available at

5

http://oig.hhs.gov/fraud/docs/safeharborregulations/acquisition122292.htm.  See also HHS-OIG

Special Fraud Alert, Dec. 19, 1994 (advising that, in the context of a transaction involving

entities that receive reimbursement from federal health care programs, "'fair market value' must

reflect an arm's length transaction which has not been adjusted to include the additional value

which one or both of the parties has attributed to the referral of business between them").

## B.    The False Claims Act

14.    The False Claims Act provides, in pertinent part, that:

(a) Any person who (1) knowingly presents, or causes to be presented,
to an officer or employee of the United States Government or a
member of the Armed Forces of the United States a false or
fraudulent claim for payment or approval; (2) knowingly makes,
uses, or causes to be made or used, a false record or statement to
get a false or fraudulent claim paid or approved by the
Government; (3) conspires to defraud the Government by getting a
false or fraudulent claim allowed or paid; . . . or (7) knowingly
makes, uses, or causes to be made or used, a false record or
statement to conceal, avoid, or decrease an obligation to pay or
transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not
less than $5,000 and not more than $10,000, plus 3 times the
amount of damages which the Government sustains because of the
act of that person. . . .

\* \* \*

(b) For purposes of this section, the terms "knowing" and
"knowingly" mean that a person, with respect to information – (1)
has actual knowledge of the information; (2) acts in deliberate
ignorance of the truth or falsity of the information; or (3) acts in
reckless disregard of the truth or falsity of the information,

and no proof of specific intent to defraud is required.

31 U.S.C. § 3729(a), (b).

15.     Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), and 64 Fed. Reg. 47099, 47103 (1999), the False Claims Act civil penalties were adjusted to $5,500 to $11,000 for violations occurring on or after September 29, 1999.

## The Relationship Between Omnicare's Pharmacy Business And Medicaid And Medicare

16.     Omnicare's principal business is to fill prescriptions and to deliver drugs to patients in long-term care facilities, including Mariner and Sava nursing homes.  When Omnicare delivers drugs to patients in Mariner and Sava nursing homes, it submits reimbursement claims on behalf of those patients to their insurers, including Medicaid and, since January 1, 2006, prescription drug sponsors acting on behalf of Medicare Part D ("Part D sponsors").

### *Medicaid*

17.     Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled.  The federal portion of each state's Medicaid payments, known as the Federal Medical Assistance Percentage ("FMAP"), is based on the state's per capita income compared to the national average.  42 U.S.C. § 1396d(b).  Among the states, the FMAP is at least 50 percent and as high as 83 percent.

18.     The Medicaid programs of all states reimburse for prescription drugs.  The vast majority of states award contracts to private companies to evaluate and to process claims for payment on behalf of Medicaid recipients.  Typically, after processing the claims, these private companies then generate funding requests to the state Medicaid programs, which in turn obtain federal funds from the United States.

7

19.     Omnicare is a party to provider agreements with each of the state Medicaid programs to which it submits drug reimbursement claims. In Massachusetts, for example, Omnicare has a provider agreement with MassHealth. Massachusetts regulations provide that: "All pharmacies participating in MassHealth must comply with the regulations governing MassHealth, including but not limited to MassHealth regulations set forth in 130 CMR 406.000 and 450.000." The Massachusetts regulation at 130 CMR 450.261 in turn provides: "All members and providers must comply with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, specifically including but not limited to 42 U.S.C. § 1320a-7b [the federal anti-kickback statute]."

### *Medicare*

20.     Medicare is a federally funded and administered health insurance program for certain groups, primarily elderly and disabled persons. HHS administers the Medicare program through the Centers for Medicare & Medicaid Services ("CMS").

21.     Medicare Part D, a voluntary prescription drug benefit program for Medicare enrollees, became effective January 1, 2006.

22.     Medicare Part D coverage is offered through private companies, known as Part D sponsors, that contract with CMS to administer prescription drug plans. CMS gives each Part D sponsor advance monthly payments consisting of the Part D sponsor plan's direct subsidy per enrollee (which is based on a standardized bid made by the Part D sponsor), estimated reinsurance subsidies for catastrophic coverage, and estimated low-income subsidies. 42 C.F.R. §§ 423.315, 423.329. Throughout the payment year, each time a Medicare beneficiary gets a prescription filled under Part D, the sponsor notifies CMS of the event, including the cost it has

8

incurred. At the end of the payment year, CMS reconciles the advance payments paid to each Part D sponsor with the actual costs the sponsor has incurred. If CMS underpaid the sponsor for low-income subsidies or reinsurance costs, it will make up the difference. If CMS overpaid the sponsor for low-income subsidies or reinsurance costs, it will recoup the overpayment from the sponsor. After CMS reconciles a plan's low-income subsidy and reinsurance costs, it then determines risk-sharing amounts owed by the plan to CMS or by CMS to the plan related to the plan's direct subsidy bid. Risk-sharing amounts involve calculations based on whether and to what degree a plan's allowable costs per beneficiary exceeded or fell below a target amount for the plan by certain threshold percentages. 42 C.F.R. § 423.336.

23.     Part D sponsors enter into subcontracts with many pharmacies to provide drugs to the Medicare Part D beneficiaries enrolled in their plans. These include subcontracts with long-term care pharmacies, such as Omnicare.

