# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA and THE STATES OF CALIFORNIA, FLORIDA, GEORGIA, ILLINOIS, INDIANA, LOUISIANA, MASSACHUSETTS, TENNESSEE, TEXAS, and WISCONSIN *ex rel.* ADAM B. RESNICK,<br><br>PLAINTIFFS,<br><br>*v.*<br><br>OMNICARE, INC., NATIONAL SENIOR CARE, INC., SAVASENIOR HEALTHCARE, INC., and RUBIN SCHRON,<br><br>DEFENDANTS. | CIVIL ACTION NO.<br>06-10149-RGS<br><br><br>**FILED UNDER SEAL<br>PURSUANT TO<br>31 U.S.C. § 3730(b)(2)**<br><br><br>JURY TRIAL DEMANDED |

## CORRECTED SECOND AMENDED COMPLAINT

Qui tam plaintiff Adam B. Resnick ("Relator") alleges as follows:

I.  INTRODUCTION

1.      This is an action to recover damages and civil penalties on behalf of the United States of America and the States of California, Florida, Georgia, Illinois, Indiana, Louisiana, Massachusetts, Tennessee, Texas, and Wisconsin (hereafter the "Plaintiff States") arising from false statements and claims made or caused to be made by the Defendants to the United States and its agents and intermediaries in violation of the Federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.* (the "Federal FCA") and to the Plaintiff States and their agents and intermediaries in violation of the Plaintiff States' False Claims Acts. The false claims and statements at issue were made or caused to be made by the Defendants in connection with kickbacks and claims for

payments made for pharmaceutical products.

2.      Originally enacted in 1863, the Federal FCA was substantially amended in 1986 by the False Claims Amendments Act. The 1986 amendments enhanced the government's ability to recover losses sustained as a result of fraud against the United States.

3.      The Federal FCA provides that any person who knowingly submits or causes to be submitted to the United States or recipients of Federal funds a false or fraudulent claim for payment or approval is liable for a civil penalty of between $5,500 and $11,000 for each such claim, and three times the amount of the damages sustained by the United States. The Act empowers persons having information regarding a false or fraudulent claim against the United States to bring an action on behalf of the United States and to share in any recovery. The original complaint must be filed under seal, without service on the defendants. That complaint remains under seal while the United States investigates the allegations and determines whether to join the action.

4.      As set forth below, Defendants' actions alleged in this Complaint also violate the California False Claims Act, Cal. Govt. Code §12650 et seq.; the Florida False Claims Act, Fla. Stat. Ann. §68.081 et seq.; the Georgia False Medicaid Claims Act, Ga. Code Ann. §49-4-168 et seq.; the Illinois Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. §175/1-8; the Indiana False Claims and Whistleblower Protection Act, Ind. Code §5-11-5.5 et seq.; the Louisiana Medical Assistance Program Integrity Law, La. Rev. Stat. §46:437.1 et seq.; the Massachusetts False Claims Law, Mass. Gen. Laws ch. 12 §5 et seq.; the Tennessee Medicaid False Claims Act, Tenn. Code Ann. §71 5 181 et seq.; the Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code Ann. §36.001 et seq.; and the Wisconsin False Claims for Medical

Assistance Act, Wis. Stat §20.931 et seq.

5.      Pursuant to the Federal and Plaintiff State False Claims Acts, Relator seeks to recover on behalf of the United States and the Plaintiff States damages and civil penalties arising from false and improper charges contained in claims for payment that Defendants submitted or caused to be submitted to the Medicare program, the Medicaid program and other Federal or State-funded health care programs.

6.      Defendant Omnicare, Inc. ("Omnicare") is a large institutional pharmacy that has grown dramatically over the last several years by purchasing other smaller institutional pharmacies. As alleged in this Complaint, Omnicare purchased at least two such institutional pharmacies – Pharmco and Medistat – at inflated purchase prices to "buy" contracts between the pharmacies and captive nursing homes.

7.      In addition, in 2004, Omnicare made a substantial "loan" to Rubin Schron to enable Schron to purchase Mariner Health Care, a nursing home chain. In return, Omnicare obtained or extended contracts to supply medication to the Mariner nursing homes. The former Mariner nursing homes are now run by National Senior Care, Inc., SavaSenior Healthcare, Inc. and other affiliates and subsidiaries of National Senior Care, Inc.

8.      In each of these cases, the nursing home contracts obtained as a result of Omnicare's improper payments allowed Omnicare to submit thousands of claims for reimbursement to health care programs funded by the United States and/or the Plaintiff States. As a result, the United States and the Plaintiff States paid Defendants and their co-conspirators substantial amounts that would not have paid had the truth been known about Defendants' and their co-conspirators' misconduct.

– 3 –

## JURISDICTION AND VENUE

9.     The Court has jurisdiction over the subject matter of this action pursuant to 28

U.S.C. § 1331, 28 U.S.C. §1367, and 31 U.S.C. § 3732, the last of which specifically confers

jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§3729 and 3730.

10.     Further, 31 U.S.C. §3732(b) specifically confers jurisdiction on this Court over

the state law claims asserted in this Complaint.

11.     Under 31 U.S.C. §3730(e), there has been no statutorily relevant public disclosure

of the "allegations or transactions" in this Complaint.  Relator, moreover, would qualify under

that section of the Federal FCA and the parallel provisions of the Plaintiff State False Claims

Acts as an "original source" of the allegations in this Complaint even had such a public

disclosure occurred.

12.     The Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C.

§ 3732(a), which authorizes nationwide service of process, and because Defendant Omnicare,

which conspired with each of the other Defendants to violate the anti-kickback law and the

Federal FCA, can be found in and transacts the business that is the subject matter of this lawsuit

in the District of Massachusetts.

13.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because

Defendant Omnicare, which conspired with each of the other Defendants to violate the Federal

Anti-Kickback law and the Federal and Plaintiff State False Claims Acts, can be found and

transacts the business that is the subject matter of this lawsuit in the District of Massachusetts.

