UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

————————————————————————— )
UNITED STATES OF AMERICA, et al., ex rel.   )
ADAM B. RESNICK,                            )
                                            )
                    Plaintiffs,             )
                                            )   Civil Action No. 06-10149-RGS
                                            )
v.                                          )
                                            )
OMNICARE, INC., RUBIN SCHRON,               )
LEONARD GRUNSTEIN, MURRAY FORMAN,           )
MARINER HEALTH CARE, INC., and              )
SAVASENIORCARE ADMINISTRATIVE               )
SERVICES, LLC,                              )
                                            )
                    Defendants.             )
————————————————————————— )

**MEMORANDUM OF LAW IN SUPPORT OF MARINER HEALTH CARE,
INC.'S MOTION TO DISMISS THE COMPLAINT**

## I.      INTRODUCTION

Notwithstanding years of investigation, the Complaint filed by the United States in this

action under the Federal False Claims Act (the "FCA") is fundamentally defective from a legal

perspective and impermissibly vague from a factual perspective.  The Complaint broadly alleges

that Defendants Rubin Schron ("Schron"), along with Defendants Mariner Health Care, Inc.

("Mariner"),[1] SavaSeniorcare Administrative Services, LLC ("Sava")[2], Leonard Grunstein and

Murray Forman (Mariner, Sava, Grunstein, and Forman collectively referred to herein as the

---

[1]  Mariner Health Care, Inc., the named Defendant in this action, does not own or operate nursing homes.  Rather, Mariner Health Care, Inc. is a holding company that owns indirectly certain separately incorporated subsidiaries, and it is these indirect subsidiary corporations that own and/or operate nursing homes.  For purposes of convenience in this Memorandum, Mariner Health Care, Inc. and all of its direct and indirect subsidiaries will be collectively referred to as "Mariner."

[2]   As explained in Sava's memorandum in support of its motion to dismiss, SavaSeniorcare Administrative Services, LLC also does not own or operate nursing homes.

"Non-Schron Defendants"), solicited and received illegal kickbacks from Defendant Omnicare,

Inc. ("Omnicare"), a provider of pharmacy services, in exchange for "arranging for" Mariner and

Sava nursing home patients' drugs to be purchased from one of Omnicare's pharmacies,

ultimately resulting in the submission of legally false claims to government programs by

Omnicare and Medicare Part D sponsors.

What is perhaps most remarkable about this Complaint is the stark contrast between what

the United States would have to allege in order to support its theory and what it actually alleges.

What the United States apparently wants to claim -- and thus must allege with specificity -- is

that, among other things: (1) Omnicare's $50 million payment to purchase a business from

Mariner greatly exceeded the fair market values of that business; (2) that the excess represented

remuneration that was paid in exchange for the referral of business that would be paid for by a

federal healthcare program; (3) that both Omnicare and each of the other Defendants acted with

the specific intent required to establish a violation of the Federal Anti-kickback Statute (the

"AKS"), 42 U.S.C. §1320a-7b(b); (4) that actions by each of the Defendants were intended to

cause and did "cause" false claims to be submitted by Omnicare or unnamed Medicare Part D

sponsors  -- the only entities that submitted claims -- which claims were rendered false by an

express or implied certification of compliance with the AKS; and (5) that the Defendants reached

an agreement with Omnicare with the intent to defraud the United States, violating the

conspiracy provisions of the FCA.

When the facts alleged in the Complaint are viewed against this framework, the picture

that emerges is reminiscent of a child's uncompleted "dot to dot picture."  Despite the extensive

opportunity to develop evidence through numerous subpoenas, interviews and other

investigation, the United States nonetheless fails to adequately plead violations of the AKS or the

False Claims Act, 31 U.S.C. § 3729 (the "FCA").  As set forth more fully below, while the Complaint alleges a fact here and a fact there, it does not -- apparently because the United States cannot -- "connect the dots."  The United States has filed a Complaint that is glaringly inadequate from both a legal and factual perspective.  Mariner and the other Non-Schron Defendants should not be required to bear the expense of further litigating this clearly deficient case, and the claims against them should be dismissed with prejudice.

The United States alleges that Omnicare filed "false" claims when it either expressly or impliedly certified compliance with the AKS in the course of submitting claims for payment to Medicare Part D and the Massachusetts Medicaid program ("MassHealth").  Even assuming false certification to be a valid theory of liability under the FCA in this Circuit, the United States cannot prevail on this theory here, as neither MassHealth nor Medicare Part D requires an express certification of compliance with the AKS, and the United States does not allege that Omnicare or any other party made such a certification.  As for implied certification, the MassHealth regulatory structure defines explicitly the content of the implied certification associated with the presentation of an invoice, and it does not condition payment of claims on compliance with the AKS.  With respect to Medicare Part D, not only is there no allegation that would render the only claims submitted to the United States -- those submitted by Part D plan sponsors -- false in any way, there is also nothing in the applicable Part D regulations that conditions payment by the United States on an express or implied certification of compliance with the AKS.  Thus, the United States' FCA claims fail as a matter of law.  Because the United States cannot plead around this deficiency, Counts IV, V, VI, and VII of the Complaint should be dismissed, without leave to amend.

These Counts also must be dismissed under Rule 12(b)(6) because they fail to state viable causes of action that the Defendants *caused* Omnicare to submit false claims.  The United States contends that the Defendants "caused" false or fraudulent claims simply as a result of participating in the alleged kickback scheme.  As noted below, not only does the United States fail to allege the necessary AKS predicate violation with specificity, but with respect to Medicare Part D in particular, the notion that actions taken in 2004 could have been intended to "cause" false claims to be submitted for a Part D program that did not yet exist is far too attenuated to pass legal muster.[3]

Counts V and VI of the Complaint, alleging claims under Sections 3729(a)(2) and (a)(3) of the FCA, must be dismissed for the additional reason that they do not state a claim based on the U.S. Supreme Court's ruling in *Allison Engine Co. v. United States ex rel. Sanders*, 128 S. Ct. 2123 (2008), in particular when reviewed under the heightened pleading standard required by Federal Rule of Civil Procedure 9(b).  The Complaint does not allege the necessary elements that the Non-Schron Defendants intended to induce the government to rely on allegedly false statements Omnicare would make in the future in deciding whether to pay the allegedly false claims, and does not allege that the Non-Schron Defendants' actions had a material effect on the government's decision to pay the claims.  The allegations in the Complaint are precisely the type that the Supreme Court said do not pass muster under the FCA and, as a result, those claims must be dismissed.

Finally, Counts IV, V, VI and VII must be dismissed under Rule 9(b) for the failure to plead fraud with particularity.  Because the Complaint alleges that violations of the AKS

---

[3]   Moreover, the United States does not allege that any of the Defendants filed any claims; assisted Omnicare in filing its claims; reviewed any claims made by Omnicare; received any funds obtained by Omnicare as a result of any of its claims; assisted Omnicare in making any certifications; reviewed any certifications made by Omnicare; or even knew of any claims or certifications made by Omnicare.

rendered claims legally false within the meaning of the FCA, the United States must, as a prerequisite to its FCA allegations, plead that the Defendants violated the AKS. Under Rule 9(b), the elements of both the underlying kickback violation and the FCA violation must be pled with particularity as to each Defendant. The Complaint fails, however, to include essential factual allegations necessary to plead either a violation of the AKS or the false claims resulting from an illegal referral arrangement.

## II.  FACTUAL ALLEGATIONS[4]

Prior to December 10, 2004, Defendant Mariner was a public company operating one of the nation's largest nursing home chains. On that date, Mariner was acquired by National Senior Care, Inc., and has since been privately held. *Complaint* at ¶ 29. The Complaint alleges that National Senior Care was "backed" by Defendant Schron, and that Defendants Grunstein and Forman proposed this transaction to Schron and advised Schron regarding how to structure the financing so that Schron would be able to contribute as little cash as possible. *Id*. at ¶¶ 29, 30.

The Complaint alleges that Defendant Forman suggested (to unspecified persons, on an unspecified date, through unspecified means) that one way to raise funds to reduce Schron's contribution would be for post-acquisition Mariner to sell the right to provide pharmacy services to its nursing homes, but that Forman was "warned" (again, by unspecified persons on an unspecified date through unspecified means) that doing so would constitute an illegal kickback. *Id*. at ¶ 30. It then alleges that Forman and Grunstein, acting as agents of Schron, "directed" (again, without any specifics) pre-acquisition Mariner to provide notice to Omnicare that it would terminate the contract for pharmacy services that it had entered into with Omnicare in

---

[4]  For the purposes of this memorandum only, the Non-Schron Defendants have accepted the facts as alleged in the Complaint. Many of those supposed "facts" are demonstrably wrong, as will be established should this litigation extend beyond the pleading stage. For example, evidence would show that the Non-Schron Defendants never proposed to "sell the right to provide pharmacy services to . . . nursing homes" as alleged in Paragraph 30 of the Complaint.

2003 upon its acquisition by National Senior Care.  *Id.* at ¶ 31.   At that time, however, Mariner was publicly held, and the Complaint makes no effort to allege the means by which either Grunstein, Forman, or even Schron, could, simply by virtue of being involved with a contract to buy Mariner in the future, "direct" Mariner to do anything.  Indeed, what the Complaint does allege is that Mariner's senior executives were generally satisfied with the Omnicare arrangement and had no desire to terminate it.  *Id.*

Subsequent to Omnicare's receipt of the Termination Notice, the Complaint alleges that at a meeting on December 2, 2004, among Forman, Grunstein and two executives of Omnicare, Omnicare requested that Mariner withdraw the Termination Notice.  *Id.* at ¶ 32.  The Complaint goes on to allege that Forman and Grunstein explained that that there was a "hole" in Schron's financing for the Mariner acquisition, that cash from Omnicare could fill that hole, and they therefore proposed that Omnicare purchase Mariner's MMS unit, a business entity that Mariner was using to arrange for the delivery of enteral supplies (feeding tubes).  The Complaint does not allege that anyone stated at the December 2 meeting, or any other time, that the withdrawal of the termination of the 2003 Pharmacy Contract would be conditioned on the sale of MMS, or that the sale of MMS would not be at fair market value or would contain excess remuneration in exchange for Mariner's continued pharmacy business.[5]  The most that is alleged is that Omnicare's outside counsel informed the participants of the meeting that it would be illegal for

---

[5]   The best the United States can do in this regard is its reference to notes created by one of Omnicare's investment bankers in a meeting that was not even attended by any of the non-Omnicare Defendants, noting:  "3 YEARS LEFT ON CURRENT DEAL: $155MM/REVS  $26 MM/OP PROFITS."  *Complaint* at  ¶ 39.  The Complaint does not, however, specifically allege that these musings reflected the discussion of the Omnicare Board -- or were even shared with the Board.  And nothing in those notes or any other specific factual allegation in the Complaint makes the explicit tie that the United States attempts to imply, nor is there any allegation here or anywhere else in the Complaint that Omnicare's Board approved the purchase of MMS for the *purpose* of  preserving those revenues. Rather, the Complaint simply makes the conclusory allegatoins that the Board "preserved those pharmacy revenues and profits by voting to approve the acquisition. . . . "  *Id.*  The United States attempts through careful pleading to suggest by innuendo what it cannot support with facts.   More importantly, there is no indication that even if Omnicare had this purpose, any of the Non-Schron Defendants shared (or were even aware of) Omnicare's intent.

