UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                           )
UNITED STATES OF AMERICA, <u>et al.</u>, <u>ex rel.</u>  )
ADAM B. RESNICK,                           )
                                           )
                Plaintiffs,          )
                                           )   Civil Action No. 06-10149-RGS
                                           )
v.                                         )
                                           )
OMNICARE, INC., RUBIN SCHRON,              )
LEONARD GRUNSTEIN, MURRAY FORMAN,          )
MARINER HEALTH CARE, INC., and             )
SAVASENIORCARE ADMINISTRATIVE              )
SERVICES, LLC,                             )
                                           )
                Defendants.          )
_____)

**MEMORANDUM IN SUPPORT OF DEFENDANT SAVASENIORCARE
ADMINISTRATIVE SERVICES, LLC'S MOTION TO DISMISS THE COMPLAINT**

SavaSeniorCare Administrative Services, LLC ("Sava") adopts and incorporates by reference the arguments set forth in the Memorandum in Support of Motion to Dismiss filed by Mariner Healthcare, Inc. (the "Mariner Brief"). The deficiencies in the government's Complaint, as outlined in the Mariner Brief, require the dismissal of not only Mariner, but also Sava and the remaining defendants. As explained below, however, the allegations in the government's Complaint with respect to Sava are even more attenuated than those against Mariner.

**I.     INTRODUCTION**

The government's 32-page Complaint includes 33 references to Sava. Yet only 4 of those references are to Sava individually. In the other 29 instances, Sava is lumped together with other defendants, sometimes in a string listing of all the defendants, at other times in references to "Mariner and Sava," or, even more cavalierly, to "Mariner/Sava," as if the two companies were a single legal entity.

Two of the four individual references to Sava are found in the "Parties" section of the Complaint. In Paragraph 10, the government identifies Sava as a Delaware company and alleges that "Sava operates numerous nursing homes, including at least two nursing homes in Massachusetts."[1]  This paragraph does not allege any unlawful conduct by Sava. The third individual reference to Sava is found in Paragraph 29:

> "29. On June 29, 2004, Mariner announced that it was being sold for approximately $1 billion to a new entity, National Senior Care, Inc., which was backed by defendant Schron. Defendants Forman and Grunstein had proposed this transaction to defendant Schron. The acquirers intended to divide Mariner's nursing homes between post-acquisition Mariner and *newly-created Sava.* To finance the transaction, an investment bank, Credit Suisse, was to provide a mortgage of approximately $800 million, while defendant Schron was responsible for providing approximately $200 million in equity. National Senior Care's acquisition of Mariner ultimately closed on December 10, 2004."

(Compl., ¶ 29) (emphasis added). Again, nothing in this paragraph suggests any wrongdoing by Sava (or, for that matter, any defendant). The allegation merely indicates the intent of others to transfer nursing homes to Sava after the acquisition of Mariner and serves to emphasize that Sava was a *"newly-created"* entity that was not operational until *after* the transaction which the government now seeks to characterize as a kickback.[2]  The only other individual reference to Sava appears in Paragraph 35 of the Complaint, where the government describes a term sheet allegedly circulated *by Omnicare* to "defendants Forman and Grunstein and others," which

---

[1] The defendant in this action, SavaSeniorCare Administrative Services, LLC, merely provides back office services to nursing homes, such as account payable and payroll processing. While there are, in fact, two homes in Massachusetts for which Sava provides such administrative support services, Sava does not own or operate those homes, as shown by the licensure registrations on file with that state. (*See* Exhibits A and B). *See Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993) (in deciding a Rule 12(b)(6) motion analyzing the sufficiency of the complaint, the court may consider official public records, the authenticity of which are not in dispute); *Boateng v. InterAmerican Univ.*, 210 F.3d 56, 60 (1st Cir. 2000). Thus, even if the remaining allegations in the Complaint were to state a claim, the government has sued the wrong party. Nevertheless, consistent with the usage in the Complaint, this brief will refer to "Sava" to mean all Sava-affiliated entities.