24.     When a long-term care pharmacy dispenses drugs to a Medicare beneficiary, it submits a claim electronically to the beneficiary's Part D sponsor and receives reimbursement from the sponsor for the portion of the drug cost not paid by the beneficiary. The Part D sponsor then notifies CMS of the drug dispensing event, including the amount it has paid to the pharmacy. CMS uses that information at the end of the payment year when it reconciles its advance payments to the sponsor with the costs that sponsor has incurred throughout the year.

25.     Part D sponsors must certify in their contracts with CMS that they agree to comply with all federal laws and regulations designed to prevent fraud, waste, and abuse, including, but not limited to, the anti-kickback statute. 42 C.F.R. § 423.505(h)(1).

9

26.     CMS regulations require that all subcontracts between Part D sponsors and

pharmacies contain language obligating the pharmacy to comply with all applicable federal laws,

regulations, and CMS instructions.  42 C.F.R. § 423.505(i)(4)(iv).  Omnicare has entered into

subcontracts with the vast majority of Medicare Part D sponsors.

## In 2003, Prior To The 2004 Kickback, Omnicare And Mariner Negotiated A Five-Year Pharmacy Contract

27.     In approximately early 2003, Mariner issued a request for proposals to suppliers

of pharmacy services.  Several large pharmacies submitted proposals.  As one of the largest

nursing home pharmacy customers in the country, Mariner had considerable leverage in the

resulting negotiations.  Ultimately, Mariner selected Omnicare.  To secure the Mariner business,

Omnicare agreed that the parties' pharmacy contract would include a formulary "savings

guarantee" provision pursuant to which Omnicare committed that its drug-switching programs

would save Mariner at least $2.5 million per year, or Omnicare would pay Mariner the

difference.  The Omnicare-Mariner contract (the "2003 Pharmacy Contract") was effective April

1, 2003, and had a five-year and four-month term.

28.     After the signing of the 2003 Pharmacy Contract, Mariner became Omnicare's

largest customer in terms of beds served.  In 2004, the 2003 Pharmacy Contract with Mariner

generated approximately $155 million in revenues and $26 million in profits for Omnicare.

## The Backdrop To The Kickback:  Raising Cash For The Purchase Of Mariner

29.     On June 29, 2004, Mariner announced that it was being sold for approximately $1

billion to a new entity, National Senior Care, Inc., which was backed by defendant Schron.

Defendants Forman and Grunstein had proposed this transaction to defendant Schron.  The

10

acquirers intended to divide Mariner's nursing homes between post-acquisition Mariner and newly-created Sava. To finance the transaction, an investment bank, Credit Suisse, was to provide a mortgage of approximately $800 million, while defendant Schron was responsible for providing approximately $200 million in equity. National Senior Care's acquisition of Mariner ultimately closed on December 10, 2004.

30. During the period between June 29 and December 10, 2004, defendants Forman and Grunstein attempted to arrange the Mariner transaction so that their client, defendant Schron, would have to contribute as little cash as possible. Defendant Forman, acting as Schron's agent, suggested that one way to collect cash would be for post-acquisition Mariner to sell the right to provide pharmacy services to its nursing homes, but Forman was warned that selling the right to provide pharmacy services to Mariner would constitute an illegal kickback. Despite this warning, defendants Forman and Grunstein pursued a plan to sell the right to provide pharmacy services to Mariner. Specifically, they planned to sell the right to Omnicare.

31. To accomplish their goal, defendants Forman and Grunstein, acting as agents of defendant Schron, directed Mariner to send Omnicare a notice dated November 23, 2004 (the "Termination Notice"), stating that the 2003 Pharmacy Contract would be terminated upon the closing of the Mariner acquisition. At the time, Mariner's senior executives were generally satisfied with the 2003 Pharmacy Contract with Omnicare and actually had no desire to terminate it. Likewise, neither defendant Forman nor defendant Grunstein, nor their principal, defendant Schron, actually had a desire to terminate the 2003 Pharmacy Contract. Rather, defendants Forman and Grunstein directed Mariner to send the Termination Notice with the hope that Omnicare then would be willing to pay Mariner to withdraw the Termination Notice.

11

**When Omnicare Asked That The Termination Notice Be Withdrawn,
Defendants Forman And Grunstein Suggested Omnicare Buy MMS.**

32.    As a result of the Termination Notice, Omnicare feared losing the Mariner

business and its associated revenues and profits. On December 2, 2004, Omnicare's Chief

Executive Officer, Joel Gemunder, and Chief Financial Officer, David Froesel, met with

defendants Forman and Grunstein and others. During the meeting, the Omnicare executives

expressed their desire that Mariner withdraw the Termination Notice. Defendants Forman and

Grunstein, acting as agents of defendant Schron, then proposed that Omnicare purchase

Mariner's MMS unit. At the time, Mariner was using MMS, which had only two employees and

less than $3 million in tangible assets, to arrange for the delivery of enteral (*i.e.*, feeding tube)

supplies to Mariner nursing home patients and then to bill Medicare Part B for those supplies.

33.    At the December 2, 2004, meeting, or shortly thereafter, defendants Forman and

Grunstein explained that there was a "hole" in defendant Schron's financing for the Mariner

acquisition, and that cash from Omnicare could fill that hole.