## PARTIES

14.     Relator is a resident of Illinois. He brings this action against all Defendants on his

− 4 −

own behalf and on behalf and the United States pursuant to 31 U.S.C. § 3730(b)(1) and the States pursuant to their respective False Claims Acts.

15.     Defendant Omnicare, Inc., headquartered in Covington, Kentucky, is a provider of pharmaceutical care for the elderly. Omnicare serves approximately 1.4 million residents in long-term care facilities and other chronic care settings across the United States (including Mass- achusetts and each of the other Plaintiff States) and in Canada. It is the largest U.S. provider of pharmacy services to nursing home residents. As a result of the fraudulent transactions alleged herein and similar transactions into which it likely also has entered (based upon its pattern of behavior of which Relator is personally aware), Omnicare has gained market share that has allowed it to increase volume discounts that it receives from pharmaceutical manufacturers and wholesale distributors and thus reap additional profits for its sales of pharmaceutical services to nursing homes throughout the country.

16.     Defendant National Senior Care, Inc. ("NSC") is a Delaware corporation. On or about December 10, 2004, National Senior Care purchased and merged with Mariner Health Care, a Delaware corporation that owned or operated (either directly or through affiliates and subsidiaries) more than 250 nursing homes, including homes in Massachusetts, California, Florida, Georgia, Illinois, Indiana, Louisiana, Tennessee, Texas and Wisconsin. After the merger, NSC operated the former Mariner nursing homes through various affiliates and subsidiaries.

17.     Defendant SavaSenior Health Care, Inc. ("Sava"), headquartered in Marietta, Georgia, owns and/or operates a number of the nursing homes formerly owned by Mariner Health Care. Sava operates more than 250 nursing homes, including homes in Amesbury, New

-5-

Bedford, and Methuen, Massachusetts.

18.    Defendant Rubin Schron is a resident of New York, New York. Mr. Schron owns and controls, either directly or through various affiliates, both NSC and Sava and their respective affiliates and subsidiaries.

## BACKGROUND

19.    Medicare is a Federally-funded health insurance program primarily benefitting the elderly. Medicare Part A, the Basic Plan of Hospital Insurance, covers the cost of inpatient hospital services and post-hospital nursing facility care.

20.    Medicaid is a program funded jointly by the Federal and state governments to provide health care benefits for certain people, primarily the poor and disabled. The Florida Medicaid program is administered by the Agency for Health Care Administration ("AHCA").

21.    Nursing facilities typically contract with an institutional pharmacy to provide the drugs and other pharmaceutical products needed by their patients – whether payment is to be made by Medicare, Medicaid, another State-funded health care program, private insurance or the patient.

22.    Since 1998, Medicare has paid skilled nursing facilities ("SNF's") under a prospective payment system ("PPS"). Under PPS, Medicare pays a fixed fee per patient per day based upon the acuity of each patient's condition. That fixed fee covers the pharmaceutical products provided to the patients. Thus, the SNF bears the risk of excessive drug costs.

23.    In contrast, prescription drugs for Medicaid patients (who make up a majority of the patients at most nursing homes) are typically billed to the Medicaid program by the pharm-

– 6 –

acy. The reimbursement levels are set for each drug by the relevant state Medicaid program.

24.     The Federal health care Anti-Kickback statute, 42 U.S.C. §1320a-7b(b), arose out of Congressional concern that payoffs to those who can influence health care decisions will result in goods and services being provided that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population. To protect the integrity of Federal health care programs from these difficult-to-detect harms, Congress enacted a prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback actually gives rise to overutilization or poor quality of care.

25.     The Federal Anti-Kickback statute prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending or arranging for the purchase of any item for which payment may be made under a Federally-funded health care program. 42 U.S.C. §1320a-7b(b). Under this statute, health care companies may not offer or pay – and sources of patient referrals may not solicit or receive – any remuneration, directly or indirectly, overtly or covertly, that is intended to induce the purchase, order or recommendation of any good, facility, service or item that may be paid for, in whole or part, by a Federal health care program. The law thus prohibits any kind of payment by a pharmacy company to a nursing home or its principals or agents, in cash or kind, that has as one of its purposes inducement of the nursing home to purchase prescriptions of the company's pharmaceutical products.

26.     Pursuant to its authority under that Act, the Department of Health and Human Services ("HHS") has delineated exceptions to application of the Federal Anti-Kickback statute for, among other things, certain kinds of investment interests that HHS has concluded do not

– 7 –

significantly implicate the policy concerns underlying the Act. See 42 C.F.R. § 1001.952. Those exceptions, however, are narrowly tailored so as not to permit improper economic inducements to be disguised as unproblematic investment mechanisms. An entity whose activity otherwise would be covered by the broad, remedial language of the proscriptions under the Act is exempted from liability for such conduct only if that entity's investment interests and conduct meet all of the applicable standards set forth in the regulations for one of the three categories of investment exceptions that HHS has approved. Id. § 1001.952(a). Thus, in the category most relevant to this matter, an entity that possesses investment interests held by active or passive investors who stand to gain from health care sales of the entity can find safe harbor from the proscriptions of the Federal Anti-Kickback statute only to the extent that it meets all eight applicable standards set forth in 42 C.F.R. § 1001.952(a)(2). Most notably, these include the requirement that no more than 40% of the value of each class of the investment interests may be held in the year prior to the transaction at issue "by investors who are in a position to make or influence referrals to . . . or otherwise generate business for the entity," and that no more than 40% of the entity's gross revenue relating to furnishing of health care items or services in the prior year my come "from referrals or business otherwise generated from investors." Id. §§1001.952(a)(2)(i) & (vi).

27.     Violation of the Federal Anti-Kickback statute subjects the violator to exclusion from participation in Federal health care programs, civil monetary penalties, and imprisonment of up to five years per violation. 42 U.S.C. §§1320a-7(b)(7), 1320a-7a(a)(7). These civil monetary penalties may be up to $50,000 for each act in violation of the Anti-Kickback statute and damages of up to three times the amount of the remuneration offered or paid. 42 U.S.C. §1320a-7(b).