Mariner to condition the withdrawal of its Termination Notice on an agreement by Omnicare to purchase MMS.  *Id.* at ¶ 34.

While an alleged "term sheet" circulated on December 4, 2004, by Omnicare provided, among other things, for the withdrawal of the Termination Notice and for Omnicare to buy MMS for $50 million (*id.* at ¶ 35), the Complaint does *not* allege that Mariner, Sava, Grunstein, Forman or any other Defendant -- either in the December 2 meeting, in the December 4 term sheet, or otherwise -- actually *did* condition withdrawal of the Termination Notice on Omnicare's agreement to purchase MMS.[6]  Indeed, when Omnicare's attorneys circulated a draft agreement for Omnicare to purchase MMS on December 6, 2004, the draft agreement provided that Omnicare would pay the purchase price up front, before the closing of the MMS transaction, and that the purpose of the up-front payment was to enable Schron to fill the hole in his financing and acquire Mariner.  *Id.* at ¶ 36.  The Complaint also does not allege that the price paid by Omnicare for MMS contained any excess remuneration above the Fair Market Value of the business; rather, the Complaint alleges only that the entity has $3 million in tangible assets and two employees, but nowhere does it address the market value of the purchased entity.  *Id.* at ¶ 32.[7]

The Complaint alleges that on December 7, 8 and 9, 2004, *after* Omnicare had already decided to purchase MMS, unspecified representatives of Omnicare, Mariner and Sava, through unspecified means, negotiated new pharmacy contracts that superceded the existing 2003 Pharmacy Contract.  In light of the facts that Sava had not yet commenced operations at that point, and Mariner was publicly held and therefore not actually under the control of any of the

---

[6]  In yet another example of conclusory pleading without specific factual support, the Complaint titles Paragraph 35 "Omnicare's Term Sheet Tying Its Purchase Of MMS to Mariner's Withdrawal Of The Termination Notice," but nowhere in Paragraph 35 or any other *factual* allegation in the Complaint does or can the United States specifically allege that the withdrawal of the termination was *actually conditioned* on Omnicare's agreement to purchase MMS.
[7]  If the United States' claims survive past the pleading stage, the Defendants will provide evidence that the parties did obtain and rely on valuation reports from independent investment bankers using well-accepted valuation methodologies that supported the price paid for MMS.

Non-Schron Defendants, the lack of specificity is particularly significant.  And while the Complaint alleges that these negotiations occurred "at the same time" as the negotiations related to Omnicare's purchase of MMS (*id*. at ¶¶ 40-42), it once again glaringly fails to "connect the dots" by alleging that there was in fact a linkage conditioning one agreement upon the other.

Indeed, recognizing that they could not legally tie new pharmacy contracts to Omnicare's purchase of MMS, the Complaint alleges that Omnicare, Grunstein and Forman all sought advice from their respective counsel regarding the transaction.  As detailed in the Complaint, each Counsel advised their client that the two transactions must be independent, and each counsel advised that the transaction would be legal if the extension of the Pharmacy Contract was not conditioned upon Omnicare's purchase of MMS.  *Id*. at ¶¶ 43, 44, and 45.[8]  Although all of the outside counsel cautioned that the simultaneous nature of the extension of the Pharmacy Contract and the MMS purchase might create the impression of conditionality, and thus could capture the attention of enforcement officials, outside counsel approved the transactions and conveyed that approval to each of the parties.  *Id*.  The Complaint further describes that on December 10, 2004, prior to National Senior Care's closing of Mariner, the parties finalized and executed the agreements for Omnicare's purchase of MMS and a new pharmacy services agreement.  *Id*. at ¶¶ 46, 47, 48.  After these agreements were in place, National Senior Care acquired Mariner, converting it into a privately-held entity.

---

[8]  Once again, the Complaint tries to suggest through a heading what its factual allegations do not plead.  This section of the Complaint is titled "The Defendants Knowingly Failed To Disclose All Relevant Facts to Omnicare's Outside Counsel," yet the only "facts" supposedly not disclosed relate to the relationship between Schron and non-defendant Harry Grunstein -- facts that are not alleged to have been known by any of the Non-Schron Defendants.  Moreover, there is no allegation that the approval of the transaction by counsel for the parties other than Omnicare was based on the non-disclosure of any fact.

The Complaint does not allege that any of the Non-Schron Defendants received any remuneration at the time of the closing of the transaction in 2004.[9]  Nor does the Complaint explain in any way how any of the Non-Schron Defendants referred, recommended or arranged for the purchase of drugs that would be paid by a federal health care program.  Nonetheless, the Complaint alleges that as a result of the "solicitation and receipt . . . of kickback payments" by the Non-Schron Defendants, all of the resulting claims Omnicare made or caused to be made to Medicaid and Medicare were false or fraudulent.  *Id.* at ¶ 74.

The Complaint asserts that the claims were rendered false due to purportedly false certifications of compliance with applicable laws, including the AKS.  *Id.* at ¶ 77.  However, the Complaint nowhere identifies *any* certification or representation made by Omnicare or any Part D sponsor that was supposedly false.  And to the extent that the United States intends to rely on an implied certification theory, nowhere does it identify a regulatory requirement in either program that would cause this unstated certification to be a condition of payment.

Over four years ago, Relator Resnick, a convicted felon, filed this *qui tam* action, which was subsequently taken over by the United States.  On October 30, 2009, the United States requested the dismissal of all allegations in the present action against Omnicare, and on November 3, 2009, the United States announced that it had settled all allegations in this Complaint with respect to Omnicare, as well as other FCA claims against Omnicare for unrelated transactions.

---

[9]   Significantly, the Complaint acknowledges the central role in the transaction at issue played by HSA Equipment, LLC, which it labels as "Schron controlled."  *Complaint* at ¶¶ 46, 59.  HSA is in fact owned by the Schron family and managed by a board elected by the members consisting of Defendant Schron and two of his children, Eli Schron and Avi Schron.  As HSA was the party alleged in the Complaint at Paragraph 46 as having signed the actual purchase agreement for MMS, it clearly would be a necessary party to fully adjudicate the issues raised in this litigation were this action to proceed beyond this stage, and the Non-Schron Defendants would thus anticipate additional motion practice to add appropriate parties.

## III.   STANDARD FOR A MOTION TO DISMISS

A court must accept the factual allegations in a complaint as true when deciding a motion

to dismiss under Rule 12(b)(6).  *See, e.g.*, *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969) ("For

the purposes of a motion to dismiss, the material allegations of the Complaint are taken as

admitted.").  Although the Non-Schron Defendants dispute the factual allegations underlying the

United States' contentions, they assume -- for purposes of this Memorandum of Law and

accompanying Motion -- the truth of those allegations.  In order to survive a motion to dismiss, a

complaint must allege "a plausible entitlement to relief."  *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 559 (2007).

On a 12(b)(6) motion, the court may "ignore  legal conclusions, unsupported conclusions,

unwarranted inferences and sweeping legal conclusions cast in the form of factual allegations."

*Farm Credit Servs. of Am. v. Am. State Bank*, 339 F.3d 764, 767 (8th Cir. 2003).  The court may

"reject claims that are made in the complaint if they are 'bald assertions' or 'unsupportable

conclusions.'"  *United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 224

(1st Cir. 2004) (quoting *Arruda v. Sears, Roebuck & Co.*, 310 F.3d 13, 18 (1st Cir. 2002)).

All claims brought under the FCA must also adhere to the strict pleading requirements set

forth in Rule 9(b) of the Federal Rules of Civil Procedure.  *See Karvelas*, 360 F.3d at 228; *see*

*also United States ex rel. Poteet v. Lenke,* 604 F. Supp. 2d 313, 323 (D. Mass. 2009).  Rule 9(b)

requires that a party alleging fraud or mistake must "state with particularity the circumstances

constituting fraud or mistake."  Specifically, the First Circuit has interpreted Rule 9(b)'s

particularity requirement to mean that a complaint must specify the "time, place, and content" of

the alleged false representations.  *Karvelas*, 360 F.3d at 226; *see also United States ex rel. Rost v.*

*Pfizer, Inc.*, 507 F.3d 720, 731 (1st Cir. 2007); *United States ex rel. Franklin v. Parke-Davis*, 147

F. Supp. 2d 39, 46 (D. Mass. 2001) ("To pass Rule 9(b) muster, the complaint must plead with particularity the time, place and contents of the false representations as well as the identity of the person making the false representations and what he obtained with them.") (citing *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783-84 (4th Cir. 1999)).

## IV.   THE COMPLAINT DOES NOT AND CANNOT STATE A CLAIM

### A.   Omnicare Did Not Make a False Certification -- Express or Implied -- of Compliance with the AKS.

The Complaint fails to allege that the Non-Schron Defendants made any claim for government payment or any statement, directly or indirectly, in support of such a claim, let alone a false one.  Indeed, the Complaint targets claims that Omnicare, not the Non-Schron Defendants, submitted or caused to be submitted. *See, e.g., Complaint* at ¶ 60 ("None of the defendants disclosed to Medicare or Medicaid that claims Omnicare submitted…."); *id.* at ¶ 61 ("Omnicare has submitted, or caused to be submitted…."); *id.* at ¶ 74 (referencing only the "claims Omnicare made….").  The Complaint alleges that the supposed kickback payments made by Omnicare rendered the claims Omnicare subsequently submitted or caused to be submitted to Medicare or Medicaid false or fraudulent.

However, the Complaint does not allege that the claims in question were *factually* false, i.e., that the claims contained factually inaccurate information, or that the claims were for drugs not covered by government programs, not based on valid prescriptions, not medically necessary or not provided to appropriate beneficiaries at a proper price.  Only as a result of the alleged kickback were these claims supposedly tainted, and therefore rendered *legally* false and ineligible for reimbursement.

In order to state a claim under the FCA based on a theory of legal falsity, the United States must do more than allege a violation of the AKS.  Rather, a violation of the AKS is

actionable under the FCA only when the government has conditioned payment of the claim upon the claimant's certification of compliance with the AKS.  *See Franklin*, 147 F. Supp. 2d at 54-55; *see also United States ex rel. Conner v. Salina Reg. Health Ctr., Inc.*, 543 F.3d 1211, 1217-18 (10th Cir. 2008) (when a claim is based on an alleged false certification, the United States must "demonstrate that the defendant has 'certifie[d] compliance with a statute or regulation as a *condition* to government payment,' yet knowingly failed to comply with such statute or regulation."  (citing *United States ex rel. Mikes v. Straus,* 274 F. 3d 687, 697 (2nd Cir. 2001)) (emphasis in original).