[2] As previously indicated, Sava does not operate any nursing homes, but even Sava's operations affiliates did not commence service in Massachusetts until August 2005, well after defendant Schron's acquisition of Mariner and Omnicare's acquisition of MMS. (*See* Licenses to Maintain a Convalescent or Nursing Home issued August 2, 2005 for SSC Methuen Operating Company, LLC and SSC New Bedford Operating Company, LLC, attached hereto as Exhibits A and B.)

purportedly included, among other items, a provision that "the new Sava entity would enter into a pharmacy contract with Omnicare 'on substantially the same terms' as the 2003 Pharmacy Contract between Omnicare and Mariner." That the Sava nursing homes would continue to use the same pharmacy provider before and after the change of ownership is hardly sinister. Indeed, as alleged in the Complaint, the term of the pharmacy contract between Omnicare and Sava continues until 2019 (*see* Compl. ¶ 60), and yet the government concluded the FCA litigation against Omnicare without insisting that the contract be voided – either in its Complaint (*see* Compl. pp. 30-31), in the settlement agreement with Omnicare, or in the Corporate Integrity Agreement ("CIA") with Omnicare.[3] If the contract (or, indeed, any billings that might flow from the contract) were, in themselves, problematic, the government would not have resolved the case against Omnicare while allowing the arrangement to remain in place, untouched, for another ten years.

None of the four individual references to Sava alleges any action taken by, or on behalf of, for the benefit of, or even with the knowledge of Sava. Thus, if the Complaint can be found to assert a claim against Sava, it must be on the basis of the other 29 references in the Complaint in which Sava is lumped together with other defendants.

## II.  LIABILITY MAY NOT BE IMPOSED UPON SAVA BASED UPON THE PURPORTED ACTIONS, INTENT, AND KNOWLEDGE OF THE OTHER DEFENDANTS.

Moving beyond the few innocuous individual references to Sava to the remaining 29 instances where Sava is lumped together with the other defendants, the sufficiency of the government's allegations must be measured against the requirement under Rule 9(b) of specific pleadings with respect to *each* defendant against whom fraudulent acts are alleged. *See Brooks*

---

[3] Omnicare's CIA is a matter of public record and is available at http://oig.hhs.gov/fraud/cia/agreements/omnicare_inc_11022009.pdf.

*v. Blue Cross and Blue Shield of Florida, Inc.*, 116 F.3d 1364, 1381 (11th Cir. 1997) (applying Rule 9(b) to dismiss complaint in which the plaintiffs "simply 'lumped together' all of the Defendants in their allegations of fraud"). Liability against Sava cannot be based on the "collective conduct of the 'defendants.'" *See Goven v. New Vision Int'l, Inc.*, 156 F.3d 721, 733 (7th Cir. 1998); *see also United States v. Kensington Hospital*, 760 F. Supp. 1120, 1125 (E.D. Pa. 1991) (finding that complaint showed "a disturbing propensity" to use the term "defendants" throughout and that such "group pleading fails to provide defendants with adequate notice, and reveals a lack of attention to detail by the government").

Here, the Complaint fails to allege that *Sava* took any action with the requisite intent or knowledge to violate either the AKS or the FCA. Unable to establish actions or intent of Sava necessary to state a claim, the government attempts to thrust upon Sava the purported actions and intent of others. A complaint "may not rely upon blanket references to acts or omissions by all of the 'defendants,' for each defendant named in the complaint is entitled to be apprised of the circumstances surrounding the fraudulent conduct with which he individually stands charged." *Benoay v. Decker*, 517 F. Supp. 490, 493 (E.D. Mich. 1981) (internal quotation marks and citations omitted), *aff'd*, 735 F.2d 1363 (6th Cir. 1984).

**III.   *SAVA* WAS NOT INVOLVED IN THE TRANSACTION WHICH THE GOVERNMENT SEEKS TO CHARACTERIZE AS A KICKBACK AND DID NOT RECEIVE ANY OF THE PROCEEDS OF THAT TRANSACTION.**

The government's theory of liability as to Sava and the other remaining defendants is predicated upon its characterization of the sale of MMS to Omnicare as an illegal kickback. (Compl. ¶¶ 74, 77, 80, 84.) The government makes conclusory assertions regarding the "solicitation and receipt by defendants Schron, Grunstein, Forman, Mariner, and Sava of Omnicare's kickback." (*Id.* ¶¶ 74, 77.) Yet the government fails to allege any facts to indicate that *Sava* actually was involved in the negotiation of the MMS transaction or that any of the

- 4 -

2715839v3

money from that transaction actually made its way to *Sava*. To the contrary, the government asserts that the MMS transaction was orchestrated by *Defendant Schron* for the benefit of *Defendant Schron* in order to fill a hole in *Defendant Schron's* financing for the acquisition of Mariner. (*Id.* ¶¶ 30-33, 36.)