**The Defendants Were Warned That Conditioning The Withdrawal
Of The Termination Notice On Omnicare's Purchase Of MMS
Would Constitute An Illegal Kickback**

34.    During the December 2, 2004 meeting, Omnicare's CEO, Gemunder, initiated a

conference call with Omnicare's regular outside counsel on healthcare regulatory issues

(hereinafter referred to as "Omnicare's outside counsel"). Omnicare's outside counsel told the

participants at the meeting that it would be illegal for Mariner to condition the withdrawal of its

Termination Notice on an agreement by Omnicare to purchase MMS, because such a condition

12

would show that Omnicare's payment for MMS also was in exchange for Mariner's agreement to continue referring patients to Omnicare for pharmacy services.

## Omnicare's Term Sheet Tying Its Purchase Of MMS To Mariner's Withdrawal Of The Termination Notice.

35.     On December 4, 2004, Omnicare circulated a term sheet to defendants Forman and Grunstein and others. The term sheet provided, inter alia, for the withdrawal of Mariner's Termination Notice, and for Omnicare to buy MMS for $50 million, with $40 million to be paid at "the closing of the purchase of [MMS]" and $10 million to paid six months later. The term sheet further provided that (1) the existing 2003 Pharmacy Contract between Mariner and Omnicare would be amended to ensure that all of the then-existing Mariner nursing homes would remain under the terms of the 2003 Pharmacy Contract with Omnicare after the larger Mariner transaction closed, even if some of those homes were sold; and (2) the new Sava entity would enter into a pharmacy contract with Omnicare "on substantially the same terms" as the 2003 Pharmacy Contract between Omnicare and Mariner.

## Omnicare Agreed To Buy MMS At Some Point In The Future For $50 Million, But To Pay $40 Million Of The Purchase Price Immediately.

36.     On December 6, 2004, Omnicare's attorneys circulated a draft agreement for Omnicare to purchase MMS for $40 million. The draft agreement provided that Omnicare would pay the entire purchase price up front, before the closing of the MMS transaction. The purpose of Omnicare paying the $40 million up front was to enable defendant Schron to fill the hole in his financing for the larger Mariner transaction.

13

37.    Defendants Forman and Grunstein, acting as agents of defendant Schron, later increased the price of MMS to $50 million, with $40 million still to be paid up front before the closing of the MMS transaction.

## When Omnicare's Board Met To Consider The Proposed Acquisition Of MMS, The Supposedly Unrelated Issue Of The Value Of Keeping Mariner's Pharmacy Business Arose.

38.    On the afternoon of December 7, 2004, Omnicare's board of directors met to consider the proposed acquisition of MMS. The internal Omnicare memorandum for the meeting explained that: "For the total anticipated consideration to the seller of $50,000,000, plus estimated transaction-related expenses of $285,000, Omnicare will receive tangible assets with an estimated net book value of $2,904,000 [consisting of accounts receivable] and create goodwill and other intangible assets of $47,381,000."

39.    One of Omnicare's investment bankers in attendance at the Omnicare board meeting specifically noted the value of the pharmacy revenues and profits that Omnicare would lose if Omnicare did not purchase MMS and the Mariner acquirers went ahead with their threat to terminate the 2003 Pharmacy Contract. The banker wrote on the board meeting memorandum: "3 YEARS LEFT ON CURRENT DEAL: $155MM/REVS    $26MM/OP PROFITS." Omnicare's board preserved those pharmacy revenues and profits by voting to approve the acquisition of MMS for $50 million, with $40 million to be paid up front before the MMS closing.

## Knowing Defendant Schron Wanted Omnicare's $40 Million Up-Front Payment To Close On The Larger Mariner Transaction, Omnicare Exercised Its Leverage To Compel The Schron-Controlled Entities To Sign New 15-Year Pharmacy Services Contracts.

40.    Prior to December 6, 2004, when Omnicare first offered to pay Schron $40

14

million up front for MMS, Omnicare had hoped only to keep the 2003 Pharmacy Contract in place for post-acquisition Mariner and Sava. Late on December 7, 2004, however, Omnicare sent Mariner a list of proposed "material changes" to the existing Omnicare-Mariner pharmacy relationship. Omnicare's list proposed that the parties enter into entirely new agreements that would supersede the existing 2003 Pharmacy Contract, which still had well over three years remaining on its term. Omnicare proposed that the new contracts have 15-year terms and omit the 2003 Pharmacy Contract's formulary "savings guarantee" under which Omnicare was obligated to pay Mariner up to $2.5 million each year.

41.     During the following two days, Omnicare, Mariner, and Sava negotiated the specific terms of new pharmacy contracts. Mariner and Sava, under the direction of defendants Forman and Grunstein, who in turn were acting as agents of Schron, agreed to all of the "material changes" that Omnicare had proposed, including the 15-year terms that would run until 2019 and the deletion of any formulary savings guarantees for the nursing homes.

42.     Omnicare negotiated the two transactions – the new pharmacy contracts and its agreement to buy MMS – at the same time, and with the same parties: defendants Forman and Grunstein, acting as agents of defendant Schron, who controlled defendants Mariner and Sava.

### Attorneys Warned The Defendants That Omnicare's Purchase Of MMS Looked Like Consideration For The New Pharmacy Contracts.