28.     Compliance with the Anti-Kickback law is a precondition to participation as a

health care provider under the Medicaid, CHAMPUS/TRICARE, CHAMPVA, Federal

Employee Health Benefit Program, and other Federal and Plaintiff State-funded health care

programs.

## ALLEGATIONS
### Pharmco Transaction

29.     Pharmco was an institutional pharmacy founded by Rocky Whitehead and Mike
Bolin.

30.     Pharmco was based in Cincinnati, Ohio, and had pharmacies in Ohio, Missouri,
Florida and California.  By 2004, Pharmco's annual revenue was $95 million.

31.     Al Schwartzberg and his son Harris Schwartzberg own a nursing home chain
called Cypress Healthcare ("Cypress").  In 2004, Cypress owned 14 nursing home throughout
Florida.

32.     In 2003, Pharmco of Florida began doing business.  Al and Harris Schwartzberg
were given a 50% ownership interest in Pharmco of Florida, and Pharmco began to provide
service to the Cypress homes in Florida.

33.     In late 2003, Relator Resnick had begun working as a consultant to a new
institutional pharmacy venture called "US Pharmacy."  US Pharmacy was to be a new pharmacy
owned by nursing home owners, and serving the owners' nursing homes.  The US Pharmacy
venture was designed, planned and being developed by a group that also owned an existing
institutional pharmacy based on a similar business / ownership model ("Total Pharmacy").
Resnick's assignment was to pitch limited partnership shares in Total Pharmacy "franchises" in

– 9 –

California and Florida under the name "US Pharmacy." Mr. Resnick also worked, occasionally, for Total Pharmacy trying to help it sign up new nursing homes.

34.     Management at Cypress quickly became dissatisfied with Pharmco's service. Because there were no contracts in place, in early 2004, Cypress executive Richard Kase and Resnick began discussions about switching Cypress' business from Pharmco to Total Pharmacy.

35.     According to Kase and the other management at Cypress, the Pharmco service was replete with medical errors and often drugs were not available, even for refilling standing orders.

36.     Throughout the first quarter of 2004, Kase and Harris Schwartzberg, CEO of Cypress, worked with Resnick to determine whether Total Pharmacy could provide them better service. After several months of meetings and due diligence, Kase decided that Total Pharmacy could provide the level of service they required. Kase formally recommended that Cypress switch its business to Total Pharmacy, and provided a detailed list of service requirements that Total Pharmacy would have to meet.

37.     On April 2, 2004, Resnick was abruptly told by Harris Schwartzberg that Cypress would stay with Pharmco, since "they were unwilling to put our Administrators and DON's through another difficult transition . . . ."

38.     Shortly thereafter, Resnick learned that, at the end of March, 2004, Omnicare had purchased Pharmco for $50 million. To achieve that purchase price for Pharmco, the Cypress homes were required to sign pharmacy service contracts with Omnicare. The Schwartzbergs were paid $1 million in exchange for signing those contracts.

## Medistat Transaction

39.     In late 2003, Omnicare was engaged in negotiations to purchase Medistat, an institutional pharmacy based in Boca Raton, Florida.

40.     During this same time period, Relator Resnick was also trying to generate business for the US Pharmacy venture with the Avante Group, which owned nursing homes in Florida and Georgia.

41.     However, once the Medistat purchase was completed, Michael Boker – the CFO of Avante – told Resnick that he was interested in US Pharmacy but that he has just signed one-year contracts with Medistat.

42.     According to Boker, Avante signed one-year contracts with Medistat when the Omnicare purchase occurred. Boker said that Avante got paid immediately for signing the contracts. Boker told Resnick that when the one-year contracts were up, he would revisit doing business with Resnick.

43.     The fact that payments were made for the Avante contracts through the Medistat purchase was confirmed in conversations that Resnick had with Alan Lichtman, a lawyer representing a number of nursing home interests.

44.     Resnick had approached Lichtman, who represented a number of nursing home interests, to see if he could interest Lichtman in US Pharmacy. Lichtman told Resnick that he could bring him 5,200 beds – 3,600 now and 1,600 when the contracts between Avante and Omnicare expired. Lichtman asked Resnick what he would get for delivering the contracts.

45.     Resnick was subsequently told that Teddy Lichstein, who owned Avante, was

paid $6 million from Medistat for delivering Avante contracts as part of the Omnicare purchase.

## Mariner Transaction

46.    In addition to his consulting work with TAS, Resnick also served as a consultant to Medliance. Medliance was a company that did consulting work with nursing homes, including reviewing bills between pharmacies and nursing homes to determine overpayments made by the nursing homes.

47.    Medliance wanted to obtain contracts with both IHS and Mariner Health Care. Mariner Health Care was a large nursing home chain that had recently emerged from bankruptcy. Rubin Schron, who had purchased IHS, another large nursing home chain, out of bankruptcy also wanted to purchase Mariner and had made an offer to do so by October 2004.

48.    In October 2004, Resnick – acting on behalf of Medliance – attended a meeting in New York City to discuss a contract between Medliance and IHS and Medliance and Mariner with representatives of Mr. Schron. At that meeting, Schron's lawyer declined to proceed with a discussion of a contract between Mariner and Medliance because Mariner was in extensive conversations with Omnicare, and Omnicare would not want Mariner to sign an agreement that would permit review of its pharmacy bills.

49.    In addition, Resnick was told that Schron was a little short of cash for the Mariner closing so that Omnicare was going to put up the cash as a "loan" to Schron and, in return, the Mariner nursing homes would sign contracts with Omnicare.

50.    On December 10, 2004, NSC (an entity controlled and funded in part by Schron) purchased and merged with Mariner. After the merger between NSC and Mariner, NSC operated

the former Mariner homes, including homes in Massachusetts and each of the other Plaintiff States, through various affiliates and subsidiaries (including Sava).

51.     After Omnicare made the "loan" to Schron, the former Mariner homes either extended old or signed new contracts with Omnicare.

52.     Resnick was also told that Medline, a large medical supply company, was also providing $10 million to Schron and that, in return, Medline would get a big supply contract with an "up front" rebate.