Courts have not uniformly required an express certification of compliance in order to trigger the FCA in such circumstances.  Rather, some courts have accepted an implied certification theory.  The First Circuit has not specifically embraced the implied certification theory.

> In the absence of an affirmative certification, some courts have found "implied certification" by virtue of the defendant's participation in the federal program . . . The implied certification theory has not gone without criticism . . . Nonetheless, at least one court in this district has accepted it as a valid basis for an action under the FCA.  *See United States ex rel. Kneepkins v. Gambro Healthcare, Inc.*, 115 F. Supp. 2d 35, 43 (D. Mass. 2000) (O'Toole, J.) (accepting theory of FCA liability based on violation of the Anti-Kickback Law, but noting that other cases "have generally involved some evidence, lacking here, of express certification of compliance with applicable law.") (Original citations omitted).

*Franklin,* 147 F. Supp. 2d at 54.[10]

---

[10]   Indeed, it appears that the First Circuit requires more than simply an allegation of underlying kickbacks in order to state a claim under the FCA, as only in those situations where there is something factually false about the claim has the First Circuit found liability to attach under the FCA.  *See, e.g., Rost*, 507 F.3d 720 (1st Cir. 2007) (even though defendant pled guilty to AKS violation, FCA complaint dismissed and remanded for plaintiff to allege *false* claims filed as a result of the AKS violation); *United States ex rel. Duxbury v. Ortho Biotech Prods.*, 579 F.3d 13, 30-31 (1st Cir. 2009) (complaint survived motion to dismiss because it alleged factually false claims).

Courts have approached the issue of whether non-compliance with an underlying statute or regulation can render a claim legally false by analyzing first whether there was an express certification of compliance. *See Conner*, 543 F.3d at 1217-18. Here, the Complaint does not and cannot identify any express certification by Omnicare of compliance with the AKS, so the United States must rely on the somewhat controversial theory of implied certification, where "the analysis focuses on the underlying contracts, statutes, or regulations themselves to ascertain whether they make compliance a prerequisite to the government's payment." *Id.* at 1218.

Critical to this analysis is the difference between "conditions of participation" and "conditions of payment." As explained by the *Conner* court, "[w]here a contractor participates in a certain government program in order to perform services for which payments are eventually made -- in this case, Medicare -- courts are careful to distinguish between conditions of program *participation* and conditions of *payment*." *Id.* at 1220 (emphasis in original). Conditions of participation must be met by providers in order to continue to participate in federal health care programs. The failure to meet such conditions, "as well as a provider's certification that it has complied with those conditions, are enforced through administrative mechanisms, and the ultimate sanction for violation of such conditions is removal from the government program." *Id.* Conditions of payment, on the other hand, "are those which, if the government knew they were not being followed, might cause it to actually refuse payment." *Id; see also United States ex rel. Landers v. Baptist Memorial Health Care Corp.,* 525 F. Supp.2d 972, 978 (W.D. Tenn. 2007) (holding that "conditions of participation are not the equivalent of conditions of payment," and thus that the alleged failure to comply with Medicare conditions of participation does not amount to a false or fraudulent claim under the FCA). This distinction is critical to the analysis in this case.

1.    **Omnicare Did Not Expressly or Implicitly Certify Compliance With the AKS As A Condition Of Payment From MassHealth.**

The United States' only specific allegations with regard to Medicaid relate to the Massachusetts Medicaid program ("MassHealth").  Analysis of the regulatory structure of MassHealth demonstrates that compliance with the AKS is not a condition of *payment* that could render Omnicare's claims false.

The applicable MassHealth regulations are explicit with respect to the issue of conditions of payment and participation in general, as well as with the nature of the provider certification associated with the submission of an invoice to MassHealth.  Conditions of *participation* are addressed generally in a series of provisions labeled "Provider Eligibility" found at 130 CMR §§ 450.212-217.  As noted in the Complaint, there is also a broad provision found at 130 CMR § 450.261 that states that providers must comply "with all federal and state laws prohibiting fraudulent acts and false reporting" including the AKS.  *Complaint* at ¶ 19.  These are broad, prospective agreements to comply not tied in any way to payment.  A promise of future compliance is not a certification of present compliance, and will not support an FCA claim.  *See, e.g., United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1268 (9th Cir. 1996).

Conditions of *payment,* on the other hand, are explicitly identified and specified at 130 CMR § 450.231, entitled "General Provisions of Payment."  Significantly, compliance with the AKS is not listed as a prerequisite for payment.

Critically, the content of any implied certification made by providers under the Provider Contract as part of invoice submission is also explicitly treated in the regulations at 130 CMR § 450.223(C).  These regulations deal directly and explicitly with the notion of how compliance is treated under provider contracts.  First, 130 CMR   § 450.223(C) mandates that the contracts

contain a broad agreement of compliance, whether the language is expressly in the contract or

implied by this regulation:

> C)   The following provisions are a part of every provider contract whether or not they are included verbatim or specifically incorporated by reference. By executing any such contract, the provider agrees
>
> > (1)   to comply with all laws, rules, and regulations governing MassHealth (see M.G.L. c.118E, § 36).[11]

Second, and wholly apart from the broad expression of compliance in subsection (1) of the

regulation, 130 CMR § 450.223(C) in subsection (2) defines the content of the certification

reflected by the submission of any invoice -- again, whether the language appears on the invoice

or not:

> > (2)   that the submission of any claim by or on behalf of the provider constitutes a certification (whether or not such certification is reproduced on the claim form) that:
> >
> > > (a)   the medical services for which payment is claimed were furnished in accordance with 130 CMR 450.301;
> > >
> > > (b)   the medical services for which payment is claimed were actually furnished to the person identified as the member at the time and in the manner stated;
> > >
> > > (c)   the payment claimed does not exceed the maximum amount payable in accordance with the applicable fees and rates or amounts established under a provider contract or regulations applicable to MassHealth payment;
> > >
> > > (d)   the payment claimed will be accepted as full payment for the medical services for which payment is claimed, except to the extent that the regulations specifically require or permit contribution or supplementation by the member;
> > >
> > > (e)   the information submitted in, with, or in support of the claim is true, accurate, and complete; and

---

[11]   In contrast to the subsequent provisions listed in (C)(2), the regulations indicate this provision as a prospective agreement to comply on a go-forward basis, and not an implied certification of compliance in connection with the submission of particular claims.  *See Hopper,* 91 F.3d at 1268.

(f) the medical services were provided in compliance with Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, and the Age Discrimination Act of 1975.

The regulations thus make it clear that the certification associated with invoice submission is related to six specific conditions of payment, and that the certification is implied "whether or not such certification is reproduced on the claim form." 130 CMR § 450.223(C)(2). In other words, the content of any implied certification is defined by the regulations and does not include any reference to broad compliance with regulatory requirements, much less any reference to the AKS. Indeed, the fact that the regulators chose to exclude the provision in 130 CMR § 450.223(C)(1) -- which specifies that the provider agrees to "comply with all laws, rules, and regulations governing MassHealth" -- from the six specific provisions contained in the immediately following section, 130 CMR § 450.223(C)(2), eliminates any ambiguity and establishes that there is no certification of broad compliance with laws such as the AKS required under MassHealth as a condition of payment. The United States has failed even to attempt to claim an express certification of compliance with the AKS, and even under an implied certification theory, the United States' claim with respect to MassHealth fails as a matter of law.

> **2.      No Plan Sponsor Implicitly or Explicitly Certified Compliance With the AKS By Omnicare As A Condition Of Payment From Medicare Part D.**

The United States' implied certification argument with respect to Part D fares no better. Under the regulations summarized in the Complaint, which, as noted below, had not even been implemented at the time of the purported kickback, Medicare Part D coverage is offered through private companies known as Part D sponsors that administer the provision of drug benefits to beneficiaries while at financial risk for the costs of those benefits. *See* 42 C.F.R. § 423.504. Only plan sponsors submit claims to the United States. The sponsors enter into agreements with

various pharmacies that fill prescriptions for eligible beneficiaries and, in turn, bill the sponsors for the drugs provided.  The Complaint does not allege that Omnicare was a sponsor, and while it alleges that Omnicare was a subcontractor with "a majority of the Part D sponsors," it does not identify any provision of any agreement between Omnicare and a sponsor or the identity of even a single sponsor supposedly under contract with Omnicare.

Nothing in the applicable regulatory scheme provides any basis for concluding that compliance with the AKS by a Part D sponsor is a condition of payment, much less that a Part D sponsor was somehow implicitly certifying compliance with the AKS by a pharmacy such that a violation by the pharmacy would render claims that included costs from prescriptions filled by such a pharmacy false.  As with the MassHealth program, the applicable regulations include provisions that delineate conditions of payment to plan sponsors, such as the data certification requirements set forth at 42 C.F.R. § 423.505(k) ("Certification of data that determine payment"), none of which reference the AKS.

The regulations also contain conditions of participation for plan sponsors including a provision that requires *Part D sponsors* to "agree[] to comply with . . . [f]ederal laws and regulations designed to prevent fraud, waste, and abuse, including, but not limited to applicable provisions of Federal criminal law, the False Claims Act (31 U.S.C. § 3729, et seq.), and the anti-kickback statute (section 1128B(b) of the Act)."  42 C.F.R. § 423.505(h)(1).  Only if the plan sponsor delegates any of its CMS contractual obligations to a pharmacy as a subcontractor would CMS direct the plan sponsor to include a far less specific provision in the subcontract, simply requiring an agreement that the pharmacy "comply with all applicable Federal laws, regulations, and CMS instructions."  42 C.F.R. § 423.505(i)(4)(iv).[12]  The Complaint does not

---

[12]   None of the Defendants is, or is alleged to be, a Part D sponsor.  The cited regulation applies only "[i]f any of the Part D plan sponsors' activities or responsibilities under its contract with CMS is delegated to the other parties. . . ."

allege any type of agreement between Omnicare and a plan sponsor with this language, and even if the Complaint had provided this necessary element to connect its attenuated theories, this is precisely the type of broad statement of compliance that courts have not been willing to use as a vehicle to bootstrap the violation of *any law* into an FCA claim. *See, e.g., Conner*, 543 F. 3d at 1219 (rejecting notion that a general certification that services were provided in compliance with "the laws and regulations regarding the provision of health care services" is sufficient to render the certification false and resulting payments fraudulent in the absence of an underlying statute or regulation providing that "payment is conditioned on perfect compliance with any particular law or regulation."); *Hopper,* 91 F.3d  at 1267 (finding no FCA violation based on certification stating that school district would "meet all applicable requirements of state and federal laws and regulations," when the government's payment was not itself conditioned on the certification). Nothing suggests that either of these Part D sponsor provisions is a condition of *payment* such that an AKS violation by a pharmacy could render a claim submitted by a plan sponsor false.