The closest the government comes to any allegation that Sava received any of the proceeds of the MMS transaction is in Paragraph 55 of the Complaint, which asserts that "Omnicare wired the [$40 million] payment into an account for the benefit of, *inter alia*, Mariner and Sava." (*Id.* ¶ 55.) This artfully vague allegation omits a reference to the specific account into which the money was wired and does not even attempt to articulate how this unidentified account would have been "for the benefit of" (whatever is meant by that ambiguous phrase) "*inter alia*" (*i.e.*, among others) both Mariner and Sava – telling omissions following the government's exhaustive investigation. Thus, the Complaint not only improperly conflates two legal entities – Mariner and Sava – but also lumps them together with other parties that are not even identified. This shotgun approach to pleading, "lump[ing] all defendants together, failing to segregate the alleged wrongdoing of one from those of another," does not satisfy the pleading requirements of Rule 9(b). *Patel v. Holiday Hospitality Franchising, Inc.*, 172 F. Supp. 2d 821, 824 (N.D. Tex. 2001).

Moreover, the implication of the naked assertion in Paragraph 55 that proceeds of the MMS sale somehow went to Sava is directly contrary to the government's prior and repeated allegations that the $40 million payment was used "to fill the 'hole' in *defendant Schron's* financing, which enabled [*defendant Schron*] to close on the larger Mariner acquisition." (*Id.* ¶¶ 30, 33, 36, 40, 48 (emphasis added).) Indeed, in Paragraph 46, the government outlines where it contends the $40 million actually went:

> On December 10, 2004, Mariner assigned MMS to a new Schron-controlled company, HSA Equipment LLC ('HSA'). That same day, *defendant Schron*, through HSA, signed a purchase agreement with Omnicare in which Omnicare agreed (a) to buy MMS at some point in the future from HSA for a total price of $50 million, (b) to pay $40 million of the purchase price to HSA immediately (*i.e.*, on December 10, 2004), and (c) to pay the final $10 million six months after the closing date of the MMS sale.

(*Id.* ¶ 46 (emphasis added).)

Thus, even if one ignores the fatal flaws in the government's case as outlined in the Mariner Brief, the Complaint fails as to Sava because the most fundamental element of a kickback violation – a *kickback* – is missing. *See* 42 U.S.C. § 1320a-7b(b)(1) (The Anti-Kickback Statute prohibits the "solicit[ation] or recei[pt] . . . [of] remuneration (including any kickback, bribe, or rebate)" in exchange for the referral of government program business.). *Sava* neither solicited nor received, directly or indirectly, any portion of the purchase price paid by Omnicare to acquire MMS. The government apparently recognized this fatal omission, and in an effort to salvage some semblance of a claim against Sava and other defendants, inserted a generic "savings clause" in Paragraph 55, whereby all defendants, and other parties yet unidentified, were purported to have somehow benefited from the MMS transaction. The allegation fails to satisfy the requirements of Rule 9(b), and the Complaint must be dismissed. *See U.S. ex rel. Clausen v. Laboratory Corp. of America*, 290 F.3d 1301, 1308 (11th Cir. 2002), *cert. denied* 123 S. Ct. 870, 154 L. Ed. 2d 774 (2003) (Rule 9(b) "guards against guilt by association").

**IV.   SAVA DID NOT HAVE ANY INTENT TO CAUSE OMNICARE TO PAY A KICKBACK OR TO SUBMIT FALSE CLAIMS.**

Undeterred by the absence of any evidence of wrongdoing by Sava during its four-year investigation, the government seeks to impose liability upon Sava by imputing to Sava the purported intent of *Defendant Schron*. The government alleges no mal-intent by Sava itself. Indeed, it appears that Sava's only intent was to obtain a pharmacy agreement substantially

- 6 -

similar to the one with which Mariner's senior executives were satisfied, and the sole action of Sava for which the government seeks to impose liability is the execution of a pharmacy contract, which is not itself illegal.  (Compl. ¶ 31 ("Mariner's senior executives were generally satisfied with the 2003 Pharmacy Contract with Omnicare and actually had no desire to terminate it [and] neither defendant Forman nor defendant Grunstein, nor their principal, defendant Schron, actually had a desire to terminate the 2003 Pharmacy Contract.").)  In fact, the government left the Sava-Omnicare pharmacy contract undisturbed in its settlement with Omnicare.