43.     The defendants understood that it was illegal for them to tie the new pharmacy contracts to Omnicare's agreement to purchase MMS, and they recognized that, if discovered, their arrangement could expose them to an enforcement action. Omnicare sought advice from Omnicare's outside counsel on how to minimize the risk of such an action. Among other things, Omnicare's outside counsel advised the parties to push off the date of the closing of Omnicare's

15

acquisition of MMS, so that it would not occur near the time of the signing of new pharmacy
contracts.

44.      Defendant Grunstein's law firm represented the Mariner acquirers in their

negotiations with Omnicare regarding both the new 15-year pharmacy contracts and Omnicare's

purchase of MMS. On December 8, 2004, defendant Grunstein's law partner sent an e-mail to

defendants Forman and Grunstein and to Darren Alch, a health care attorney at defendant

Grunstein's firm. The e-mail concerned the structure of the sale of MMS to Omnicare, and

whether MMS first should be assigned by Mariner to a new limited liability company controlled

by defendant Schron, which then would sell MMS to Omnicare:

> [W]ould having reps and warranties from [National Senior Care] and Mariner
> directly to Omnicare . . . create a bigger problem (tying the two transactions
> together) than it solves (helping to exculpate [the Schron LLC] from liability
> for Mariner operations)?  **Or is the issue just that, if noticed and
> investigated by the regulators, we'll have to defend against the possible
> allegations that the [MMS] sale and Pharmacy deals are tied together and
> part of the consideration for each other?**
>
> **I understand the back-to-back signing of [Asset Purchase Agreements],
> regardless of the delay between closings, creates a calculated risk, in the
> event that OIG investigates the transaction**; right, Darren?  [Darren] thinks
> that three or four months delay between the closings (or longer, obviously)
> would be better, but **a closing at the end February (subject to checking
> with [Omnicare's outside counsel] again) . . . might be OK--not safe, but
> assuming no one at OIG is really watching closely**.

(Emphasis added.)

45.      In an e-mail to defendants Forman and Grunstein and others on December 9,

2004, defendant Grunstein's law partner further cautioned:

> In connection with the parties['] intended sale of the assets of Mariner
> Medical Supply, Inc. (MMS) to Omnicare, Inc. (immediately post-merger
> but pre-financing), healthcare regulatory lawyers for both sides told us that

16

> a simultaneous sale of that . . . business could be viewed as
> consideration for the pharmacy contracts that the parties want to enter
> into at the closing.

(Emphasis added.)

## On The Same Day That Omnicare Paid $40 Million To A Schron-Controlled Entity, It Obtained New 15-Year Pharmacy Contracts From Other Schron-Controlled Entities.

46.     On December 10, 2004, Mariner assigned MMS to a new Schron-controlled

company, HSA Equipment LLC ("HSA"). That same day, defendant Schron, through HSA,

signed a purchase agreement with Omnicare in which Omnicare agreed (a) to buy MMS at some

point in the future from HSA for a total price of $50 million, (b) to pay $40 million of the

purchase price to HSA immediately (*i.e.*, on December 10, 2004), and (c) to pay the final $10

million six months after the closing date of the MMS sale.

47.     Omnicare knew that, in order for defendants Schron, Forman, and Grunstein to

close their acquisition of Mariner on December 10, 2004, they needed Omnicare's $40 million

up-front payment for MMS. At the same time, Omnicare wanted to be sure that the Mariner

acquirers signed the new pharmacy contracts with Omnicare. Accordingly, and notwithstanding

Omnicare's outside counsel's advice that the pharmacy contracts and the MMS acquisition had

to be independent, Omnicare insisted that Mariner and Sava sign the new 15-year pharmacy

contracts with Omnicare prior to Omnicare paying the $40 million. Mariner and Sava complied

and signed the new contracts first.

48.     As the parties had contemplated, defendants Schron, Forman, and Grunstein used

Omnicare's $40 million up-front payment for MMS to fill the "hole" in defendant Schron's

financing, which enabled him to close on the larger Mariner acquisition on December 10, 2004.

17

## The Defendants Knowingly Failed To Disclose
## All Relevant Facts To Omnicare's Outside Counsel

49.    Omnicare had asked its outside counsel to approve its simultaneous payment of
\$40 million to a Schron-controlled entity and execution of new 15-year pharmacy agreements
with Mariner and Sava.

50.    Omnicare's outside counsel told Omnicare that he would approve the
simultaneous transactions only if they were independent of each other.

51.    The defendants led Omnicare's outside counsel to believe that the two
transactions were independent of each other by misrepresenting to him that Mariner and Sava
were not controlled by defendant Schron, but by Harry Grunstein, defendant Leonard
Grunstein's brother. In fact, Harry Grunstein, a resident of Israel, was only the titular owner of
Mariner and Sava. He was also the titular owner of National Senior Care, the shell entity that
was acquiring Mariner (on paper). Harry Grunstein contributed no money to purchase Mariner,
Sava, or National Senior Care.

52.    Omnicare's outside counsel conditioned his approval of the simultaneous
transactions on defendant Schron and Harry Grunstein signing certificates attesting to their
independence from each other.