53.     In June 2005, Medline announced a $30 million sole-source contract to supply Mariner's 81 nursing homes.

## SUMMARY

54.     As described above, Omnicare has engaged in a pattern and practice of buying contracts to supply medications to nursing facilities.

55.     The inducements offered by Omnicare, whether in the form of (1) a high package sales price for a pharmacy plus last minute (or back dated) long-term contracts with captive nursing home customers; and/or (2) cash inducements to nursing home owners under the guise of a "loan," violate the Federal Anti-Kickback statute and the Federal and Plaintiff State False Claims Acts.

56.     Claims submitted by Omnicare to the United States or the Plaintiff States for medications supplied to patients who reside in homes where Omnicare obtained contracts through the payment of such unlawful inducements are fraudulent claims and are not properly subject to reimbursement under the Medicare program, the Medicaid program or other Federal or

– 13 –

Plaintiff State-funded health care programs.

## COUNT ONE
### Federal False Claims Act
31 U.S.C. §§ 3729(a)(1)-(3)

57.     Relator realleges and incorporates by reference the allegations made in Paragraphs
1 through 56 of this Complaint.

58.     This is a claim for treble damages and penalties under the False Claims Act, 31
U.S.C. §§ 3729 *et seq.*, as amended.

59.     Through the acts described above, Defendants knowingly presented and caused to
be presented to the United States fraudulent claims, records, and statements in order to obtain
reimbursement for pharmacy services provided under the Medicare program, the Medicaid
program or other Federally-funded health care programs.

60.     Through the acts described above, Defendant knowingly made, used, and caused
to be made and used false records and statements to get false or fraudulent claims paid or
approved by the United States.

61.     In the manner described above, Defendants have conspired among themselves
with the other persons and entities identified in this Complaint whereby Defendants have agreed
unlawfully to pay and receive unlawful kickbacks and to procure, sign, and accept the benefit of
fraudulent  pharmacy service contracts for care provided to nursing home residents insured by the
Medicare program, the Medicaid program or other Federally-funded health care programs.

62.     Defendants and their co-conspirators knew, both in fact and within the meaning of

the Federal False Claims Act, that through these inflated long-term pharmacy arrangements that

Defendants and their co-conspirators would be violating the Federal health care Anti-Kickback

statute and the False Claims Act, by getting false or fraudulent claims submitted by Defendants

and/or their co-conspirators to the Medicare program, the Medicaid program or other Federally-

funded health care programs allowed or paid.

63.     Each prescription that was dispensed as a result of Defendants' illegal

inducements and/or illegal conspiracy represents a false or fraudulent record, and each claim for

reimbursement for such prescriptions submitted to a Federally-funded health care program

represents a false or fraudulent claim for payment.

64.     The United States, unaware of the falsity of the claims made by the Defendants,

approved, paid, and participated in payments made by the United States' fiscal intermediaries for

claims that otherwise would not have been allowed.

65.     By reason of these payments and approvals, the United States has been damaged,

and continues to be damaged, in an amount yet to be determined.

### COUNT TWO
California False Claims Act
Cal Govt Code §12651(a)(1)-(3)

66.     Relator realleges and incorporates by reference the allegations made in Paragraphs

1 through 56 of this Complaint.

67.     This is a claim for treble damages and penalties under the California False Claims

Act.

68.     Through the acts described above, Defendants and their agents and employees

knowingly presented and caused to be presented to the State of California false claims in order to obtain reimbursement for pharmacy services provided under the Medicaid program and other State-funded health care programs.

69.     Through the acts described above, Defendants and their agents and employees knowingly made, used and caused to be made and used false records or statements to get the State of California to pay or approve false or fraudulent claims for pharmacy services provided under the Medicaid program and other State-funded health care programs.

70.     In the manner described above, Defendants have conspired among themselves with the other persons and entities identified in this Complaint whereby Defendants have agreed unlawfully to pay and receive unlawful kickbacks and to procure, sign, and accept the benefit of fraudulent  pharmacy service contracts for care provided to nursing home residents insured by the Medicaid program or other State-funded health care programs.

71.     Defendants and their co-conspirators knew, both in fact and within the meaning of the California False Claims Act, that through these inflated long-term pharmacy arrangements that Defendants and their co-conspirators would be violating the Federal health care Anti-Kickback statute and the California False Claims Act, by getting false or fraudulent claims sub-mitted by Defendants and/or their co-conspirators to the Medicaid program or other State-funded health care programs allowed or paid.

72.     Each prescription that was dispensed as a result of Defendants' illegal inducements represents a false or fraudulent record, and each claim for reimbursement for such prescriptions submitted to a State-funded health care program represents a false or fraudulent claim for payment.

73.     The State of California, unaware of the falsity or fraudulence of the records, statements and claims made or submitted by Defendants, their agents, employees and co-conspirators, approved, paid and continues to approve and pay claims that otherwise would not have been approved or paid.

74.     Defendants and their co-conspirators knew, both in fact and within the meaning of the California False Claims Act, that through the acts described above they would be violating the Federal Anti-Kickback statutes and the California False Claims Act, by getting false or fraudulent claims submitted by Defendants and/or their co-conspirators allowed or paid.

75.     By reason of these payments and approvals, the State of California has been damaged, and continues to be damaged, in an amount yet to be determined.

## COUNT THREE
### Florida False Claims Act
Section 68.082(2)(a)-(c), Florida Statutes

76.     Relator realleges and incorporates by reference the allegations made in Paragraphs 1 through 56 of this Complaint.

77.     This is a claim for treble damages and penalties under the Florida False Claims Act.

78.     Through the acts described above, Defendants and their agents and employees knowingly presented and caused to be presented to the State of Florida false claims in order to obtain reimbursement for pharmacy services provided under the Medicaid program and other State-funded health care programs.

79.     Through the acts described above, Defendants and their agents and employees knowingly made, used and caused to be made and used false records or statements to get the

State of Florida to pay or approve false or fraudulent claims for pharmacy services provided under the Medicaid program and other State-funded health care programs.

80.     In the manner described above, Defendants have conspired among themselves with the other persons and entities identified in this Complaint whereby Defendants have agreed unlawfully to pay and receive unlawful kickbacks and to procure, sign, and accept the benefit of fraudulent  pharmacy service contracts for care provided to nursing home residents insured by the Medicaid program or other State-funded health care programs.