Of course in this case, there is no allegation that any plan sponsor violated the AKS, so even if a sponsor's compliance with Section 423.505(h)(1) could be deemed a condition of payment, it would not be enough to state a claim here.  The only other obligation of the plan sponsors that actually submitted the claims to the United States was to require the provision noted above in subcontracts under 42 C.F.R. § 423.505(i)(4)(iv) demanding compliance with laws and regulations.  There is no allegation that any plan sponsor failed to comply with this obligation, and thus even if sponsors were impliedly certifying that they had complied with this requirement, no claim submitted to the United States was rendered false under this provision.

---

42 C.F.R. § 423.505(i)(4)(iv).  The Complaint does not allege any such delegation.  Thus, the Complaint fails to allege that there was any requirement at all imposed upon Omnicare as a result of these unidentified contractual arrangements with Part D sponsors, much less some requirement that Omnicare's certification with this unspecified requirement was a condition of payment.

### 3.   In Order for Any of These Defendants to Have Caused a False Claim to Be Made, the Claim Submitted Must Have Been False.

Finding that the United States had stated a viable theory under the facts alleged in the Complaint would require the extraordinary extension of the questionable implied certification theory to claims that -- as submitted by plan sponsors -- were in no sense factually false.  The United States would not only have to demonstrate that the broad language of Section 423.505(i)(4)(iv) must be construed as a certification by Part D sponsors that they perfectly complied with every single federal law, regulation, and CMS instruction, including the AKS, as a condition of payment, but also that sponsors are certifying that all of the pharmacies with which they contract perfectly complied with all of the myriad laws and regulations -- or else all claims submitted by the plan sponsor are false.  Such an extension is unsupported by case law.  *See, e.g., Franklin,* 147 F. Supp. 2d at 55 (finding relator's allegations of underlying kickbacks did not state a claim under the FCA when the claims were not filed by the party alleged to have paid or received the kickbacks, but by third parties, who were not alleged to have violated the AKS or to have filed false or fraudulent certifications of compliance).

As noted above, the only basis for the United States' assertion that the alleged payment of kickbacks caused the claims submitted to the United States to be false is the implied certification theory.  This in turn relies on the notion that the party submitting the claims is making an implicit certification of its compliance with the applicable regulatory scheme.  Nowhere in either the Medicare Part D or MassHealth regulatory scheme is there any suggestion that, by submitting an invoice, the party submitting the invoice is certifying that no third party violated applicable statutes or regulations.

This issue was squarely addressed by the court in *United States ex rel. Thomas v. Bailey,* No. 4:06CV00465JLH, 2008 WL 4853630 (E.D. Ark. Nov. 6, 2008).  *Thomas* involved alleged

kickbacks paid by manufacturers of medical devices to physicians, who allegedly then caused hospitals to purchase the manufacturers' devices in connection with surgeries performed at and billed by the hospitals.  The relator argued that the underlying AKS violations by the device manufacturer and the physicians tainted the claims submitted by the hospitals, rendering them false under both express and implied certification theories.  The court found that while the hospitals might have impliedly certified that *they* were in compliance with the AKS, in no way did the hospital's certification extend to the compliance of third parties, such as attending physicians, much less to the compliance of the even more removed device manufacturers.  *Id.* at *9 ("it is another matter to say that a hospital's act of submitting a claim for payment is an implied certification that a person who is not employed by the hospital, is not an agent or subcontractor of the hospital, and who does not act under the hospital's control, complied with the Anti-Kickback Statute").  The court conducted an exhaustive analysis of the laws and regulations that related to the prerequisites for hospital payment, and concluded that while the hospitals may have been making an implicit certification of their own compliance with the AKS, "they did not impliedly or expressly certify that the physicians who attended patients in their hospital complied with that statute," nor was there anything in the applicable statutes or regulations that required them to do so in order to be paid.  *Id. a*t * 11-13.  Thus, the claims submitted by the hospitals were not false, and the causes of action against the entities who had paid and received the kickbacks (i.e., the manufacturers and physicians) for "causing false claims to be made" were dismissed as a matter of law.[13]

---

[13]   On October 28, 2009, Senators Leahy and Kaufman introduced the Health Care Fraud Enforcement Act, and Senator Leahy issued a press release discussing certain provisions of the proposed legislation, including a provision aimed specifically at amending the FCA to overrule *Thomas* to provide that a claim "resulting" from illegal kickbacks would be false, even when the claim is submitted by an innocent third party.  The announcement's "Background" section suggests that this amendment was proposed at the urging of the Department of Justice in response to the acknowledged inability of the United States to pursue claims such as those alleged here under current law.  *See* http://leahy.senate.gov/press/200910/102809b.html.

Because the Complaint does not even purport to allege any violation (or even knowledge of any violation) by any of the unidentified Part D sponsors that would render claims submitted by them to be false, the Part D claims must be dismissed.  And because the Complaint fails to properly allege an AKS violation against Omnicare, the claims with respect to MassHealth must also be dismissed, even if the regulations could somehow be construed to include an implied certification of compliance with the AKS.

> **B.**     **Counts IV and V Fail to State Claims Because the Defendants Did Not Cause the Presentation Of Any False Claims Or False Statements.**

The Complaint baldly asserts that Omnicare's purported payment of a kickback to the Non-Schron Defendants resulted in their causing Omnicare (and Part D sponsors) to make false statements and submit false claims to the government.  The chain of causation from a kickback allegedly paid (not received) by Omnicare to the submission of false claims by Omnicare is not articulated.

Although there is no definition or standard for causation written into the FCA, a Court in this District has held that "to 'cause' the presentation of false claims under the FCA, some degree of participation in the claims process is required."  *United States v. President & Fellows of Harvard College*, 323 F. Supp. 2d 151, 186-87 (D. Mass. 2004).  "Generally, mere knowledge of the submission of claims and knowledge of the falsity of those claims is insufficient to establish liability under the FCA."  *United States. ex rel. Sikkenga v. Regence Blue Cross Blue Shield of Utah*, 472 F.3d 702, 714 (10th Cir. 2006) (citations omitted).  "Such a test separates the wheat from the chaff, allowing FCA claims to proceed against parties who can fairly be said to have caused a claim to be presented to the government, while winnowing out those claims with only attenuated links between the defendants' specific actions and the presentation of the false claim."  *Id.*  In *Franklin*, the court applied the common law tort concept of causation to an FCA

suit, requiring that (1) the defendant's conduct was a "substantial factor" in producing the

alleged harm and (2) the outcome was foreseeable.  *United States ex rel. Franklin v. Parke-*

*Davis,* No. 96-11651PBS, 2003 WL 22048255, at *4 (D. Mass.  Aug. 22, 2003) (*citing*

*Rodriguez-Cirilo v. Garcia,* 115 F.3d 50, 54 (1st Cir. 1997) (Campbell, J., concurring)).

### 1.    Actions Taken In 2004 Could Not "Cause" False Submissions To a Part D Program That Did Not Yet Exist.

The events described in the Complaint took place at the end of 2004.  At that point in

time, Omnicare was not providing any Part D benefits because the Part D program was not yet

operational.  Indeed, CMS had articulated only proposed regulations for the Part D Program at

the end of August 2004, and it did not issue any final regulations until several months after the

events described in the Complaint.  *See* 69 Fed. Reg. 46,678 (Aug. 3, 2004); 70 Fed. Reg. 13,397

(March 21, 2005).  At the time the United States alleges that the Defendants engaged in the

kickback scheme underlying its FCA claim, *none* of the Medicare regulations cited in the

Complaint had been issued in final form.  CMS did not start providing coverage for pharmacy

benefits under Part D until 2006 -- more than a full year after the alleged kickback occurred.

Thus, as a legal matter, at the end of 2004 there was no definition of what the conditions of

payment under this program would be.

As a factual matter, while Omnicare's market position would provide an incentive for it

to investigate this new Medicare program, there was no way the Non-Schron Defendants could

know that Omnicare might decide to enter into agreements with any of the unnamed Part D plan

sponsors under unidentified terms, conditions and requirements, or that these plan sponsors

would find Omnicare to be acceptable under whatever criteria might be established.  The causal

chain here is extraordinarily attenuated -- these defendants did not and could not have "some

degree of participation in the claims process" by actions in 2004 with respect to a program with

then-undefined requirements that did not exist until 2006.  Accordingly, these claims must be dismissed.

### 2. Courts Have Not Found That the Recipients Of An Alleged Kickback "Caused" False Claims Or False Statements To Be Made.

The United States fails to allege how the Non-Schron Defendants *caused* the presentment of any claims.  Courts have allowed FCA claims to proceed against defendants who have *paid* a kickback which *induced* the recipient to submit false claims.  *See, e.g., Pfizer*, 253 F.R.D. 11 (pharmaceutical company paid kickbacks which caused doctors to submit false claims); *Kneepkins*, 115 F. Supp. 2d 35 (dialysis company paid kickback to blood testing company which submitted the claims).  But in those cases, the causative effect of the kickback is clear.  Here, the causation chain is in reverse, with Omnicare both making the payment on the front end and the claim on the back end.  The alleged kickback did not induce the filing of a claim.  Accordingly, the requisite causation is absent.  *See Sikkenga*, 472 F.3d at 714.

### C. The Allegations In Counts V and VI Fail To Plead Violations Of The FCA Under *Allison Engine*.

The United States has failed to state a claim in Counts V and VI of the Complaint under the Supreme Court's ruling in *Allison Engine,* 128 S. Ct. 2123*,* in particular when reviewed under the heightened pleading standard of Federal Rule of Civil Procedure 9(b).  Count V alleges in a conclusory fashion that the Defendants knowingly "caused" a false record or statement to be made or used to cause the United States to pay or approve false or fraudulent claims in violation of section 3729(a)(2).  Count VI alleges that the Defendants conspired to defraud the government by getting a false or fraudulent claim paid in violation of section 3729(a)(3).  Because the United States is unable to identify a single claim submitted by any of the remaining Defendants, it must

rely instead on a theory that each of the remaining Defendants caused Omnicare to submit claims to Medicare and Medicaid while failing to disclose the supposed kickback.

The Supreme Court's June 2008 ruling in *Allison Engine* specifically rejected such an attenuated approach to liability under (a)(2) and (a)(3).  The Supreme Court rejected the Sixth Circuit's ruling below -- and the United States' approach in the present case -- that it is enough under (a)(2) and (a)(3) to show that a defendant intended to cause a false claim to be submitted and that the plaintiff need not prove that a defendant intended to defraud the government.  *Id*. at 2128.  Such an interpretation "would expand the FCA well beyond its intended role of combating 'fraud against the Government'" and would make the FCA "'almost boundless.'"  *Id*.  Rather, the Supreme Court, focusing on the language "to get" and "by getting" in the two sections of the FCA cited above, held that a plaintiff must allege and prove an intent to defraud.  *Id*. at 2130.