The government appears to premise its claims against Sava upon an assertion that Defendant Schron controlled Sava.  This is precisely the type of sloppy pleading and effort to achieve "guilt by association" that Rule 9(b) seeks to prevent.  *See Brooks*, 116 F.3d at 1381; *Goven*, 156 F.3d at 733; *Kensington Hospital*, 760 F. Supp. at 1125; *Clausen*, 290 F.3d at 1308; *U.S. ex rel. Kneepkins v. Gambro Healthcare, Inc.*, 115 F. Supp. 2d 35, 39-41 (D. Mass. 2000) (dismissing parent corporation whose only alleged wrongdoing was through wholly-owned subsidiary).  The naked statement that Defendant Schron "controlled" Sava is, in addition to being insufficient to establish the liability of Sava, unsupported by any allegations of fact.  The government asserts – without facts sufficient to support the assertion – that the actual owner of Sava, Harry Grunstein, "was only the titular owner of Mariner and Sava." (Compl. ¶ 51.)  The government further asserts that "Harry Grunstein contributed no money to purchase Mariner, Sava, or National Senior Care."  (*Id.*)  The government does not contend that Defendant Schron was the owner or an officer or director of Sava, but rather merely asserts that Defendant "Schron effectively controlled Mariner and Sava" based on a combination of loans and option agreements.  Yet, the allegations in the Complaint do not support that conclusion.  At most, the Complaint asserts that the option agreements purportedly gave an entity named Cammeby's Equity Holdings LLC ("Cammeby's") "the right to own 99.999% of *Sava's parent* (a holding

- 8 -

company) in exchange for Cammeby's forgiving a $100 million loan that it had extended to that entity." (*Id.* ¶ 53 (emphasis added).) The government alleges no facts regarding the nature of Defendant Schron's interest or control of Cammeby's; nor does it allege that the consideration for the option -- forgiveness of a $100 million loan -- was inadequate and therefore insufficient to deter any exercise of the option. Moreover, whatever Defendant Schron's ownership interest or control over Cammeby's, that entity merely had a purported right (the exact parameters, terms and conditions of which are not specified by the government) to acquire *Sava's parent*, an entity distinct from Sava.

Furthermore, Defendant Schron's intent in exercising any such control would not constitute mal-intent on the part of Sava. The intent of one does not establish the intent of the other. *Defendant Schron's* purported intent and actions cannot be conflated with the intent and actions of *this Defendant,* Sava. *See Resolution Trust Corp. v. Driscoll*, 985 F. 2d 44, 48 (1st Cir. 1993) (affirming dismissal of subsidiary sought to be held liable for purported actions of its parent corporation). As in *Driscoll*, Sava is a separate entity which – while involved in a transaction sought to be characterized as illegal – *itself engaged in no illegal activity. See id.* Thus, using the language of the First Circuit in *Driscoll*:

> [the government's] complaint against [Sava] is deficient; this litigation has persisted for [over four years during which time the government conducted an extensive investigation]; and yet even now [the government] is still unable to explain what exactly it is that [Sava] did that is wrongful. . . . No amount of embellished attack on [Defendant Schron, Omnicare, or the other defendants] can replace what [the government] still has not supplied: a single, coherent, specific description of what [Sava] has done that is wrongful.

*See id.* Sava merely entered into a pharmacy contract which was not itself illegal or improper, and the government has not demonstrated that *Sava's* intent in entering the pharmacy contract was for any purpose other than to secure a favorable pharmacy contract. The government has


not supplied a single, coherent, specific description of what Sava has done that is unlawful, and the Complaint against Sava must be dismissed.

## V. CONCLUSION.

For the reasons set forth above and as set forth in Mariner's Brief, Sava respectfully requests that the Court grant Sava's motion and dismiss the Government's Complaint with prejudice.

Respectfully submitted,

SAVASENIORCARE ADMINISTRATIVE SERVICES, LLC,

By its attorneys,

Dennis J. Kelly, Esq. (BBO #266340)
dkelly@burnslev.com
David M. Losier, Esq. (BBO#561690)
dlosier@burnslev.com
Burns & Levinson LLP
125 Summer Street
Boston, MA 02110
Telephone: (617) 345-3000
Facsimile: (617) 345-3299

/s/ Glenn P. Hendrix
Glenn P. Hendrix, Esq. (*pro hac vice*)
glenn.hendrix@agg.com
Aaron M. Danzig, Esq. (*pro hac vice*)
aaron.danzig@agg.com
Jason E. Bring, Esq. (*pro hac vice*)
jason.bring@agg.com
W. Jerad Rissler, Esq. (*pro hac vice*)
jerad.rissler@agg.com
Arnall Golden Gregory LLP
171 17th Street NW, Suite 2100
Atlanta, Georgia 30363-1031
Telephone: (404) 873-8500
Facsimile: (404) 873-8501

Dated: December 23, 2009

## **CERTIFICATE OF SERVICE**

  I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on December 23, 2009.

            /s/ Glenn P. Hendrix
            Glenn P. Hendrix, Esq.