53.    Defendant Schron and Harry Grunstein signed such certificates on December 10,
2004. Both certificates contained factual misrepresentations. For example, in the certificate he
signed on December 10, 2004, defendant Schron represented that, among other things, he did not
have or intend to acquire any equity interest in any entity controlled by Harry Grunstein. This
representation was directly contrary to two option agreements Schron signed that same day on

18

behalf of another of his entities called Cammeby's Equity Holdings LLC ("Cammeby's"). One option agreement gave Cammeby's the right to own 66.67% of Mariner or National Senior Care in exchange for Cammeby's forgiving a $75 million loan that it had extended to National Senior Care. The other option agreement gave Cammeby's the right to own 99.999% of Sava's parent (a holding company) in exchange for Cammeby's forgiving a $100 million loan that it had extended to that entity. Through the combination of these option agreements and outstanding loans, Schron effectively controlled Mariner and Sava. Schron also exercised practical control over Mariner and Sava because he had installed Harry Grunstein as their titular owner.

54.     The certificates by defendant Schron and Harry Grunstein also falsely represented that none of Harry Grunstein's relatives had an equity interest in SMV, another Schron entity. In fact, Harry Grunstein's brother, defendant Leonard Grunstein, had an equity interest in SMV.

55.     Omnicare understood that, notwithstanding the signed certificates, Schron and Harry Grunstein were not really independent, and that defendant Schron controlled the nursing home entities that agreed, on the same day that Omnicare made its $40 million up-front payment, to arrange for the purchase of all of their patients' drugs from Omnicare for the next fifteen years. Although Omnicare's $40 million up-front payment for MMS was owed to Schron, Omnicare wired the payment into an account for the benefit of, inter alia, Mariner and Sava, the entities nominally owned by Harry Grunstein that entered into the new 15-year pharmacy contracts with Omnicare. Moreover, Omnicare later paid the remaining $10 million for MMS to Mariner, not to Schron.

56.     Omnicare's outside counsel approved the simultaneous transactions in reliance on the factually inaccurate certificates and misrepresentations concerning Schron's and Harry

19

Grunstein's independence. Had Omnicare's outside counsel known that the certificates contained factual misrepresentations, he would not have given his approval.

## Fabricated Documents

57.    In August and September 2006, the United States issued subpoenas to Omnicare and various entities involved with Mariner that were controlled by defendant Schron.

58.    After receiving the subpoenas, defendants Grunstein, Forman, and Schron created new documents relating to the sale of MMS and backdated them to December 10, 2004. Defendant Schron signed these new documents.

59.    These post-hoc documents were intended to make it appear that, on December 10, 2004, Schron-controlled HSA paid Mariner $50 million for MMS, when in fact HSA paid nothing for MMS. The documents also were intended to create a false justification to explain why Omnicare paid the final $10 million owed on its purchase of MMS to Mariner, one of the entities that had signed new pharmacy contracts with Omnicare, instead of to HSA, the party that ostensibly had sold MMS to Omnicare.

## False Claims

60.    As a result of Omnicare's kickback, Mariner and Sava arranged for their nursing home patients' drugs to be purchased from Omnicare after December 10, 2004. Mariner and Sava are contractually bound to arrange for the continuation of these kickback-induced purchases from Omnicare until the year 2019. None of the defendants disclosed to Medicare or Medicaid that claims Omnicare submitted, or caused to be submitted, for drugs purchased for Mariner and Sava nursing home patients resulted from Omnicare's payment of a kickback to Mariner and Sava. These claims were ineligible for reimbursement because they were a result of the illegal

20

kickback.

61.     Omnicare has submitted, or caused to be submitted, thousands of false or

fraudulent claims to Medicare and Medicaid for the kickback-induced drug purchases for

Mariner and Sava nursing home patients. These claims include, for example, claims Omnicare

submitted, or caused to be submitted, for drugs delivered to one Medicaid patient in a

Mariner/Sava nursing home in Massachusetts:

| Drug Product Name | Rx Count | Days Supply | Total Paid |
|---|---|---|---|
| ALENDRONATE SODIUM | 13 | 351 | $944.19 |
| AMITRIPTYLINE HCL | 7 | 195 | $30.60 |
| AMPICILLIN SODIUM | 5 | 11 | $104.24 |
| AZATHIOPRINE | 3 | 75 | $78.07 |
| BACLOFEN | 19 | 495 | $686.33 |
| CEFTRIAXONE SODIUM | 4 | 19 | $649.18 |
| CEFUROXIME AXETIL | 1 | 10 | $21.49 |
| CIPROFLOXACIN HCL | 1 | 7 | $6.68 |
| CITALOPRAM HYDROBROMIDE | 9 | 233 | $81.78 |
| COLLAGENASE | 6 | 18 | $365.85 |
| CYCLOSPORINE | 8 | 108 | $737.82 |
| DEXTROSE 5%-0.45% SALINE | 1 | 1 | $7.00 |
| DEXTROSE 5%-NORMAL SALINE | 1 | 1 | $4.80 |
| DEXTROSE 5%-WATER | 11 | 25 | $436.68 |
| DULOXETINE HCL | 1 | 3 | $24.19 |
| ENOXAPARIN SODIUM | 58 | 566 | $15,444.68 |
| ESOMEPRAZOLE MAG TRIHYDRATE | 4 | 51 | $242.53 |
| FAMOTIDINE | 11 | 315 | $87.84 |
| FLUCONAZOLE | 2 | 13 | $11.91 |
| FOLIC ACID | 15 | 435 | $74.43 |
| FUROSEMIDE | 2 | 5 | $6.23 |
| GABAPENTIN | 20 | 555 | $1,898.20 |
| GENTAMICIN/SOD CHLORIDE | 4 | 8 | $177.44 |
| HEPARIN SODIUM,PORCINE | 5 | 50 | $108.93 |
| HYDROCHLOROTHIAZIDE | 5 | 135 | $20.80 |
| HYDROCODONE BIT/ACETAMINOPHEN | 1 | 1 | $3.08 |