81.     Defendants and their co-conspirators knew, both in fact and within the meaning of the Florida False Claims Act, that through these inflated long-term pharmacy arrangements that Defendants and their co-conspirators would be violating the Federal health care Anti-Kickback statute and the Florida False Claims Act, by getting false or fraudulent claims submitted by Defendants and/or their co-conspirators to the Medicaid program or other State-funded health care programs allowed or paid.

82.     Each prescription that was dispensed as a result of Defendants' illegal inducements represents a false or fraudulent record, and each claim for reimbursement for such prescriptions submitted to a State-funded health care program represents a false or fraudulent claim for payment.

83.     The State of Florida, unaware of the falsity or fraudulence of the records, statements and claims made or submitted by Defendants, their agents, employees and co-conspirators, approved, paid and continues to approve and pay claims that otherwise would not have been approved or paid.

84.     Defendants and their co-conspirators knew, both in fact and within the meaning of

the Florida False Claims Act, that through the acts described above they would be violating the

Federal Anti-Kickback statutes and the State False Claims Act, by getting false or fraudulent

claims submitted by Defendants and/or their co-conspirators allowed or paid.

85.    By reason of these payments and approvals, the State of Florida has been

damaged, and continues to be damaged, in an amount yet to be determined.

## COUNT FOUR

Georgia False Medicaid Claims Act

Ga. Code Ann. §49-4-168.1(1)-(3)

86.    Relator realleges and incorporates by reference the allegations made in Paragraphs

1 through 56 of this Complaint.

87.    This is a claim for treble damages and penalties under the Georgia False Medicaid

Claims Act.

88.    Through the acts described above, Defendants and their agents and employees

knowingly presented and caused to be presented to the State of Georgia false claims in order to

obtain reimbursement for pharmacy services provided under the Medicaid program and other

State-funded health care programs.

89.    Through the acts described above, Defendants and their agents and employees

knowingly made, used and caused to be made and used false records or statements to get the

State of Georgia to pay or approve false or fraudulent claims for pharmacy services provided

under the Medicaid program and other State-funded health care programs.

90.    In the manner described above, Defendants have conspired among themselves

with the other persons and entities identified in this Complaint whereby Defendants have agreed

unlawfully to pay and receive unlawful kickbacks and to procure, sign, and accept the benefit of

fraudulent  pharmacy service contracts for care provided to nursing home residents insured by the Medicaid program or other State-funded health care programs.

91.     Defendants and their co-conspirators knew, both in fact and within the meaning of the Georgia False Medicaid Claims Act, that through these inflated long-term pharmacy arrangements that Defendants and their co-conspirators would be violating the Federal health care Anti-Kickback statute and the Georgia False Medicaid Claims Act, by getting false or fraudulent claims submitted by Defendants and/or their co-conspirators to the Medicaid program or other State-funded health care programs allowed or paid.

92.     Each prescription that was dispensed as a result of Defendants' illegal inducements represents a false or fraudulent record, and each claim for reimbursement for such prescriptions submitted to a State-funded health care program represents a false or fraudulent claim for payment.

93.     The State of Georgia, unaware of the falsity or fraudulence of the records, statements and claims made or submitted by Defendants, their agents, employees and co-conspirators, approved, paid and continues to approve and pay claims that otherwise would not have been approved or paid.

94.     Defendants and their co-conspirators knew, both in fact and within the meaning of the Georgia False Medicaid Claims Act, that through the acts described above they would be violating the Federal Anti-Kickback statutes and the State False Claims Act, by getting false or fraudulent claims submitted by Defendants and/or their co-conspirators allowed or paid.

95.     By reason of these payments and approvals, the State of Georgia has been damaged, and continues to be damaged, in an amount yet to be determined.

## COUNT FIVE

Illinois Whistleblower Reward and Protection Act

740 Ill. Comp. Stat. §175/3(a)(1)-(3)

96.     Relator realleges and incorporates by reference the allegations made in Paragraphs 1 through 56 of this Complaint.

97.     This is a claim for treble damages and penalties under the Illinois Whistleblower Reward and Protection Act.

98.     Through the acts described above, Defendants and their agents and employees knowingly presented and caused to be presented to the State of Illinois false claims in order to obtain reimbursement for pharmacy services provided under the Medicaid program and other State-funded health care programs.

99.     Through the acts described above, Defendants and their agents and employees knowingly made, used and caused to be made and used false records or statements to get the State of Illinois to pay or approve false or fraudulent claims for pharmacy services provided under the Medicaid program and other State-funded health care programs.

100.     In the manner described above, Defendants have conspired among themselves with the other persons and entities identified in this Complaint whereby Defendants have agreed unlawfully to pay and receive unlawful kickbacks and to procure, sign, and accept the benefit of fraudulent  pharmacy service contracts for care provided to nursing home residents insured by the Medicaid program or other State-funded health care programs.

101.     Defendants and their co-conspirators knew, both in fact and within the meaning of the Illinois Whistleblower Reward and Protection Act, that through these inflated long-term pharmacy arrangements that Defendants and their co-conspirators would be violating the Federal

health care Anti-Kickback statute and the Illinois Whistleblower Reward and Protection Act, by getting false or fraudulent claims submitted by Defendants and/or their co-conspirators to the Medicaid program or other State-funded health care programs allowed or paid.

102.    Each prescription that was dispensed as a result of Defendants' illegal inducements represents a false or fraudulent record, and each claim for reimbursement for such prescriptions submitted to a State-funded health care program represents a false or fraudulent claim for payment.

103.    The State of Illinois, unaware of the falsity or fraudulence of the records, statements and claims made or submitted by Defendants, their agents, employees and co-conspirators, approved, paid and continues to approve and pay claims that otherwise would not have been approved or paid.

104.    Defendants and their co-conspirators knew, both in fact and within the meaning of the Illinois Whistleblower Reward and Protection Act, that through the acts described above they would be violating the Federal Anti-Kickback statutes and the State False Claims Act, by getting false or fraudulent claims submitted by Defendants and/or their co-conspirators allowed or paid.