Accordingly, it is not enough after *Allison Engine* for an FCA plaintiff to allege that a defendant was aware that its conduct would result in false claims being paid.  *Id*. at 2128.  Moreover, the United States has not even made such an allegation in the Complaint, nor could it.  Indeed, to the contrary, the Complaint's allegations themselves negate this necessary element under the FCA.  Specifically, the Complaint alleges unequivocally that Defendant Schron's intent in supposedly soliciting the $50M from Omnicare for the purchase of MMS was to fill a hole in Defendant Schron's financing for the Mariner acquisition.  *See Complaint* at ¶36 ("The purpose of Omnicare paying the $40 million up front was to enable defendant Schron to fill the hole in his financing for the larger Mariner transaction."); *id.* at ¶47 ("Omnicare knew that, in order for defendants Schron, Forman, and Grunstein to close the acquisition of Mariner on December 10, 2004, they needed Omnicare's $40 million up-front payment for MMS"); *id.* at ¶48 ("As the parties had contemplated, defendants Schron, Forman, and Grunstein used

Omnicare's $40 million up-front payment for MMS to fill the "hole" in defendant Schron's financing…."). [14]  Relatedly, the Complaint contains no allegation as to how the Non-Schron Defendants were to have profited from the alleged kickback scheme.  Accordingly, the Complaint's own allegations, even when read most favorably to the United States, do not allege an intent to defraud the government, but instead provide an altogether different intent or motive for the alleged conduct described in the Complaint.

Counts V and VI also fail because the Complaint does not allege, as required by *Allison Engine*, that the remaining Defendants' actions were intended to have a material effect on the government's decision to pay the claims.  The second major aspect of the Supreme Court's holding in *Allison Engine* is the requirement that the United States establish a direct connection between the false statement or record and the government's decision to pay.  128 S. Ct. at 2131. Without that, "the direct link between the false statement and the Government's decision to pay or approve a false claim is too attenuated."  *Id.* at 2130.  The Complaint fails to allege that the government would not have paid the Medicare/Medicaid claims but for the alleged false certifications of compliance.

This is a critical pleading deficiency as it has been held that, to pass Rule 9(b) muster, an FCA plaintiff must plead that the false statements ultimately led the government to pay amounts it did not owe.  *Hopper v. Solvay Pharmaceuticals Inc.,* No. 08-15810, slip op. at pp. 19-20 (11th Cir. Dec. 4, 2009) ("If the government has not paid funds it does not owe, it has suffered no loss.").  In dismissing the complaint in *Solvay,* the Eleventh Circuit notes the absence of any allegation linking the defendant's alleged conduct and the government's decision to pay the claim as required by *Allison Engine.  Id.* at p. 22 ("[The complaint] fails to allege that the

---

[14]   Moreover, as noted below, there is no allegation that the $50 million paid for MMS did not in fact reflect fair market value.  Indeed, were this case to proceed, evidence would be introduced that would show that Mariner's basis in MMS was in fact approximately $60 million.

defendants intended for the government to rely on the substance of their off-label marketing campaign to decide to pay the claim.").  This reasoning is directly applicable to the case at bar, as the Complaint does not allege anywhere that the Defendants' activities related to financing the acquisition of Mariner were intended to, or did, have any effect on the government's decision whether to pay the claims.

Indeed, as discussed above, there was no way that the parties acting in 2004 could have known what conditions CMS might impose on pharmacies submitting claims under the Part D program -- before there were final regulations and before the Program was effective.  And, as also discussed above, neither Medicare Part D nor MassHealth condition payment on a truthful certification of compliance with the AKS.[15]

For these reasons, Counts V and VI must be dismissed.  This conclusion is not altered by the Fraud Enforcement and Recovery Act of 2009 ("FERA"), which was signed into law on May 20, 2009 -- long after the Complaint was filed.  FERA amended the FCA, replacing the words "to get a false or fraudulent claims paid or approved by the government" with the words "material to a false or fraudulent claim."   FERA provides that this change "shall take effect as if enacted on June 7, 2008, and apply to all claims . . . . that are pending on or after that date."  Pub. L. No. 111-21, § 4(f), 123 Stat. 1617, 1625 (2009).  The only Court of Appeals to address the retroactivity of FERA, the Eleventh Circuit in *Solvay*, concluded that FERA does not apply retroactively to *cases* pending on and after the effective date.  Rather, the amendments apply only to *claims*  -- that is, "'any request or demand . . . for money or property,' as defined by 31

---

[15]   The Complaint also does not allege that the United States would have paid less but for the allegedly false statements, in contrast to the more typical cases, such as those where there is an allegation that the price or usage of a drug was overinflated.  *See, e.g., United States ex rel. Walsh v. Eastman Kodak Co.,* 98 F. Supp. 2d 141 (D. Mass. 2000).  In the latter kinds of cases, the nexus between allegations of price inflation or overutilization of a drug and the government's decision to pay for that drug is self-evident (i.e. higher prices or utilization equate to more funds being paid by the government).  By contrast in this case, the United States' Complaint does not allege that any state Medicaid program or any Part D Sponsor paid more for drugs *after* the transaction between the parties in 2004 than *before*.

U.S.C. § 3729(b)(2)(A)," -- pending on or after that date.  *Solvay,* slip op. at n.3.  Thus, the

amendments embodied by FERA have no bearing on the present case, because the Complaint

does not purport to encompass ongoing and/or future claims.  Rather, the substantive Counts

speak only in the past tense -- claims that Omnicare had already made as of the date of the

Complaint (which preceded FERA's effective date).  *See, e.g., Complaint* ¶ 74 (referencing only

"all of the claims Omnicare made, or caused to be made").  Thus the claims at issue were not

"pending" as of June 2008.

Even if the Complaint could be read to encompass ongoing and future claims submitted

by Omnicare, applying FERA's provisions in this case would violate the Ex Post Facto and Due

Process Clauses of the United States Constitution.  U.S. Const., Art. I, Sec. 9, Clause 3 and

Amend. V.  All of the conduct the Complaint alleges occurred in December 2004[16] -- long before

FERA.  It would be unconstitutional to apply the new FCA language, including its retroactivity

provisions, to create liability for Defendants arising out of conduct that did not violate the law at

the time it was allegedly undertaken.[17]  *United States v. Allison Engine Co., Inc.,* Case No.

1:95:cv-970 (S.D. Ohio, October 27, 2009) (FERA's retroactivity provisions violated the Ex Post

Facto Clause).

## V.   THE CLAIMS SHOULD BE DISMISSED FOR FAILURE TO SATISFY THE HEIGHTENED PLEADING REQUIREMENTS UNDER RULE 9(B).

Even assuming the United States had alleged facts sufficient to state a legally cognizable

claim under the FCA against the Non-Schron Defendants – which, for the many reasons

articulated above, it has not -- it still must allege those claims with the particularity and

---

[16]  The only exception, which is not material here, is the Complaint's allegation that the second MMS payment of $10 million was made in 2005.  *Complaint* at ¶46.

[17]  At a minimum, even if the Court concluded that the Complaint encompasses claims that had not been submitted by Omnicare at the time the original Complaint was filed, and that the Ex Post Facto and Due Process clauses do not apply, FERA limits damages to claims pending only after from June 7, 2008.

specificity required by Federal Rule of Civil Procedure 9(b).  *See Karvelas,* 360 F.3d at 228

(confirming that in the First Circuit, cases brought under the FCA must satisfy the particularity

requirements of Rule 9(b)).  The pleading requirements of Rule 9(b) extend to the predicate

offense forming the basis for a FCA claim.  Because the allegation that the AKS has been

violated is itself an allegation of fraud, the Complaint must describe the alleged kickback with

sufficient detail to pass 9(b) muster.  *See Rost*, 507 F.3d at 731; *see also United States ex rel.

Lam v. Tenet Healthcare Corp.*, 481 F. Supp. 2d 673, 687-89 (W.D. Tex. 2006); *United States ex

rel. Barrett v. Columbia/HCA Healthcare Corp.*, 251 F. Supp. 2d 28, 35 (D.D.C. 2003)

(dismissing kickback claims under Rule 9(b) as "too vague to give defendants notice of the

relationship between the alleged kickbacks and the submission of claims to Medicare").

Despite every opportunity to develop supporting facts, the United States has failed to

adequately plead with specificity the following essential elements of its claims:

> (a)    the solicitation or receipt of remuneration in excess of fair market value in
> the sale of MMS by any Defendant in exchange for referrals;
>
> (b)    that any party to the transaction possessed the AKS scienter elements of
> knowledge and willfulness necessary to establish a violation; or
>
> (c)    the submission of any false claim as a result of the alleged kickback
> scheme.

Not only has the United States failed to adequately plead a violation of the AKS, which is

a predicate requirement under its FCA theory, it has also failed to allege specific facts with

respect to causation.  Indeed, the Complaint largely attributes conduct and actions to all the

Defendants generally, rather than any one actor specifically.[18]  It is well established that a

---

[18]   For example, the Complaint is devoid of any allegation that any of Mariner's senior executives or counsel -- i.e., the publicly-held Mariner that was in existence at the time the alleged kickback was being negotiated -- were aware of the alleged scheme, even while it alleges that pre-acquisition Mariner negotiated the terms of the pharmacy contract.

complaint must plead with particularity the identity of the person engaged in the fraudulent

conduct alleged.  *See Franklin,* 147 F. Supp. 2d at 46; *Harrison,* 176 F.3d at 783-84.  As will be

demonstrated below, the Complaint fails to plead with the specificity necessary to state a claim

for relief against Mariner, providing the Court with yet another basis to dismiss Mariner from

this case.

A.     **The United States Fails To Allege That Mariner Solicited Or Received Remuneration From Omnicare In Exchange For Referrals.**

The AKS prohibits the "solicit[ation] or recei[pt] . . . [of] remuneration (including any

kickback, bribe, or rebate)" in exchange for the referral of government program business.  42

U.S.C. § 1320a-7b(b)(1).  Yet the Complaint never alleges that Mariner solicited or received any

remuneration from Omnicare in exchange for referrals.  Rather, the Complaint alleges that

Omnicare agreed to pay -- and did pay -- $50 million to purchase MMS.  The agreement alleged

was not with Mariner, Forman, Grunstein or Sava.  The agreement was between Omnicare and

HSA Equipment LLC, an entity controlled by Schron to which Mariner had assigned MMS, and

called for the $40 million to be paid to HSA at the time the Pharmacy Contract was signed.