| | | | |
|---|---|---|---|
| HYDROCODONE BITARTRATE/APAP | 4 | 11 | $15.48 |
| HYOSCYAMINE SULFATE | 1 | 5 | $3.55 |
| IBUPROFEN | 18 | 86 | $65.34 |
| INSULIN REGULAR, HUMAN | 4 | 40 | $133.42 |
| LACTULOSE | 5 | 35 | $53.81 |
| LEVOFLOXACIN | 1 | 7 | $81.71 |
| LIDOCAINE | 8 | 66 | $1,125.82 |
| LIDOCAINE HCL | 1 | 7 | $3.49 |
| LISINOPRIL | 5 | 135 | $32.55 |
| LORAZEPAM | 3 | 37 | $13.72 |
| METHADONE HCL | 32 | 687 | $327.38 |
| METRONIDAZOLE | 3 | 52 | $22.85 |
| MORPHINE SULFATE | 3 | 33 | $75.32 |
| MYCOPHENOLATE MOFETIL | 10 | 210 | $4,758.53 |
| NITROFURANTOIN MACROCRYSTAL | 5 | 92 | $186.02 |
| NITROFURANTOIN/NITROFURAN MAC | 1 | 7 | $26.94 |
| NORTRIPTYLINE HCL | 5 | 150 | $24.15 |
| NYSTATIN | 1 | 5 | $23.19 |
| OMEPRAZOLE | 9 | 243 | $974.71 |
| ONDANSETRON HCL | 1 | 2 | $321.11 |
| OXYCODONE HCL | 2 | 30 | $51.08 |
| PANTOPRAZOLE SODIUM | 2 | 33 | $126.55 |
| PIPERACILLIN/TAZOBACTAM/DEX-IS | 3 | 10 | $825.58 |
| PNEUMOCOCCAL 23-VAL P-SAC VAC | 1 | 1 | $33.73 |
| POLYETHYLENE GLYCOL 3350 | 3 | 45 | $46.26 |
| POTASSIUM CHLORIDE | 2 | 5 | $8.78 |
| PREDNISONE | 21 | 412 | $112.14 |
| PREGABALIN | 13 | 306 | $1,172.84 |
| PROCHLORPERAZINE MALEATE | 1 | 3 | $6.10 |
| PROPOXYPHENE HCL | 2 | 14 | $17.52 |
| QUETIAPINE FUMARATE | 11 | 330 | $2,354.59 |
| RANITIDINE HCL | 2 | 60 | $13.86 |
| RISEDRONATE SODIUM | 6 | 168 | $388.63 |
| SILVER SULFADIAZINE | 3 | 19 | $17.88 |
| SODIUM CL 0.9PC IRRIG. SOLN | 8 | 80 | $441.60 |
| SULFAMETHOXAZOLE/TRIMETHOPRIM | 15 | 303 | $82.15 |
| TIZANIDINE HCL | 4 | 105 | $197.60 |

| | | | |
|---|---|---|---|
| TRAMADOL HCL | 2 | 5 | $8.08 |
| TRAZODONE HCL | 1 | 15 | $3.33 |
| VANCOMYCIN HCL | 5 | 56 | $5,212.97 |
| ZINC OXIDE | 2 | 10 | $17.53 |

These claims also include, for example, claims Omnicare submitted, or caused to be submitted,

for drugs delivered to one Medicare patient in a Mariner/Sava nursing home in Massachusetts:

| Drug Product Name | Rx Count | Days Supply | Total Paid |
|---|---|---|---|
| ZYPREXA | 52 | 1560 | $13,861.39 |
| MIRTAZAPINE | 32 | 960 | $865.43 |
| LEVOTHYROXINE SODIUM | 31 | 930 | $323.00 |
| LIPITOR | 3 | 90 | $246.09 |
| METOPROLOL TARTRATE | 27 | 784 | $239.62 |
| PROTONIX | 1 | 30 | $113.66 |
| TAMIFLU | 1 | 14 | $113.31 |
| TOBRADEX | 1 | 10 | $68.34 |
| SYNTHROID | 2 | 60 | $32.75 |
| TOBRAMYCIN SULFATE | 1 | 1 | $8.34 |

### Count One
### (False Claims Act: Presentation Of False Claims, 31 U.S.C. § 3729(a)(1); Against Omnicare, Inc.)

62.    Plaintiff United States repeats and realleges each allegation in each of the

preceding paragraphs as if fully set forth herein.

63.    As a result of Omnicare's kickback payments to induce the other defendants to

purchase, order, or recommend or arrange for the purchasing or ordering of drugs from Omnicare

for Mariner and Sava nursing home patients, in violation of the anti-kickback statute, 42 U.S.C.

§ 1320a-7b(b)(2), all of the claims Omnicare presented, or caused to be presented, to Medicare

and Medicaid for those drugs are false or fraudulent.  Accordingly, Omnicare knowingly

23

presented, or caused to be presented, false or fraudulent claims to officials of the United States in violation of 31 U.S.C. § 3729(a)(1).