105.    By reason of these payments and approvals, the State of Illinois has been damaged, and continues to be damaged, in an amount yet to be determined.

## COUNT SIX
Indiana False Claims and Whistleblower Protection Act
Ind. Code Ann. §5-11-5.5-2(b)(1)-(3)

106.    Relator realleges and incorporates by reference the allegations made in Paragraphs 1 through 56 of this Complaint.

107.    This is a claim for treble damages and penalties under the Indiana False Claims

and Whistleblower Protection Act.

108.    Through the acts described above, Defendants and their agents and employees knowingly presented and caused to be presented to the State of Indiana false claims in order to obtain reimbursement for pharmacy services provided under the Medicaid program and other State-funded health care programs.

109.    Through the acts described above, Defendants and their agents and employees knowingly made, used and caused to be made and used false records or statements to get the State of Indiana to pay or approve false or fraudulent claims for pharmacy services provided under the Medicaid program and other State-funded health care programs.

110.    In the manner described above, Defendants have conspired among themselves with the other persons and entities identified in this Complaint whereby Defendants have agreed unlawfully to pay and receive unlawful kickbacks and to procure, sign, and accept the benefit of fraudulent  pharmacy service contracts for care provided to nursing home residents insured by the Medicaid program or other State-funded health care programs.

111.    Defendants and their co-conspirators knew, both in fact and within the meaning of the Indiana False Claims and Whistleblower Protection Act, that through these inflated long-term pharmacy arrangements that Defendants and their co-conspirators would be violating the Federal health care Anti-Kickback statute and the Indiana False Claims and Whistleblower Protection Act, by getting false or fraudulent claims submitted by Defendants and/or their co-conspirators to the Medicaid program or other State-funded health care programs allowed or paid.

112.    Each prescription that was dispensed as a result of Defendants' illegal inducements represents a false or fraudulent record, and each claim for reimbursement for such

prescriptions submitted to a State-funded health care program represents a false or fraudulent claim for payment.

113.    The State of Indiana, unaware of the falsity or fraudulence of the records, statements and claims made or submitted by Defendants, their agents, employees and co-conspirators, approved, paid and continues to approve and pay claims that otherwise would not have been approved or paid.

114.    Defendants and their co-conspirators knew, both in fact and within the meaning of the Indiana False Claims and Whistleblower Protection Act, that through the acts described above they would be violating the Federal Anti-Kickback statutes and the State False Claims Act, by getting false or fraudulent claims submitted by Defendants and/or their co-conspirators allowed or paid.

115.    By reason of these payments and approvals, the State of Indiana has been damaged, and continues to be damaged, in an amount yet to be determined.

**COUNT SEVEN**

Louisiana Medical Assistance Programs Integrity Law

La. Rev. Stat. §437 et seq.

116.    Relator realleges and incorporates by reference the allegations made in Paragraphs 1 through 56 of this Complaint.

117.    This is a claim for treble damages and penalties under the Louisiana Medical Assistance Programs Integrity Law.

118.    Through the acts described above, Defendants and their agents and employees knowingly presented and caused to be presented to the State of Louisiana false claims in order to obtain reimbursement for pharmacy services provided under the Medicaid program and other

— 24 —

State-funded health care programs.

119.    Through the acts described above, Defendants and their agents and employees knowingly made, used and caused to be made and used false records or statements to get the State of Louisiana to pay or approve false or fraudulent claims for pharmacy services provided under the Medicaid program and other State-funded health care programs.

120.    In the manner described above, Defendants have conspired among themselves with the other persons and entities identified in this Complaint whereby Defendants have agreed unlawfully to pay and receive unlawful kickbacks and to procure, sign, and accept the benefit of fraudulent  pharmacy service contracts for care provided to nursing home residents insured by the Medicaid program or other State-funded health care programs.

121.    Defendants and their co-conspirators knew, both in fact and within the meaning of the Louisiana Medical Assistance Programs Integrity Law, that through these inflated long-term pharmacy arrangements that Defendants and their co-conspirators would be violating the Federal health care Anti-Kickback statute and the Louisiana Medical Assistance Programs Integrity Law, by getting false or fraudulent claims submitted by Defendants and/or their co-conspirators to the Medicaid program or other State-funded health care programs allowed or paid.

122.    Each prescription that was dispensed as a result of Defendants' illegal inducements represents a false or fraudulent record, and each claim for reimbursement for such prescriptions submitted to a State-funded health care program represents a false or fraudulent claim for payment.

123.    The State of Louisiana, unaware of the falsity or fraudulence of the records, statements and claims made or submitted by Defendants, their agents, employees and co-

conspirators, approved, paid and continues to approve and pay claims that otherwise would not have been approved or paid.

124.    Defendants and their co-conspirators knew, both in fact and within the meaning of the Louisiana Medical Assistance Programs Integrity Law, that through the acts described above they would be violating the Federal Anti-Kickback statutes and the State False Claims Act, by getting false or fraudulent claims submitted by Defendants and/or their co-conspirators allowed or paid.

125.    By reason of these payments and approvals, the State of Louisiana has been damaged, and continues to be damaged, in an amount yet to be determined.

## COUNT EIGHT

Massachusetts False Claims Law

Mass. Gen. Laws ch. 12 §5B(1)-(3)

126.    Relator realleges and incorporates by reference the allegations made in Paragraphs 1 through 56 of this Complaint.

127.    This is a claim for treble damages and penalties under the Massachusetts False Claims Law.

128.    Through the acts described above, Defendants and their agents and employees knowingly presented and caused to be presented to the State of Massachusetts false claims in order to obtain reimbursement for pharmacy services provided under the Medicaid program and other State-funded health care programs.

129.    Through the acts described above, Defendants and their agents and employees knowingly made, used and caused to be made and used false records or statements to get the State of Massachusetts to pay or approve false or fraudulent claims for pharmacy services

provided under the Medicaid program and other State-funded health care programs.