*Complaint* at ¶¶ 40, 46.   The Complaint contains only a vague allegation that $40 million was

wired into an account on the same day the new pharmacy contract was signed "for the benefit of,

*inter alia*, Mariner and Sava." *Id.* at ¶ 55.  Although the Complaint does allege that Mariner

received a $10 million delayed payment months after the MMS purchase agreement was signed,

it does not allege any connection between that payment and the extension of the Pharmacy

Contract.  Without an allegation that remuneration was solicited or received by any of these

Defendants in the context of an agreement to refer, the Complaint fails to plead the most basic

element of the AKS -- remuneration in exchange for referrals.[19]

> **1.    The Complaint Fails To Allege That the Amount Paid For MMS Was Above Fair Market Value.**

The United States does, however, make the conclusory allegation that Omnicare paid

Mariner and Sava $50 million "disguise[d] . . . as payment for a Mariner business unit called

Mariner Medical Supply ('MMS')." *Complaint* at pages 1-2.  When alleging violation of the

AKS as a predicate act under the FCA in such a context, the courts require that the Complaint

allege both the fair market value of the business purchased and the amount of remuneration paid

in excess of that amount for referrals.  *See, e.g.*, *United States ex rel. Perales v. St. Margaret's*

*Hosp.*, 243 F. Supp. 2d 843, 851 (C.D. Ill. 2003) (granting summary judgment to defendant in

case alleging that the acquisition of physician practices violated the AKS because relator "failed

to demonstrate what the fair market value of the practices in question was").

As a general matter, entities have been found to comply with the AKS so long as they pay

or receive "fair market value" for their acquisitions or sales.  *See, e.g.*, *United States ex rel.*

*Jamison v. McKesson Corp.*, No. 2:08CV214-SA-DAS, 2009 U.S. Dist. LEXIS 89807, at *27

(N.D. Miss. Sept. 29, 2009) (collecting cases).  Indeed, "[t]he Anti-Kickback Statute itself states

that impermissible remuneration includes 'transfers of items or services for free or other than fair

market value.'"  *Id.* at *28 (quoting 42 U.S.C. §1320a-7a(i)(6)).  Here, the Complaint alleges no

such facts.  Instead of alleging the fair market value of MMS and the value by which the

purchase price exceeded that value, the Complaint alleges only that the entity has $3 million in

---

[19]    Moreover, the Complaint does not allege that pre-acquisition Mariner solicited or received anything.  As pled, Mariner is no more than the vehicle for the alleged kickback.  Mariner's management is not alleged to have solicited any remuneration, to have participated in the decision to send the Notice of Termination, or to have participated in the negotiations to sell MMS.  Similarly, Sava is not alleged to have participated in any of the activity alleged in the Complaint (not surprisingly, as Sava did not even begin to operate prior to the close of the acquisition on December 10, 2004).

tangible assets and two employees.  *Complaint* at ¶ 32.  Given the United States' extensive

factual investigation, it speaks volumes that the United States is not able to make even a general

allegation that the MMS acquisition contained any excess remuneration over and above the fair

market value of MMS in exchange for the referral of Mariner's pharmacy business.[20]

The Northern District of Illinois found analogous allegations in the context of a physician

practice acquisition insufficient under Rule 9(b) to plead false claims based on violations of the

AKS.  *United States ex rel. Obert-Hong v. Advocate Health Care*, 211 F. Supp. 2d 1045, 1049

(N.D. Ill. 2002).  In *Obert-Hong,* the relator alleged that a hospital acquired a physician practice

for "commercially unreasonable amounts" to induce the physicians to refer to the hospitals.  *Id.*

at 1047.  But as the court explained:  "The Anti-Kickback [Statute] does not prohibit hospitals

from acquiring medical practices, nor does it preclude the seller-doctor from making future

referrals to the buyer-hospital, provided there are no economic inducements for those referrals.

To comply with the statute, the hospital must simply pay fair market value for the practice's

assets."  *Id.* at 1049; s*ee also Perales*, 243 F. Supp. 2d at 850;

Absent a detailed allegation of facts that support a finding that the amount Omnicare paid

for MMS was in excess of fair market value in the sale, and that the purpose of that excess

compensation was to induce referrals from Mariner, the United States' allegations are

insufficient, amounting to little more than the "plans and schemes" that Rule 9(b) seeks to avoid.

*Rost*, 507 F.3d at 731 (citation omitted); *see also Obert-Hong*, 211 F. Supp. 2d at 1049 ("Relator

does not identify what assets were purchased, the amounts paid, or anything beyond conclusory

allegations that they were not commercially reasonable.  This is not sufficient to plead fraud.

The complaint fails to provide the Defendants with notice of what was unreasonable about these

---

[20]   As indicated in footnote 6, above, the parties did in fact obtain and rely upon multiple valuation reports from independent investment bankers supporting the price paid for MMS.  These reports were produced to the United States during the course of the investigation.

acquisitions. Permitting relator to make bald allegations of unreasonableness, without any details demonstrating how or why, would defeat Rule 9(b)'s purposes.").

> **2.      The Complaint Fails To Allege That Any Excess Remuneration Omnicare Paid For MMS Was In Exchange For Referrals.**

Even if the Complaint had adequately alleged that Omnicare paid more than fair market value for MMS, the Complaint fails to go the next step to allege that such remuneration was "in return" for referring patients to Omnicare for pharmacy services, as required by the statute.  42 U.S.C. § 1320a-7b(b)(1)(A).  As discussed above, only when the remuneration is paid or received with the intent to induce or in exchange for referrals will the statute be violated.  The AKS is an intent-based statute, and the structure of a transaction alone is not sufficient to establish a violation.  Thus, it is well established that even the payment of excessive amounts must "be attributed to an improper inducement" in order to violate the AKS.  *Perales*, 243 F. Supp. 2d at 851 (citations omitted); *see also United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am.*, 565 F. Supp. 153, 162 (D.D.C. 2008) ("Courts strictly enforce the inducement prohibitions codified in the AKS.") (citing *United States v. Bay State Ambulance & Hosp. Rental Serv., Inc.*, 874 F.2d 20, 30 (1st Cir. 1989)).

The AKS does not prohibit an entity such as Omnicare from purchasing a business entity from a referral source such as Mariner, nor does it preclude Mariner from making future referrals to Omnicare, provided that the acquisition of the entity did not serve as economic inducement for those referrals.  *See Obert-Hong* 211 F. Supp. 2d at 1049.  Because neither business acquisitions nor contracts for pharmacy services are prohibited *per se* by the AKS, the United States must do more than merely allege the existence of such transactions.  Instead, the "how" aspect of the 9(b) pleading standard must explain how the acquisition of MMS resulted in illegally-induced referrals.

The Complaint does not sufficiently plead that Mariner actually conditioned either the withdrawal of the Notice of Termination or the new, extended Pharmacy Contract on Omnicare's purchase of MMS.  At best, the Complaint alleges only that the transactions were negotiated at about the same time, between the same parties, and that one of Omnicare's investment bankers made some notations on board meeting notes from a meeting not attended by any representative of Mariner or other non-Omnicare Defendants, indicating the profits that Omnicare expected to earn over the remainder of the life of the existing 2003 Pharmacy Contract.[21]  But specific, detailed allegations that the purchase of MMS was the condition precedent for the continuation of an arrangement for pharmacy services between Mariner and Omnicare are conspicuously absent (again suggesting that despite the very extensive factual information that the United States received during its investigation, it did not find any evidence that the transactions were actually tied together).  The facts that are pled explicitly suggest an alternative -- and not improper -- purpose for Omnicare's purchase of MMS -- i.e., the desire to obtain funding in order to close the "hole" in Schron's financing so that he could complete his acquisition of Mariner.  *Complaint* at ¶¶ 29-30, 32, and 47.

The Complaint makes only general attempts, which fall short of the 9(b) standard for particularity, to allege that Defendants Forman and Grunstein "hoped" that Omnicare would be willing to pay Mariner to rescind the termination notice of the 2003 Pharmacy Services Contract.  *Id.* at ¶ 31.  The United States never alleges that Omnicare had anything more than a "desire that Mariner withdraw the Termination Notice."  *Id.* at ¶ 32, 39 (asserting that the Omnicare Board "preserved" its pharmacy revenues by voting to acquire MMS, but carefully failing to allege that the Board's approval of the MMS acquisition was motivated by an intent to induce Mariner to

---

[21]    As noted in footnote 4, above, there is no allegation that these notes reflected any Board discussion.  Indeed, there is no allegation that the banker was a Board member, or even that the notes were taken during the meeting.

withdraw the termination).  Hopes and expectations are insufficient to plead a kickback under the AKS, which requires that remuneration must induce the referrals or that referrals be provided in exchange for remuneration.  *See United States v. Rogan*, 459 F. Supp. 2d 692, 714 (N.D. Ill. 2006) ("[A] hope, expectation or belief that referrals may ensue from remuneration for legitimate services is not a violation of the Anti-Kickback Statute.") (citation omitted); *cf. United States v. McClatchey*, 217 F.3d 823, 834 (10th Cir. 2000) (approving of a jury instruction which stated that defendants "cannot be convicted merely because they hoped or expected or believed that referrals may ensue from remuneration that was designed wholly for other purposes").

Thus having failed to allege that the MMS purchase was not for fair market value, the United States also unmistakably shies away from alleging that any of the Defendants -- much less Mariner -- explicitly conditioned withdrawal of the Termination Notice on Omnicare's acquisition of MMS.  At the meeting on December 2, 2004, the Complaint simply states in succession that "the Omnicare executives expressed their desire that Mariner withdraw the Termination Notice," and that "Defendants Forman and Grunstein . . . then proposed that Omnicare purchase Mariner's MMS unit."  *Complaint* at ¶¶ 32, 46-48 (noting that Omnicare paid $40 million for MMS on the "same day" that Mariner signed the new pharmacy contracts). The Complaint highlights that the Defendants were cautioned by numerous attorneys that the transactions had to be independent and that closing the two transactions at the same time could subject the transactions to scrutiny (*id.* at ¶¶ 43-45), yet the Complaint fails to directly assert that the transactions were linked or that the closing of the acquisition of MMS was in exchange for referrals pursuant to the pharmacy services agreement.  Without these most central allegations, the Complaint cannot survive under 9(b).

**B.      The United States Fails To Allege That Any of the Participants In the Transaction "Knowingly and Willfully" Solicited or Received Any Unlawful Remuneration.**

The AKS contains two scienter requirements.  One is the specific AKS scienter requirement, discussed above, that requires remuneration in exchange for referrals.  *See Bay State*, 874 F.2d at 33.  The second scienter requirement is the "standard requirement of knowing and willful acts." *Id.*   In order to plead a violation of the AKS, the Complaint must allege that the Defendants -- and Omnicare -- "knowingly and willfully" solicited or received remuneration in exchange for referrals.  42 U.S.C. § 1320a-7b(b)(1).  In addition to failing to allege the most basic factual elements of remuneration in exchange for referrals, the Complaint also fails to allege with particularity that any Defendant acted with the specific intent to violate the AKS.[22]

Most circuits define "willfully" as meaning that the act "was committed voluntarily and purposely, with the specific intent to do something the law forbids, that is with a bad purpose, either to disobey or disregard the law." *United States v. Starks*, 157 F.3d 833, 838 (11th Cir. 1998); *accord McClatchey*, 217 F.3d at 829 ("A person acts willfully if he or she acts unjustifiably and wrongly while knowing that his or her actions are unjustifiable and wrong. Thus, in order to act willfully as I have defined that term, a person must specifically intend to do something the law forbids, purposely intending to violate the law.").  At least two circuits take the position that the government must also prove that the defendant knew of, and intended to violate, the AKS in particular.  *See United States v. Mittal*, 36 Fed. Appx. 20, 21 (2d Cir. 2002) (collecting cases and identifying *Hanlester Network v. Shalala*, 51 F.3d 1390, 1399-1400 (9th

---

[22]   Indeed, the Complaint largely attributes conduct and actions to all the Defendants generally, rather than any one actor specifically.  For example, the Complaint is devoid of any allegation that any of Mariner's senior executives -- i.e., the publicly-held Mariner that was in existence at the time the alleged kickback was being negotiated -- were aware of the alleged scheme.  It is well established that a complaint must plead with particularity the identity of the person engaged in the fraudulent conduct alleged.  *See Franklin*, 147 F. Supp. 2d at 46; *Harrison,* 176 F.3d at 783-84.