64.     By virtue of the false or fraudulent claims Omnicare presented, or caused to be presented, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

## Count Two
### (False Claims Act: Making Or Using False Records Or Statements To Cause Claims To Be Paid, 31 U.S.C. § 3729(a)(2); Against Omnicare, Inc.)

65.     Plaintiff United States repeats and realleges each allegation in each of the preceding paragraphs as if fully set forth herein.

66.     Omnicare knowingly made, used, or caused to be made or used, false records or statements to cause the United States to pay or approve false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(2). The false records or statements were the false certifications and representations of full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the anti-kickback statute, 42 U.S.C. § 1320a-7b. Omnicare made or caused to be made such false certifications and representations in agreements under state Medicaid programs and Medicare Part D when seeking to ensure that Medicaid and Medicare would reimburse for the drugs that Omnicare dispensed to Mariner and Sava nursing home patients.

67.     By virtue of the false records or statements Omnicare made, used, or caused to be made or used, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

24

## Count Three
### (False Claims Act:  Making Or Using False Records Or Statements To Conceal, Avoid, Or Decrease An Obligation To Pay Money To The United States, 31 U.S.C. § 3729(a)(7); Against Omnicare, Inc.)

68.    Plaintiff United States repeats and realleges each allegation in each of the preceding paragraphs as if fully set forth herein.

69.    Omnicare knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease Medicare Part D sponsors' obligations to pay or transmit money or property to the Government, in violation of 31 U.S.C. § 3729(a)(7).

70.    The false records or statements were the false certifications and representations Omnicare made or caused to be made in Medicare Part D agreements when seeking to ensure that Medicare would reimburse for the drugs that Omnicare dispensed to Mariner and Sava nursing home patients.  Those agreements contained certifications and representations of full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the anti-kickback statute, 42 U.S.C. § 1320a-7b.

71.    The false records or statements were submitted to the United States in conjunction with sponsors' agreements to operate one or more plans pursuant to Part D of the Medicare program, which includes an annual reconciliation process and risk-sharing arrangements. Consequently, any low-income subsidy and reinsurance payments made to Part D sponsors as a result of Omnicare's violations of the anti-kickback statute were owed to CMS in the reconciliation process, as well as any risk-sharing amounts resulting from Omnicare's anti-kickback statute violations that were paid to Part D sponsors under the risk-sharing arrangements.

72.   By virtue of the false records or statements Omnicare made, used, or caused to be

made or used, the United States has suffered actual damages and is entitled to recover treble

damages plus a civil monetary penalty for each false claim.

## Count Four
### (False Claims Act:  Causing The Presentation Of False Claims, 31 U.S.C. § 3729(a)(1); Against Rubin Schron, Leonard Grunstein, Murray Forman, Mariner Health Care, Inc., and SavaSeniorCare Administrative Services, LLC)

73.   Plaintiff United States repeats and realleges each allegation in each of the

preceding paragraphs as if fully set forth herein.

74.   As a result of the solicitation and receipt by defendants Schron, Grunstein,

Forman, Mariner, and Sava of Omnicare's kickback payments to obtain referrals of Mariner and

Sava nursing home patients for drug purchases, in violation of the anti-kickback statute, 42

U.S.C. § 1320a-7b(b)(1), all of the claims Omnicare made, or caused to be made, to Medicaid

and Medicare for those drugs are false or fraudulent.  Accordingly, defendants Schron,

Grunstein, Forman, Mariner, and Sava knowingly caused false or fraudulent claims to be

presented to officials of the United States in violation of 31 U.S.C. § 3729(a)(1).

75.   By virtue of the false or fraudulent claims that defendants Schron, Grunstein,

Forman, Mariner, and Sava knowingly caused to be presented, the United States has suffered

actual damages and is entitled to recover treble damages plus a civil monetary penalty for each

false claim.

26

**Count Five**
**(False Claims Act: Making Or Using False Records Or Statements To Cause Claims To Be Paid, 31 U.S.C. § 3729(a)(2);**
**Against Rubin Schron, Leonard Grunstein, Murray Forman, Mariner Health Care, Inc., and SavaSeniorCare Administrative Services, LLC)**

76.     Plaintiff United States repeats and realleges each allegation in each of the preceding paragraphs as if fully set forth herein.

77.     As a result of the solicitation and receipt by defendants Schron, Grunstein, Forman, Mariner, and Sava of Omnicare's kickback payments to obtain referrals of Mariner and Sava nursing home patients for drug purchases, in violation of the anti-kickback statute, 42 U.S.C. § 1320a-7b(b)(2), defendants Schron, Grunstein, Forman, Mariner, and Sava knowingly caused false records or statements to be made or used to cause the United States to pay or approve false or fraudulent claims. The false records or statements were the false certifications and representations of full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the anti-kickback statute, 42 U.S.C. § 1320a-7b. Defendants Schron, Grunstein, Forman, Mariner, and Sava caused such false certifications and representations to be made in agreements under state Medicaid programs and Medicare Part D when seeking to ensure that Medicaid and Medicare would reimburse for the drugs that Omnicare dispensed to Mariner and Sava nursing home patients.

78.     By virtue of the false records or statements defendants Schron, Grunstein, Forman, Mariner, and Sava caused to be made or used, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

## Count Six
### (False Claims Act: Conspiracy To Submit False Claims, 31 U.S.C. § 3729(a)(3); Against All Defendants)

79.     Plaintiff United States repeats and realleges each allegation in each of the preceding paragraphs as if fully set forth herein.