130. In the manner described above, Defendants have conspired among themselves with the other persons and entities identified in this Complaint whereby Defendants have agreed unlawfully to pay and receive unlawful kickbacks and to procure, sign, and accept the benefit of fraudulent pharmacy service contracts for care provided to nursing home residents insured by the Medicaid program or other State-funded health care programs.

131. Defendants and their co-conspirators knew, both in fact and within the meaning of the Massachusetts False Claims Law, that through these inflated long-term pharmacy arrangements that Defendants and their co-conspirators would be violating the Federal health care Anti-Kickback statute and the Massachusetts False Claims Law, by getting false or fraudulent claims submitted by Defendants and/or their co-conspirators to the Medicaid program or other State-funded health care programs allowed or paid.

132. Each prescription that was dispensed as a result of Defendants' illegal inducements represents a false or fraudulent record, and each claim for reimbursement for such prescriptions submitted to a State-funded health care program represents a false or fraudulent claim for payment.

133. The State of Massachusetts, unaware of the falsity or fraudulence of the records, statements and claims made or submitted by Defendants, their agents, employees and co-conspirators, approved, paid and continues to approve and pay claims that otherwise would not have been approved or paid.

134. Defendants and their co-conspirators knew, both in fact and within the meaning of the Massachusetts False Claims Law, that through the acts described above they would be

violating the Federal Anti-Kickback statutes and the State False Claims Act, by getting false or fraudulent claims submitted by Defendants and/or their co-conspirators allowed or paid.

135.   By reason of these payments and approvals, the State of Massachusetts has been damaged, and continues to be damaged, in an amount yet to be determined.

## COUNT NINE
Tennessee Medicaid False Claims Act
Tenn. Code Ann. § 71-5-182(a)(1)

136.   Relator realleges and incorporates by reference the allegations made in Paragraphs 1 through 56 of this Complaint.

137.   This is a claim for treble damages and penalties under the Tennessee Medicaid False Claims Act.

138.   Through the acts described above, Defendants and their agents and employees knowingly presented and caused to be presented to the State of Tennessee false claims in order to obtain reimbursement for pharmacy services provided under the Medicaid program and other State-funded health care programs.

139.   Through the acts described above, Defendants and their agents and employees knowingly made, used and caused to be made and used false records or statements to get the State of Tennessee to pay or approve false or fraudulent claims for pharmacy services provided under the Medicaid program and other State-funded health care programs.

140.   In the manner described above, Defendants have conspired among themselves with the other persons and entities identified in this Complaint whereby Defendants have agreed unlawfully to pay and receive unlawful kickbacks and to procure, sign, and accept the benefit of fraudulent  pharmacy service contracts for care provided to nursing home residents insured by the

Medicaid program or other State-funded health care programs.

141.    Defendants and their co-conspirators knew, both in fact and within the meaning of the Tennessee Medicaid False Claims Act, that through these inflated long-term pharmacy arrangements that Defendants and their co-conspirators would be violating the Federal health care Anti-Kickback statute and the Tennessee Medicaid False Claims Act, by getting false or fraudulent claims submitted by Defendants and/or their co-conspirators to the Medicaid program or other State-funded health care programs allowed or paid.

142.    Each prescription that was dispensed as a result of Defendants' illegal inducements represents a false or fraudulent record, and each claim for reimbursement for such prescriptions submitted to a State-funded health care program represents a false or fraudulent claim for payment.

143.    The State of Tennessee, unaware of the falsity or fraudulence of the records, statements and claims made or submitted by Defendants, their agents, employees and co-conspirators, approved, paid and continues to approve and pay claims that otherwise would not have been approved or paid.

144.    Defendants and their co-conspirators knew, both in fact and within the meaning of the Tennessee Medicaid False Claims Act, that through the acts described above they would be violating the Federal Anti-Kickback statutes and the State False Claims Acts, by getting false or fraudulent claims submitted by Defendants and/or their co-conspirators allowed or paid.

145.    By reason of these payments and approvals, the State of Tennessee has been damaged, and continues to be damaged, in an amount yet to be determined.

## COUNT TEN

Texas Medicaid Fraud Prevention Law
Tex. Hum. Res. Code Ann. §36.002

146.    Relator realleges and incorporates by reference the allegations made in Paragraphs 1 through 56 of this Complaint.

147.    This is a claim for treble damages and penalties under the Texas Medicaid Fraud Prevention Law.

148.    Through the acts described above, Defendants and their agents and employees knowingly presented and caused to be presented to the State of Texas false claims in order to obtain reimbursement for pharmacy services provided under the Medicaid program and other State-funded health care programs.

149.    Through the acts described above, Defendants and their agents and employees knowingly made, used and caused to be made and used false records or statements to get the State of Texas to pay or approve false or fraudulent claims for pharmacy services provided under the Medicaid program and other State-funded health care programs.

150.    In the manner described above, Defendants have conspired among themselves with the other persons and entities identified in this Complaint whereby Defendants have agreed unlawfully to pay and receive unlawful kickbacks and to procure, sign, and accept the benefit of fraudulent  pharmacy service contracts for care provided to nursing home residents insured by the Medicaid program or other State-funded health care programs.

151.    Defendants and their co-conspirators knew, both in fact and within the meaning of the Texas Medicaid Fraud Prevention Law, that through these inflated long-term pharmacy arrangements that Defendants and their co-conspirators would be violating the Federal health care Anti-Kickback statute and the Texas Medicaid Fraud Prevention Law, by getting false or

fraudulent claims submitted by Defendants and/or their co-conspirators to the Medicaid program or other State-funded health care programs allowed or paid.

152.    Each prescription that was dispensed as a result of Defendants' illegal inducements represents a false or fraudulent record, and each claim for reimbursement for such prescriptions submitted to a State-funded health care program represents a false or fraudulent claim for payment.

153.    The State of Texas, unaware of the falsity or fraudulence of the records, statements and claims made or submitted by Defendants, their agents, employees and co-conspirators, approved, paid and continues to approve and pay claims that otherwise would not have been approved or paid.