Cir. 1995)).  The Complaint fails under either test.  As previously described, the United States

alleges that the Defendants were informed by counsel that the transactions needed to be

independent to comply with the AKS.  What the Complaint fails to do, however, is allege facts to

demonstrate that any of the Defendants -- or Omnicare, for that matter -- entered into the

transactions with the intent to violate the law.  *See Complaint* at ¶¶ 34, 43-45.  Instead, the *facts*

in the Complaint demonstrate the opposite -- that both parties to the transaction sought and

received advice that the transactions were legal.

  Reliance on advice of counsel that a transaction does not violate the AKS is a complete

defense to FCA claims premised on the underlying kickbacks.  *See, e.g., United States ex rel.*

*Bidani v. Lewis,*  No. 97 C 6502, 2001 WL 32868, *6-10 (N.D. Ill. Jan. 12, 2001), *rev'd on other*

*grounds*, 2001 WL 747524 (N.D. Ill, June 29, 2001).  If the United States "cannot prove a

knowing violation of the kickback statute, it will be impossible for [it] to prosecute successfully

the suit under the FCA."  *United States ex rel. Sharp v. Consolidated Medical Transport, Inc.,*

No. 96 C 6502, 2001 WL 1035720, *10  (N.D. Ill. Sept. 4, 2001).  *See also Rogan,* 459 F. Supp.

2d at 716 n. 12 (noting that United States must prove "criminal intent" -- a knowing violation of

the AKS where the AKS is the predicate for an alleged FCA violation).  Thus, it is not surprising

that the United States goes to great length to attempt to neuter Omnicare's reliance on counsel by

alleging that counsel would not have approved the transaction if he had been informed of all of

the true facts surrounding the relationships between Schron and HSA.  Importantly, the

Complaint does not allege that Omnicare withheld any information from its counsel, nor does it

allege that Omnicare knew that any of the specific factual representations provided by Schron or

Harry Grunstein were not accurate, or that it even relied on those representations.  The only facts

alleged indicate that Omnicare believed that the transactions did not violate the AKS at the time

it entered into the transactions, and under the law, such a belief defeats any claim that Omnicare violated the AKS.

Similarly, there is no specific allegation that any Defendant intended to violate the law. Like Omnicare, the Non-Schron Defendants sought guidance from outside counsel, who suggested only that the optics of the transactions would be better if they occurred at different times, but who is not alleged to have advised that even simultaneous transactions would be unlawful. Moreover, the United States never alleges that Mariner's senior executives took any action at all with the knowledge that they would be violating the law. *Complaint* at ¶ 31.

In sum, the Complaint merely alleges a series of actions, none of which are *per se* improper or illegal, coupled with the United States' assertion -- unsupported by any facts -- that these actions violated the Anti-kickback Statute. As the Eleventh Circuit stated, "[i]f Rule 9(b) is to carry any water, it must mean that . . . essential allegation[s] and circumstance[s] of fraudulent conduct cannot be alleged in such conclusory fashion." *United States ex rel. Clausen v. Lab. Corp. of Am. Inc.*, 290 F.3d 1301, 1313 (11th Cir. 2002), *cert. denied*, 537 U.S. 1105 (2003). It is not this Court's obligation to grasp illegality in the absence of specific supporting facts; rather facts must be pled and pled with particularity. Because the underlying kickback allegations upon which each of the United States' claims against the Defendants is based fail to meet the heightened pleading standard of Rule 9(b), the claims should be dismissed.

> ### C. The United States Fails to Allege that Mariner or Any of the Other Non-Schron Defendants Submitted or Caused False Claims to be Submitted With the Specificity Required by Rule 9(b).

Critical to the success of the United States' FCA allegations is a sufficient pleading that Defendants submitted or caused to be submitted one or more false claims to the government for payment or approval. *Poteet,* 604 F. Supp. 2d at 324 (complaint must allege both that

remuneration caused the filing of claims to government programs and that the claims were false); *Rost*, 507 F.3d at 727 (the FCA does not create liability for violations of federal law independent of any false claim).  As articulated above, however, the United States utterly fails, as a matter of law, to identify any false claim, either express or implied, that the Defendants submitted or caused to be submitted. Such a deficiency translates into a failure to identify any claims with the requisite particularity to satisfy Rule 9(b).

1.      **The Complaint Does Not Allege The Submission of Any Factually False Claim For Pharmacy Services.**

In order to satisfy Rule 9(b), the Complaint must also identify the claims submitted in connection with illegal referrals that resulted from the alleged kickback scheme.  *See Lam,* 481 F. Supp. 2d at 688.  Here, the Complaint alleges generally that Omnicare submitted "thousands" of claims for Mariner and Sava nursing home patients, and purports at paragraphs 60 and 61 to summarize specific claims relating to drugs delivered to two "Mariner/Sava" nursing home patients.  What the Complaint does not do, however, is allege a single false claim with the specificity required by Rule 9(b), nor does it allege in detail how the transactions at issue resulted in the submission of false claims by Omnicare.  In particular, the Complaint does not allege that Mariner's residents would not have purchased their drugs from Omnicare "but for" the alleged kickbacks.  Quite to the contrary, the facts alleged in the Complaint indicate that if the alleged kickback transactions had never occurred, those very same drugs would have been provided to those very same patients by Omnicare at the very same price.

2.      **The Complaint Does Not Allege How the Nursing Homes "Arranged for the Purchase" of Prescription Drugs.**

The Complaint attempts to tie Mariner and Sava to the alleged false claims by generally asserting that "[a]s a result of Omnicare's kickback, Mariner and Sava arranged for their nursing

home patients' drugs to be purchased from Omnicare after December 10, 2004." *Complaint* at ¶

60.  However, the United States has left the details of "how" Mariner and Sava "arranged for"

the purchase of drugs under Medicare Part D or MassHealth by entering the Omnicare Pharmacy

Services Contract to the imagination.   Generally, under Medicare Part D, enrolled Medicare

beneficiaries can have Medicare pay for all or a portion of the costs of their outpatient drugs.

Medicare beneficiaries, in consultation with their physicians, can have their Part D drugs filled at

any pharmacy they choose.  The same is true for Medicaid.  Mariner and Sava are not

participants in the beneficiary's outpatient drug decisions.  The Complaint is fatally vague as to

how the United States contends that the nursing homes are thus able to intercede and "arrange

for" Medicare beneficiaries to purchase their drugs from Omnicare.

In cases like this one, where the mechanism or basis of the fraud is not apparent from the

face of the complaint, specific pleading of the "how" requirement under Rule 9(b) is crucial.  *See*

*United States. ex rel. Wilkins v. North Am. Constr. Corp.,* 173 F. Supp. 2d 601, 616 (S.D. Tex.

2001).  The United States must explain precisely how the fraud worked.  *Id.*  Because it is

entirely unclear how an arrangement between Omnicare and Mariner or Sava could potentially

alter the behavior of nursing home residents and their physicians, the United States must do more

than baldly assert an unsupported arrangement.

The Eleventh Circuit very recently rejected similar efforts by a FCA plaintiff to hold

attenuated parties liable under the FCA.  In *Hopper v. Solvay Pharmaceuticals Inc.*, a *qui tam*

relator attempted to bring a FCA claim against Solvay by alleging that its off-label marketing

campaign for the drug Marinol caused the government to pay false claims through Medicaid and

other programs that provide prescription drug benefits.  *See Solvay,* No. 08-15810, slip op. (11th

Cir. Dec. 4, 2009).  The Eleventh Circuit affirmed the district court's dismissal of the case for

failure to state a claim, based, at least in part, on Solvay's attenuation from the actual claim submission, and the relator's failure to sufficiently plead a connection between Solvay's marketing campaign and the eventual filing, processing, and payment of the false claims. Specifically, the Eleventh Circuit stated that "[t]he Complaint piles inference upon inference to suggest that Solvay's marketing campaign influenced some unknown third parties to file false claims," and therefore it did not pass Rule 9(b) muster. *Id.* at p. 13.

The parallels to the present case are striking. Just as in *Solvay*, the United States is attempting to hold the Non-Schron Defendants liable for causing the submission of false claims without pleading how -- or even if -- *any* of them influenced (1) the decision of nursing home residents to purchase drugs from Omnicare; (2) the claim submission process by Omnicare or Part D sponsors; or (3) or the government's decision to pay the claims. Such pleading is insufficient to state a claim regardless of how many inferences the United States may make.

Contrary to the United States' vague inferences, the facts alleged in the Complaint do not establish that any Mariner resident would not have purchased drugs from an Omnicare pharmacy "but for" the kickback. Omnicare and Mariner entered into the 2003 Pharmacy Contract effective April 1, 2003. That agreement had a five-year and four-month term, with an expiration date of July 31, 2008. *Complaint* at ¶ 27. The United States alleges that the notice to terminate the 2003 Pharmacy Contract was the first step in a scheme to solicit and receive remuneration from Omnicare in exchange for a new, extended pharmacy contract, and that the only reason for the Notice of Termination was "the hope" that Omnicare might be willing to pay Mariner to withdraw the Termination Notice. *Id.* at ¶ 31. Indeed, the Complaint goes so far as to plead that Mariner's executives were satisfied with the 2003 Pharmacy Contract and had no desire to terminate it. *Id.* In other words, had the alleged kickback scheme not been implemented, the

2003 Pharmacy Contract would have remained in effect until July 31, 2008, and, pursuant to that agreement, during that period of time Omnicare would have had the exact same access to Mariner's nursing home residents as it is alleged to have "bought" through its purchase of MMS. Any referrals during the term of the 2003 Pharmacy Contract would have occurred in the absence of the kickback.  Because the Complaint does not contain detail sufficient to identify claims submitted by Omnicare outside of that time frame, nor does or can it allege that such referrals would not have occurred "but for" the kickback, the United States' FCA claims must be dismissed under Rule 9(b).