80.     Each of the defendants conspired with the other defendants to arrange for Omnicare to make kickback payments in exchange for referrals of Mariner and Sava nursing home patients for drug purchases, in violation of the anti-kickback statute, 42 U.S.C. § 1320a-7b(b)(2), thereby causing all of the claims, from on or shortly after December 10, 2004, through the present, to Medicaid and Medicare for those drugs, to be false or fraudulent. Accordingly, each of the defendants conspired to defraud the United States by getting false or fraudulent claims allowed or paid, in violation of 31 U.S.C. § 3729(a)(3).

81.     By virtue of the false or fraudulent claims defendants conspired to get allowed or paid, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

## Count Seven
### (False Claims Act: Making Or Using False Records Or Statements To Conceal, Avoid, Or Decrease An Obligation To Pay Money To The United States, 31 U.S.C. § 3729(a)(7); Against Rubin Schron, Leonard Grunstein, Murray Forman, Mariner Health Care, Inc., and SavaSeniorCare Administrative Services, LLC)

82.     Plaintiff United States repeats and realleges each allegation in each of the preceding paragraphs as if fully set forth herein.

83.     Defendants Schron, Grunstein, Forman, Mariner, and Sava knowingly caused to be made or used false records or statements to conceal, avoid, or decrease Medicare Part D

28

sponsors' obligations to pay or transmit money or property to the Government, in violation of 31
U.S.C. § 3729(a)(7).

84.     The false records or statements were the false certifications and representations
Defendants Schron, Grunstein, Forman, Mariner, and Sava caused to be made in agreements
between Omnicare and Medicare Part D sponsors when seeking to ensure that Medicare would
reimburse for the drugs that Omnicare dispensed to Mariner and Sava nursing home patients.
Those agreements contained certifications and representations of full compliance with all federal
and state laws and regulations prohibiting fraudulent acts and false reporting, including but not
limited to the anti-kickback statute, 42 U.S.C. § 1320a-7b.

85.     The false records or statements were submitted to the United States in conjunction
with Part D sponsors' transmittal of cost information to CMS for use in the annual reconciliation
process. Consequently, if CMS demanded a post-reconciliation payment from any such Part D
sponsor, it demanded too little.

86.     By virtue of the false records or statements defendants Schron, Grunstein,
Forman, Mariner, and Sava caused to be made or used, the United States has suffered actual
damages and is entitled to recover treble damages plus a civil monetary penalty for each false
claim.

## Count Eight
### (Unjust Enrichment And Disgorgement; Against Omnicare, Inc.)

87.     Plaintiff United States repeats and realleges each allegation in each of the
preceding paragraphs as if fully set forth herein.

88.     This is a claim for the recovery of monies by which Omnicare has been unjustly
enriched.

29

89.     By directly or indirectly obtaining government funds to which it was not entitled,

Omnicare was unjustly enriched, and is liable to account for and to disgorge such amounts, or the

proceeds therefrom, which are to be determined at trial, to the United States.

## Count Nine
### (Payment By Mistake; Against Omnicare, Inc.)

90.     Plaintiff United States repeats and realleges each allegation in each of the

preceding paragraphs as if fully set forth herein.

91.     This is a claim for the recovery of monies paid by the United States to Omnicare

as a result of mistaken understandings of fact.

92.     The false claims that Omnicare presented to the United States were based upon

mistaken or erroneous understandings of material fact.

93.     The United States, acting in reasonable reliance on the accuracy and truthfulness

of the information contained in the claims, paid Omnicare, directly or indirectly, certain sums of

money to which Omnicare was not entitled, and Omnicare is thus liable to account for and to pay

such amounts to the United States.

## Prayer For Relief

WHEREFORE, the United States demands and prays that judgment be entered in favor of

the United States as follows:

1.     On Counts One, Two, and Three under the False Claims Act, against Omnicare,

Inc., for the amount of the United States' damages, trebled as required by law, and such civil

penalties as are required by law, together with such further relief as may be just and proper.

30

2.     On Counts Four, Five, and Seven under the False Claims Act, against Rubin Schron, Leonard Grunstein, Murray Forman, Mariner Health Care, Inc., and SavaSeniorCare Administrative Services, LLC, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together with such further relief as may be just and proper.

3.     On Count Six under the False Claims Act, against all defendants, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together with such further relief as may be just and proper.

4.     On Counts Eight and Nine, against Omnicare, Inc., for unjust enrichment and payment by mistake, for the damages sustained and/or amounts by which Omnicare was unjustly enriched or by which Omnicare retained illegally obtained monies, plus interest, costs, and expenses, and such further relief as may be just and proper.

Respectfully submitted,

MICHAEL F. HERTZ
Acting Assistant Attorney General

MICHAEL J. SULLIVAN
United States Attorney

Dated: March 4, 2009

By:

GREGG SHAPIRO
CHRISTINE WICHERS
Assistant United States Attorneys
One Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3100

JOYCE R. BRANDA
DANIEL R. ANDERSON
LAURIE A. OBEREMBT
Attorneys, Civil Division
U.S. Department of Justice
P.O. Box 261, Ben Franklin Station
Washington, D.C. 20044
(202) 514-3345