154.    Defendants and their co-conspirators knew, both in fact and within the meaning of the Texas Medicaid Fraud Prevention Law, that through the acts described above they would be violating the Federal Anti-Kickback statutes and the State False Claims Act, by getting false or fraudulent claims submitted by Defendants and/or their co-conspirators allowed or paid.

155.    By reason of these payments and approvals, the State of Texas has been damaged, and continues to be damaged, in an amount yet to be determined.

### COUNT ELEVEN
Wisconsin False Claims for Medical Assistance Act
Wis. Stat §20.931(2)(a)-(c)

156.    Relator realleges and incorporates by reference the allegations made in Paragraphs 1 through 56 of this Complaint.

157.    This is a claim for treble damages and penalties under the Wisconsin False Claims for Medical Assistance Act.

158.    Through the acts described above, Defendants and their agents and employees knowingly presented and caused to be presented to the State of Wisconsin false claims in order to obtain reimbursement for pharmacy services provided under the Medicaid program and other State-funded health care programs.

159.    Through the acts described above, Defendants and their agents and employees knowingly made, used and caused to be made and used false records or statements to get the State of Wisconsin to pay or approve false or fraudulent claims for pharmacy services provided under the Medicaid program and other State-funded health care programs.

160.    In the manner described above, Defendants have conspired among themselves with the other persons and entities identified in this Complaint whereby Defendants have agreed unlawfully to pay and receive unlawful kickbacks and to procure, sign, and accept the benefit of fraudulent  pharmacy service contracts for care provided to nursing home residents insured by the Medicaid program or other State-funded health care programs.

161.    Defendants and their co-conspirators knew, both in fact and within the meaning of the Wisconsin False Claims for Medical Assistance Act, that through these inflated long-term pharmacy arrangements that Defendants and their co-conspirators would be violating the Federal health care Anti-Kickback statute and the Wisconsin False Claims for Medical Assistance Act, by getting false or fraudulent claims submitted by Defendants and/or their co-conspirators to the Medicaid program or other State-funded health care programs allowed or paid.

162.    Each prescription that was dispensed as a result of Defendants' illegal inducements represents a false or fraudulent record, and each claim for reimbursement for such prescriptions submitted to a State-funded health care program represents a false or fraudulent

claim for payment.

163.    The State of Wisconsin, unaware of the falsity or fraudulence of the records, statements and claims made or submitted by Defendants, their agents, employees and co-conspirators, approved, paid and continues to approve and pay claims that otherwise would not have been approved or paid.

164.    Defendants and their co-conspirators knew, both in fact and within the meaning of the Wisconsin False Claims for Medical Assistance Act, that through the acts described above they would be violating the Federal Anti-Kickback statutes and the State False Claims Act, by getting false or fraudulent claims submitted by Defendants and/or their co-conspirators allowed or paid.

165.    By reason of these payments and approvals, the State of Wisconsin has been damaged, and continues to be damaged, in an amount yet to be determined.

## PRAYER FOR RELIEF

**WHEREFORE,**   Relator requests that judgment be entered against Defendants, ordering that:

a.      Defendants cease and desist from violating the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.* and the Plaintiff State False Claims Acts;

b.      that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. §3729;

c.      that this Court enter judgment against Defendants in an amount equal to three

times the amount of damages the State of California has sustained because of Defendants' actions,  plus a civil penalty of $10,000 for each violation of Cal. Govt. Code §12651(a);

d.      that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Florida has sustained because of Defendants' actions, plus a civil penalty of $11,000 for each violation of Fla. Stat. Ann. §68.082(2);

e.      that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Georgia has sustained because of Defendants' actions, plus a civil penalty of $11,000 for each violation of Ga. Code Ann. §49-4-168.1;

f.      that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Illinois has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of 740 Ill. Comp. Stat. §175/3(a);

g.      that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Indiana has sustained because of Defendants' actions, plus a civil penalty of $5,000 for each violation of Ind. Code Ann. §5-11-5.5-2(b);

h.      that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Louisiana has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of La. Rev. Stat. §437 et seq.;

i.      that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Massachusetts has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of Mass. Gen. L. Ch. 12 §5B;

j.      that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Tennessee has sustained because of Defendants'

actions, plus a civil penalty of $10,000 for each violation of Tenn. Code Ann. §§4-18-103(a) and 71-5-182(a)(1);

      k.     that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Texas has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of Tex. Hum. Res. Code Ann. §36.002;

      l.     that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Wisconsin has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of Wis. Stat §20.931(2);

      c.     Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) and the parallel provisions of the Plaintiff State False Claims Acts;

      d.     Relator be awarded all costs of this action, including attorneys' fees, expenses, and costs pursuant to 31 U.S.C. § 3730(d) and (h) and the parallel provisions of the Plaintiff State False Claims Acts;

      e.     The United States, the Plaintiff States and Relator be granted all such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

      Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demand a trial by jury.

Dated: August ___, 2009

BARTLETT HACKETT FEINBERG P.C.

By: _____

Howard Brown
BBO#547948
Bartlett Hackett Feinberg PC
155 Federal Street, Ninth Floor
Boston, MA 02110
Telephone: (617) 422-0200


PHILLIPS & COHEN LLP
Mary Louise Cohen
Peter W. Chatfield
Timothy P. McCormack
2000 Massachusetts Avenue, NW
Washington, DC 20036
Telephone: (202) 833-4567

COUNSEL FOR *QUI TAM* PLAINTIFF

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

FILED
IN CLERKS OFFIC

2009 AUG -6  P 12:

ST.ICT COUR
DISTRICT OF MASS

|  |  |
|---|---|
| [UNDER SEAL], ) | CIVIL ACTION NO. |
| ) | 06-10149-RGS |
| PLAINTIFFS, ) | |
| ) | |
| *v.* ) | **MOTION FOR LEAVE TO FILE** |
| ) | **CORRECTED SECOND** |
| [UNDER SEAL], ) | **AMENDED COMPLAINT AND** |
| ) | **TO CORRECT DOCKETING OF** |
| DEFENDANT. ) | **PRIOR MOTION AND** |
| ) | **COMPLAINT** |

**FILED UNDER SEAL**

**PLEASE DO NOT PUT ON PACER**