Not only does the Complaint fail to tie the referrals to the alleged kickback, but it also fails to identify even one claim with the specificity required by 9(b).  The First Circuit has held that a FCA Complaint must provide "details that identify particular false claims for payment that were submitted to the government."  *Karvelas*, 360 F.3d at 232.  To satisfy these requirements, the United States must provide at least some details concerning the dates of the claims, the content of the forms or bills submitted, the amount of money charged to the government, and the individuals involved in the billing.  *Id.*

Instead of providing these necessary details about any claims submitted to the government, the United States generally alleges that "thousands" of claims were submitted for Mariner and Sava nursing home patients.  *Complaint* at ¶ 61.  Presumably, the United States intended to provide requisite detail in the two tables in Paragraph 61.  However, these two tables and their introductory sentences do <u>not</u> identify a single claim for a single specific patient that was submitted to the government, nor do they identify the Omnicare pharmacy submitting the claim or even in which "Mariner/Sava" nursing home the patients resided.  Once again the

United States fails to connect the dots to sufficiently plead the submission of even a single false claim.

Such general information is insufficient to identify a claim under Rule 9(b).  *See, e.g., United States ex rel. King v. Alcon Labs, Inc.*, 232 F.R.D. 568, 572 (N.D. Tex. 2005) (confirming that identifying "various Federal Supply Schedule contracts . . . each of which spans multiple years and covers multiple drugs," was insufficient under Rule 9(b) to specifically identify any false claim submitted to the government).  Despite claiming thousands of claims were submitted, the United States fails to identify even one with any detail in its Complaint, rendering it fatally deficient.  *See Clausen,* 290 F.3d. at 1311-12 ("failure to allege with any specificity if -- or when -- any actual improper claims were submitted to the Government is indeed fatal to [her] complaints.").

### 3.      The Complaint Does Not Allege The Existence of A "Reverse False Claim."

In Count VII of the Complaint, the United States attempts to assert a "reverse false claim" theory on the basis that the Defendants "caused to be made or used false records or statements to conceal, avoid, or decrease Medicare Part D sponsors' obligations to pay or transmit money or property to the Government, in violation of 31 U.S.C. § 3729(a)(7)." *Complaint* at ¶ 83.  Even assuming that an obligation on the part of a *Part D sponsor* -- as opposed to an obligation on the part of any Defendant -- might serve as the basis for a claim against the Non-Schron Defendants, the United States would have to plead that there was, in fact, an existing obligation by a Part D sponsor to pay or transmit money to the government.  *See United States v. Q Int'l Courier, Inc.*, 131 F.3d 770, 773 (8th Cir. 1997) ("The obligation cannot be merely a potential liability:  instead . . . a defendant must have had a present duty to pay money or property that was created by a statute, regulation, contract, judgment, or

acknowledgment of indebtedness"); *see also United States  ex rel. S. Prawer & Co. v. Verrill & Dana*, 962 F. Supp. 206 (D. Me. 1997).

Here, the closest the United States comes to any such allegation (and it is not very close at all) is the following statement:  *"[I]f* CMS demanded a post-reconciliation payment from any such Part D sponsor, it demanded too little."  *Complaint* at ¶ 85. (emphasis added).  The United States does not allege that any payment was, in fact, due from a Part D sponsor or, indeed, explain the circumstances in which a Part D sponsor would ever owe money to the government.

In addition, the Complaint fails to identify any false record or statement made or used by Mariner (or any other defendant) to conceal, avoid or decrease this hypothetical obligation. Finally, the United States has also failed to plead, even generally, how this unspecified failure on the part of the Part D sponsors to pay or transmit some undefined sum of money to the government based on a contingent obligation might have been caused by the Defendants.  Count VII of the Complaint must be dismissed.

      **D.**     **The Complaint Fails to Allege a Conspiracy to Get a False or Fraudulent Claim Paid by the United States.**

Count VI of the Complaint alleges a conspiracy in violation of 31 U.S.C. § 3729(a)(3). To survive a motion to dismiss, the Complaint must plead the following elements of the conspiracy with the particularity required by Rule 9(b):  "(1) that the defendant conspired with one or more persons to get a false or fraudulent claim paid by the United States; (2) that one or more of the conspirators performed any act to effect the object of the conspiracy; and (3) that the United States suffered damages as a result of the false or fraudulent claim."  *United States ex rel. Corsello v. Lincare, Inc.,* 428 F.3d 1008, 1014 (11th Cir. 2005) (quoting *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Provident Life & Accident Ins. Co.*, 721 F. Supp.

1247, 1259 (S.D. Fla. 1989)); *see also United States ex rel. Gagne v. City of Worcester*, 565 F.3d

40, 45 (1st Cir. 2009).

Here, the United States' bare-boned allegation of a conspiracy to violate the FCA asserts

that:

> [e]ach of the defendants conspired with the other defendants to
> arrange for Omnicare to make kickback payments in exchange for
> referrals of Mariner and Sava nursing home patients for drug
> purchases, in violation of the anti-kickback statute, 42 U.S.C. §
> 1320a-7b(b)(2), thereby causing all claims, from on or shortly after
> December 10, 2004, through the present, to Medicaid and
> Medicare for those drugs, to be false or fraudulent.

*Complaint* at ¶ 80.

The alleged FCA conspiracy is merely derivative of an alleged AKS violation.  While an

FCA violation is asserted to have "thereby" flowed from a purported AKS violation, the

Complaint does not allege that the object of the conspiracy was "to get a false or fraudulent

claim paid by the United States."  Although some courts have held that an AKS violation may

give rise to a cause of action under the FCA in certain situations, *no* court has held that *every*

AKS violation constitutes an FCA violation.  *See, e.g., Franklin,* 147 F. Supp. 2d at 54 ("[A]

violation of the federal antikickback provision is not a *per se* violation of the FCA").  FCA

liability cannot be established upon an allegation that a purported AKS conspiracy thereby

caused all claims thereafter submitted to be false or fraudulent.

Furthermore, an FCA conspiracy violation requires specific intent.  *See U. S. ex rel.

Johnson v. Shell Oil Co.*, 183 F.R.D. 204, 208 (E.D. Tex. 1998) ("[T]he conspiracy provision of

the [FCA] seems to require the specific intent to defraud, unlike the other provisions which

merely require knowledge.").  The U.S. Supreme Court emphasized the point in *Allison Engine*,

holding that §3729(a)(3) "makes liable any person who 'conspires to defraud the Government by

getting a false or fraudulent claim allowed or paid.'"  128 S. Ct. at 2130.  The Court also

observed that:  "'To get' denotes purpose, and thus a person must have the purpose of getting a

false or fraudulent claim 'paid or approved by the Government.'"  *Id.* at 2128.  Thus,

> it must be shown that the conspirators intended "to defraud the
> Government."  Where the conduct that the conspirators are alleged
> to have agreed upon involved the making of a false record or
> statement, it must be shown that the conspirators had the purpose
> of "getting" the false record or statement to bring about the
> Government's payment of a false or fraudulent claim.

*Id.* at 2130.  The Court specifically rejected the "result" oriented approach upon which the

United States is relying in this case.  *See id.* at 2127-28 (reversing Sixth Circuit's decision that it

was sufficient for plaintiff to show that the false statement "resulted" in the use of government

funds to pay).

Here, the United States has *at most* alleged that Defendant Schron intended to obtain

funds from Omnicare in order to fill the "hole" in his financing.  The Complaint does not allege

any intent -- specific or otherwise -- on the part of the Non-Schron Defendants (or Schron

himself, for that matter) "to get" any claim paid, much less a false claim.  The object of the

alleged conspiracy was a violation of the AKS, not the submission of false or fraudulent claims.

Allowing the government to prosecute a purported conspiracy to violate the AKS as a conspiracy

"to get a false or fraudulent claim paid by the United States" is contrary to the Supreme Court's

admonition that the FCA is not "an all-purpose antifraud statute."  *Id.* at 2130.  The United States

has failed to state a claim for conspiracy under the FCA, and Count VI of the Complaint must be

dismissed.

## VI.    THE COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE

Because the United States has already had the opportunity to amend its Complaint

numerous times, each time with the benefit of the information it gathered in its extensive

investigation of this matter, this Court should dismiss all of the Counts with prejudice, rather than give the United States an additional chance to replead its allegations.  The Supreme Court has made clear that a plaintiff's repeated failure to cure pleading deficiencies is grounds for denying leave to amend.  *Foman v. Davis*, 371 U.S. 178, 182 (1962).  Here, the United States has already had a minimum of four opportunities, of which the Defendants are aware, to plead its case properly and it has still failed to do so.[23]  It should not be given the benefit of a fifth chance. *See, e.g., ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 57 (1st Cir. 2008) (affirming the denial of leave to amend on the grounds that "plaintiffs do not get leisurely repeated bites at the apple.").

Several other courts, including the First Circuit, have upheld the denial of leave to amend, and the dismissal of complaints brought under the False Claims Act, where, as here, the complaint had already been amended numerous times.  *See, e.g., Gagne*, 565 F.3d at 48 (affirming denial of leave to amend where amendment would have been plaintiff's "fourth chance" to properly plead its claims); *United States ex rel. Bly-Magee v. Premo*, 333 Fed. Appx. 169, 171 (9th Cir. 2009) (affirming denial of leave to amend where plaintiff had already done so four times and therefore already had "ample opportunity to plead her case").  The United States' repeated failure to plead its claims sufficiently despite its ample resources and opportunities to investigate and gather facts, testimony, and documents, underscores the futility of the Complaint and the justification to dismiss it with prejudice.  In any event, the defects with the Complaint that form the basis for this Motion to Dismiss are fundamental and cannot be cured.  Thus, the Court should not hesitate to dismiss the Complaint with prejudice.

---

[23] Not all iterations of the Complaint in this case have been unsealed.  Therefore, it is impossible for Defendants to ascertain precisely how many times the Government has already amended the Complaint.  However, in light of the fact that a Corrected Second Amended Complaint exists, that means, at an absolute minimum, that the Government has crafted four versions to date: the Original Complaint, the First Amended Complaint, the Second Amended Complaint, and the Corrected Second Amended Complaint.

## VII.    CONCLUSION

For the reasons stated above, Mariner respectfully requests that the Court dismiss Counts IV, V,

VI, and VII of the Complaint with prejudice.  In the alternative, Mariner respectfully requests

that the Court dismiss Defendant Mariner from these Counts for the reasons stated above.

Respectfully submitted,

MARINER HEALTH CARE, INC.

By its attorneys,


/s/ Laura B. Angelini
Michael J. Connolly (BBO #638611)
Laura Angelini (BBO #658647)
Hinckley, Allen & Snyder LLP
28 State Street
Boston, MA 02109-1775
(617) 378-4104
mconnolly@haslaw.com
langelini@haslaw.com

Roger S. Goldman (Pro Hac Vice)
Katherine A. Lauer (Pro Hac Vice)
Latham & Watkins LLP
555 Eleventh Street, NW
Suite 1000
Washington DC 20004-1304
(202) 637-2253
Roger.goldman@lw.com
Katherine.lauer@lw.com

Dated:  December 23, 2009

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified in the Notice of Electronic Filing and paper or electronic copies will be delivered to those indicated as non-registered participants on today's date.

/s/ Laura B. Angelini